# EXHIBIT A

Law Division Motion Section Initial Case Management Dates for CALENDARS (A,B,C,D,E,F,H,R,X,Z) will be heard In Person.
All other Law Division Initial Case Management Dates will be heard via Zoom
For more information and Zoom Meeting IDs go to https://www.cookcountycourt.org/HOME?Zoom-Links?Agg4906_SelectTab/12
Court Date: <<CmsHearingStart>>

FILED DATE: 1/8/2025 11:22 AM    2025L000261

# SUMMONS

**IN THE STATE OF ILLINOIS, CIRCUIT COURT**

☐ **Alias Summons**
*Check if this is not the 1ˢᵗ Summons issued for this Defendant/Respondent.*

**COUNTY:** Cook
*County Where You Are Filing the Case*

*Enter the case information as it appears on your other court documents.*

**PLAINTIFF/PETITIONER OR IN RE:** James Beyer, et al
*Who started the case.*        *First, Middle, and Last Name or Business Name*

**DEFENDANTS/RESPONDENTS:** DraftKings, Inc., Crown IL Gaming LLC
*Who the case was filed against.*
d/b/a DraftKings, Casino Queen Inc., and
Northside Crown Gaming LLC
*First, Middle, and Last Name or Business Name*

FILED
1/8/2025 11:22 AM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025L000261
Calendar, S
30877457

**2025L000261**

**Case Number**

**The Defendant/Respondent named above has been sued. Read this form for information about how to respond to this lawsuit. Also see page 4 for next steps.**

**For the person filling out this form: Read all instructions in this box.**

This *Summons* can only be used for certain types of cases. See the *How To Serve a Summons* Instructions for more information: ilcourts.info/summons-instructions.

Check 1 if this is a 30-day summons, or check 2 if this is a date certain summons. Fill in all the information in 1 or 2.

- Use a **date certain summons** if you are asking for money of $50,000 or less or recovery of your personal property that you think the Defendant has, and for some mandatory arbitration cases. In 2, fill in your court date and how to go to court. You may get the court date when you e-file or you may need to ask the Circuit Clerk's office.

- Use a **30-day summons** for most other case types.

Complete the rest of the form with the Defendant/Respondent's information and information about the lawsuit.

**If you are suing more than 1 Defendant/Respondent**, attach an *Additional Defendant/Respondent Address and Service Information* form for **each** additional Defendant/Respondent.

## ☑ 1. 30-DAY SUMMONS

To participate in this case, you must **file** your *Appearance* and *Answer/Response* forms with the court within 30 days after you are served with this *Summons* (not counting the day of service) by e-filing or at:

Court Address: 50 W. Washington, Suite 801, Chicago, IL
*Courthouse Street Address*

**- or -**

## ☐ 2. DATE CERTAIN SUMMONS

*Your court date is listed below. Information about getting a court date and how to attend is available from the Circuit Clerk. You can find their contact information at ilcourts.info/CircuitClerks.*

To respond to this *Summons*, you must **attend court** in one of the ways checked below on:

_____ at _____ ☐ a.m. ☐ p.m. in _____.
*Month, Day, Year*        *Time*                    *Courtroom Number*

Case Number: _____

## Going to Court for a Date Certain Summons

Court dates may be in-person, remote, or a combination of in-person and remote.

☐ **In person** at: _____
<div align="center">Courtroom Address            Courtroom Number</div>

☐ **Remotely** (video or telephone)

     **By video conference** at: _____
<div align="center">Video Conference Website</div>

     Log-in information: _____
<div align="center">Video Conference Log-in Information, Meeting ID, Password, etc.</div>

     **By telephone** at: _____
<div align="center">Call-in Number for Telephone Remote Appearance</div>

To find out more about remote court options:

Phone: _____ or Website: _____
<div align="center">Circuit Clerk's Phone Number         Website URL</div>

---

## 3. ADDITIONAL INFORMATION ABOUT THE LAWSUIT

a. I am asking for the following amount of money in my *Complaint/Petition*: $ _____.

*(Enter 0 if you are not asking for money)*

b. I am asking for the return of tangible personal property (items in the Defendant/Respondent's possession) in my *Complaint/Petition*.

☐ Yes ☐ No

## 4. DEFENDANT/RESPONDENT'S INFORMATION

a. Number of Defendants/Respondents being served:

☐ I am having 1 Defendant/Respondent served and their information is on this form below.

☑ I am having more than 1 Defendant/Respondent served. The first is listed below. I have attached *Additional Defendant/Respondent Address and Service Information* forms for the following number of additional Defendants/Respondents: 3 _____.
<div align="center">Number</div>

b. First Defendant/Respondent's **primary address/information** for service:

Name: DraftKings, Inc. _____
<div align="center">First, Middle, and Last Name, or Business Name</div>

Registered Agent's Name *(if you are serving the Registered Agent of a business)*:

CT Corporation System _____
<div align="center">First, Middle, and Last Name</div>

Street Address: 155 Federal Street, Suite 700 _____
<div align="center">Street, Apt #</div>

City, State, ZIP: Boston, MA 02110 _____
<div align="center">City        State        Zip</div>

Telephone: _____ Email: _____

FILED DATE: 1/8/2025 11:22 AM 2025L000261

*Case Number:* _____

c. **Second address** for this Defendant/Respondent:

☑ I do **not** have another address where the Defendant/Respondent might be found.

☐ I have another address where this Defendant/Respondent might be found. It is:

Street Address: _____
*Street, Apt #*

City, State, ZIP: _____
*City*                          *State*              *Zip*

Telephone: _____     Email: _____

d. Person who will serve your documents on this Defendant/Respondent:

☐ Sheriff in Illinois  ☐ Special process server  ☑ Licensed private detective

☐ Sheriff outside Illinois: _____
*County & State*

---

**PLAINTIFF/PETITIONER INFORMATION:**

*Enter your information below.*

Name James Beyer, et al _____
*First, Middle and Last Name*

Registered Agent's name, if any Michael Kanovitz, Loevy & Loevy _____
*First, Middle and Last Name*

Street Address 311 N. Aberdeen, 3rd FL _____
*Street, Apt #*

City, State, ZIP: Chicago, IL 60607 _____
*City*                          *State*              *Zip*

Telephone: (312) 243-5900 _____     Email: mike@loevy.com _____

Be sure to **check your email every day** so you do not miss important information, court dates, or documents from other parties.

---

**STOP** The Circuit Clerk and officer or process server will fill in this section.

**To be filled in by the Circuit Clerk:**

1/8/2025 11:22 AM, Mariyana T. Spyropoulos

Witness this Date: _____          *Seal of Court*

Clerk of the Court: _____

**To be filled in by an officer or process server:**

Date of Service: _____

*Fill in the date above and give this copy of the Summons to the person served.*

---

**Note to officer or process server:**

- If 1 is checked, this is a 30-day *Summons* and must be served within 30 days of the witness date.
- If 2 is checked, this is a date certain *Summons* and must be served at least 21 days before the court date, unless 3b is checked yes.
  - If 2 is checked **and** 3b is checked yes, the *Summons* must be served at least 3 days before the court date.
- Fill in the date above and give this copy of the *Summons* to the person served.
- You must also complete the attached *Proof of Service* form and file it with the court or return it to the Plaintiff.

FILED DATE: 1/8/2025 11:22 AM   2025L000261

FILED DATE: 1/8/2025 11:22 AM   2025L000261

Case Number: _____



## NEXT STEPS FOR PERSON FILLING OUT THIS FORM:

When you file a lawsuit, you must notify the person or business you are suing of the court case by having the *Summons* and Complaint or Petition delivered to them. This is called "serving" them.

File your *Summons* and Complaint or Petition with the Circuit Clerk in the county where your court case should be filed. The Circuit Clerk will "issue" the *Summons* by putting a court seal on the form.

Have the sheriff or a private process server serve the *Summons* and a copy of the Complaint or Petition on the Defendant/Respondent. You cannot serve the *Summons* yourself.

 Learn more about each step in the process and how to file in the instructions:
ilcourts.info/summons-instructions.

## NEXT STEPS FOR PERSON RECEIVING THIS DOCUMENT:



**You have been sued:**
- Read all documents attached to this *Summons*.
- All documents referred to in this *Summons* can be found at ilcourts.info/forms. Other documents may be available from your local Circuit Court Clerk's office or website.
- You may be charged filing fees, but if you cannot pay them, you can file an *Application for Waiver of Court Fees (Civil)*.
- When you go to court, it is possible that the court will allow you to attend the first court date in this case in-person or remotely by video or phone. Contact the Circuit Court Clerk's office or visit the Court's website to find out whether this is possible and, if so, how to do this.

**If Section 1 on page 1 of this *Summons* is checked (30-day summons*)*:**
- You **must** file official documents called an *Appearance* and an *Answer/Response* with the court within 30 days of the date you were served with this *Summons*.
- If you do not file an *Appearance* and *Answer/Response* on time, the judge may decide the case without hearing from you. This is called "default." As a result, you could lose the case.
- After you fill out the necessary documents, you need to electronically file (e-file) them with the court. To e-file, you must create an account with an e-filing service provider. For more information, go to ilcourts.info/efiling. If you cannot e-file, you can get an exemption that allows you to file in-person or by mail.
- You should be notified of any future court dates.

**If Section 2 on page 1 of on this *Summons* is checked (date certain summons):**
- You **must** attend court on the date listed in Section 2 of this *Summons*.
- If you do not attend that court date, the judge may decide the case without hearing from you. This is called "default." As a result, you could lose the case.

**Need Help? ¿Necesita ayuda?**
- Call or text Illinois Court Help at 833-411-1121 or go to ilcourthelp.gov for information about going to court, including how to fill out and file documents.
- Llame o envíe un mensaje de texto a Illinois Court Help al 833-411-1121, o visite ilcourthelp.gov para obtener información sobre los casos de la corte y cómo completar y presentar formularios.
- You can also get free legal information and legal referrals at illinoislegalaid.org.
- If there are any words or terms that you do not understand, please **visit Illinois Legal Aid Online** at ilao.info/glossary. You may also find more information, resources, and the location of your local legal self-help center at: ilao.info/lshc-directory.

Case Number: _____

**FILED DATE: 1/8/2025 11:22 AM 2025L000261**

# PROOF OF SERVICE OF SUMMONS AND COMPLAINT/PETITION

IN THE STATE OF ILLINOIS, CIRCUIT COURT

☐ **Alias Summons**
*Check if this is not the 1st Summons issued for this Defendant/Respondent.*

**COUNTY:** Cook_____
*County Where You Are Filing the Case*

*Enter the case information as it appears on your other court documents.*

**PLAINTIFF/PETITIONER OR IN RE:** James Beyer, et al_____
*Who started the case.*  *First, Middle, and Last Name or Business Name*

**DEFENDANTS/RESPONDENTS:** DraftKings, Inc., Crown IL Gaming LLC
*Who the case was filed against.*  d/b/a DraftKings, Casino Queen Inc., and

Northside Crown Gaming LLC
*First, Middle, and Last Name or Business Name*

**2025L000261**
_____
**Case Number**

---

**STOP** Do not complete the rest of the form. **The sheriff or special process server will fill in the form.**
Give them one copy of this blank *Proof of Service* form for each Defendant/Respondent who will be served.

---

My name is _____ and I state:
*Officer/Process Server First, Middle, Last Name*

## SERVICE INFORMATION

Defendant/Respondent: _____
*First, Middle, Last Name, or Business Name*

☐ I was not able to serve the *Summons* and Complaint/Petition on the Defendant/Respondent named above.

- or -

☐ I served the *Summons* and Complaint/Petition on the Defendant/Respondent named above as follows:

☐ **Personally** on the Defendant/Respondent:
☐ Male ☐ Female ☐ Non-Binary  Approx. Age: _____ Race: _____

On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____

☐ On **someone else at the Defendant/Respondent's home** who is at least 13 years old and is a family member or lives there:
Name of person served: _____
*First, Middle, Last Name*
☐ Male ☐ Female ☐ Non-Binary  Approx. Age: _____ Race: _____

On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____
and by sending a copy to this Defendant/Respondent in a postage-paid, sealed envelope to the above

address on this date: _____.

FILED DATE: 1/8/2025 11:22 AM 2025L000261

*Case Number:* _____

☐ On the **Business's agent:** _____

*First, Middle, Last Name*

☐ Male ☐ Female ☐ Non-Binary  Approx. Age: _____  Race: _____

On this date: _____  at this time: _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____

## SERVICE ATTEMPTS

I made the following attempts to serve the *Summons* and Complaint/Petition on the Defendant/Respondent:

**First Attempt:** On this date: _____  at this time: _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____
Other information about service attempt:

_____

_____

_____

**Second Attempt:** On this date: _____  at this time: _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____
Other information about service attempt:

_____

_____

_____

**Third Attempt:** On this date: _____  at this time: _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____
Other information about service attempt:

_____

_____

_____

## SIGN

I certify under 735 ILCS 5/1-109 that:

1) everything in this document is true and correct, or I have been informed or I believe it to be true and correct, and

2) I understand that making a false statement on this form is perjury and has penalties provided by law.

Your Signature /s/ _____  Print Your Name _____

You are: ☐ Sheriff in Illinois                              ☐ Special process server
         ☐ Sheriff outside Illinois: _____  ☐ Licensed private detective, license number: _____
                        *County and State*                                                            *License number*

**FEES:**

Service and Return: $_____  Miles: $_____  Total: $_____

FILED DATE: 1/8/2025 11:22 AM 2025L000261

# ADDITIONAL DEFENDANT/RESPONDENT ADDRESS AND SERVICE INFORMATION

IN THE STATE OF ILLINOIS, CIRCUIT COURT

**COUNTY:** Cook
*County Where You Are Filing the Case*

*Enter the case information as it appears on your other court documents.*

**PLAINTIFF/PETITIONER OR IN RE:** James Beyer, et al
*Who started the case.*  *First, Middle, and Last Name or Business Name*

**2025L000261**

**Case Number**

**DEFENDANTS/RESPONDENTS:** DraftKings, Inc., Crown IL Gaming LLC
*Who the case was filed against.*  d/b/a DraftKings, Casino Queen Inc., and

Northside Crown Gaming LLC
*First, Middle, and Last Name or Business Name*

Use this form only if you are serving more than one Defendant/Respondent. Attach this document to the *Summons*.

## NEXT DEFENDANT/RESPONDENT'S INFORMATION

*Enter the name and address of the next person who will be served with the* Summons.

A. Defendant/Respondent's **primary address/information** for service:

Name: Crown IL Gaming LLC
*First, Middle, and Last Name, or Business Name*

Registered Agent's Name *(if you are serving the Registered Agent of a business):*

C T CORPORATION SYSTEM
*First, Middle, and Last Name*

Street Address 208 SO LASALLE ST, SUITE 814
*Street, Apt #*

City, State, ZIP: CHICAGO, IL 60604-1101
*City*                *State*        *Zip*

Telephone: _____ Email: _____

B. **Second address** for this Defendant/Respondent:

☑ I do **not** have another address where the Defendant/Respondent might be found.
☐ I have another address where this Defendant/Respondent might be found. It is:

Street Address _____
*Street, Apt #*

City, State, ZIP: _____
*City*                *State*        *Zip*

Telephone: _____ Email: _____

C. Person who will serve your documents on this Defendant/Respondent:

☐ Sheriff in Illinois  ☐ Special process server  ☑ Licensed private detective
☐ Sheriff outside Illinois: _____
*County & State*

*This form is approved by the Illinois Supreme Court and is required to be accepted in all Illinois Circuit Courts. Forms are free at ilcourts.info/forms.*

SU-AD 1506.2                 Page 1 of 1                 (11/24)

Law Division Motion Section Initial Case Management Dates for Calendars (A, B, D, E, F, H, R, X, Z) will be heard in Person.
All other Law Division Initial Case Management Dates will be heard via Zoom
For more information and Zoom Meeting IDs go to https://www.cookcountycourt.org/HOME?Zoom-Links?Agg4906_SelectTab/12
Court Date: <<CmsHearingStart>>

FILED
1/8/2025 11:22 AM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025L000261
Calendar, S
30877457

FILED DATE: 1/8/2025 11:22 AM   2025L000261

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## LAW DIVISION

James Beyer, Collin Smothers, Mateen Zafer, and Corey Davis, individually and on behalf of all others similarly situated,

*Plaintiff,*

v.

DraftKings, Inc.; Crown IL Gaming LLC d/b/a DraftKings, Casino Queen Inc., and Northside Crown Gaming LLC,

*Defendants.*

2025L000261

Case No. _____

**CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

For updated information about your case, including hearings, subsequent filing and other case information, please visit our Online Case Search and search for your case: https://casesearch.cookcountyclerkofcourt.org

Plaintiffs James Beyer, Collin Smothers, Mateen Zafer, and Corey Davis ("Plaintiffs"), individually and on behalf of all others similarly situated, brings this class action against Defendants DraftKings, Inc., and its above-named subsidiaries and affiliates (collectively "DraftKings" or "Defendants"). Plaintiffs bring the following Class Action Complaint ("Complaint") pursuant to the Illinois Code of Civil Procedure, 735 ILCS §§ 5/2-801 and 2-802. Plaintiffs make the following allegations based on personal knowledge as to their own acts, and upon information and belief and the investigation of counsel as to all other matters.

## **INTRODUCTION**

1.      Online sports gambling was legalized in Illinois only five years ago, but it is already a massive industry. Illinois citizens wager almost $40 billion on sports each year. Almost all that money goes to a few companies that dominate the industry. Those companies split the revenues from legalized gambling, over $3.5 billion for Illinois operators annually. The largest of these companies in terms of "handle" in Illinois is the Defendant in this case, DraftKings.

1

FILED DATE: 1/8/2025 11:22 AM 2025L000261

2.      More than 96% of sports betting customers lose money, which is a natural deterrent to continuing as a customer of DraftKings.[1] Thus, unlike with other industries, where a customer, once acquired, will reliably provide repeat business, most of DraftKings' customers will be incentivized to stop using the platform, all things being equal. Those who irrationally keep betting despite the losses—often because of a gambling addiction—will eventually "crap out," meaning that DraftKings will lose the customer. Thus, DraftKings' business model requires it to find ways to keep customers betting even as they lose money and to recruit new bettors to its platform. DraftKings manages to keep the customers flowing through carefully designed promotions and user interfaces that make it easy to start gambling and hard to stop.

3.      Plaintiffs bring this action because DraftKings has crossed the line in its efforts to recruit fresh blood, deceiving Illinois citizens and tying them into unconscionable contracts in which they lose large amounts of money.

4.      To further these goals, DraftKings advertises an all-upside gambling experience, falsely promising new users that they will get free money which they can wager without any risk. In reality, DraftKings has created an all-upside opportunity only for itself: the contracts require new users to deposit and gamble almost exclusively with their own money, which they almost always lose. DraftKings also engages in other, undisclosed, manipulations, forcing those users who are able to initially win to make worse and worse bets until their funds are exhausted.

5.      These unethical and fraudulent practices by DraftKings are the present face of competition in the obscenely profitable, and formerly illegal, industry.

---

[1] Wayne J. Taylor, et al., *Online Gambling Policy Effects on Tax Revenue and Irresponsible Gambling*, SMU Cox School of Business Research Paper No. 24-7, Jun. 10, 2024, https://dx.doi.org/10.2139/ssrn.4856684 (last visited Dec. 15, 2024).

FILED DATE: 1/8/2025 11:22 AM   2025L000261

6.      DraftKings' business model has long involved pushing the boundaries of the law, misleading consumers, and luring naïve gamblers into developing addictions.

7.      DraftKings began operating long before the Supreme Court's 2018 decision, originally running daily fantasy sports contests that, as explained further below, were sports gambling under another name.

8.      Many regulators, including those in Illinois, tried to crack down on these contests, but DraftKings managed to evade any real sanctions. As a result, it developed a brand and customer relationships that positioned it to capitalize on the tidal wave of sports betting legalization that followed the Supreme Court's 2018 decision in *Murphy v. NCAA*, which held that the Professional and Amateur Sports Protection Act was unconstitutional insofar as it purported to prohibit states from "authorizing" sports betting.

9.      In June of 2019 Illinois became the fifteenth state to legalize online sports betting.

10.     DraftKings seized the opportunity to cash in on amateur Illinois gamblers—citizens who tend to be young men with limited experience or savvy.

11.     DraftKings uses false promises of the opportunity to win big with no risk to lure these naïve users into committing more money to the platform than they otherwise would, based on the false impression that the money was not at risk. DraftKings uses these tactics to identify and cultivate the people it wants on its platform: those who are susceptible to these sorts of advertisements and most likely to lose a lot of money sports betting. In other words, marks.

12.     DraftKings' activities in Illinois are a textbook example of its pattern of skirting and sometimes flat-out ignoring laws and regulations intended to protect consumers.

3

FILED DATE: 1/8/2025 11:22 AM 2025L000261

13.     DraftKings targeted its promotions at new customers who may have been cautious about risking their money but had the potential to become cash cows for the company, regularly placing losing bets on sporting events.

14.     Rather than put its own money on the line to give customers a genuine all-upside taste of gambling, as its advertisements suggest, DraftKings is using misleading promotions to lure new users into believing that creating and funding an account on DraftKings is far more financially advantageous than it actually is.

15.     Only after new users sign up, make their first deposit, and start losing bets does the true nature of their bargain with DraftKings become clear. At that point, DraftKings attempts to instill long-term gambling habits in the new user by forcing them to make many bets to comply with the fine print—many more bets than they initially were led to believe would be required—while chasing the promises DraftKings made in its advertisement and new-user promotions.

16.     Most users do not recoup their money, let alone win the additional money they were promised by DraftKings' misleading advertisements.

17.     Indeed, despite DraftKings advertising the chance for customers to win and win big, the company is really only interested in keeping customers gambling wildly and therefore eventually losing big. And as soon as a user reveals a propensity to consistently make better bets—meaning bets that take advantage of an arbitrage in DraftKings' odds-making—the company drastically limits the size and frequence of bets that user can make so that they can't cost the company too much money.

18.     In short, while DraftKings advertises an all-upside gambling experience to new users, it is actually offering one that is almost all down-side.

4

FILED DATE: 1/8/2025 11:22 AM 2025L000261

19.     One of DraftKings' deceptive practices is a promotion that promises new users that if they sign up, their first bet would be at no risk to them ("Risk-Free Bet" or, later "No Sweat First Bet").

20.     These purportedly no-risk bets, however, were not as advertised. The promotion requires that the customer deposit funds and place the bet with their own money. If a customer loses their bet, they are not returned to their original position. Instead, their accounts are credited with an expiring "Bonus Bet" rather than the amount the user initially wagered in U.S. dollars.

21.     Receiving "Bonus Bets" when the original bet loses does not make the original bet "Risk-Free" as advertised. "Bonus Bets" cannot be withdrawn for cash. Instead, they must be both wagered and won before they have any cash value.

22.     Furthermore, wagers made with Bonus Bets are not paid out like wagers made with U.S. dollars. A winning $100 bet made with U.S. dollars at even odds recovers the $100 stake plus the $100 winnings less the sportsbook's cut (known as the "vig" or "rake") of ~9%, which results in a payment of approximately $191. By contrast, a winning bet made with a $100 Bonus Bet converts only to $100 US dollars less vig, which results in a payment of approximately $91.

23.     Thus, the new customer responding to the advertisement can get their "risk free" money back only if they win their second bet, which is not risk free, and even then, with the vig subtracted, which is not their complete money back.

24.     The Bonus Bet is thus worth significantly less than the initial bet, meaning that the money the customers was induced to deposit was never in fact risk-free as advertised.

5

FILED DATE: 1/8/2025 11:22 AM   2025L000261

25.     DraftKings further engages in deceptive practices through its near-ubiquitous advertisements that offer to match a new user's first deposit up to $1,000. This promotion, too, is misleading and inaccurate.

26.     In order to receive the promised matching amount, users have to deposit up to 5x the matching amount and then bet up to 25x the matching amount on long-shot bets (sometimes called "sucker bets") that users have low odds of winning, all within a relatively short period of time. Even then, and even if they win, customers do not actually receive a cash match of their deposit as the promotion implies. Instead, they receive "DK Dollars" equal to their deposit amount. Like "Bonus Bets," "DK Dollars" are not redeemable for cash and must be wagered and won before they have any value.

27.     DraftKings has invested heavily in large-scale marketing, including television and print advertisements, in-arena marketing, and extensive internet and social media advertising to publicize each of these materially deceptive promotions.

28.     These advertisements allowed DraftKings to sign up a multitude of new customers, including Plaintiffs. But little did these new customers know that the representations and omissions upon which they relied were misleading and false.

29.     DraftKings' actions in promulgating these marketing representations and omissions violate Illinois consumer protection statutes as well as Illinois common law, as discussed in detail below.

30.     Reasonable consumers, including Plaintiffs, were misled to their detriment. They did not receive the advertised benefit of the promotions, and, in many cases, they placed larger bets and more bets than they would have but for the misleading advertising.

31.     DraftKings also deliberately targeted and groomed underage Illinoisans to join its platform and to play daily fantasy sports contests before they were of legal sports betting age. DraftKings intentionally marketed to underage users and cultivated relationships with them to encourage them to develop sports betting habits and an affinity for DraftKings before they were even old enough to bet. Then, as soon as these young people turned twenty-one, DraftKings converted them into its target customer: naïve young people willing to deposit funds and spend a significant amount of time and money on sports betting despite losing more than they win.

32.     As expected, some of these young people developed debilitating gambling addictions as a result of DraftKings' carefully orchestrated schemes to draw them in with targeted misrepresentations and then force them to engage in habit-forming behavior to meet the promotional terms as they chased after DraftKings' illusory promises.

33.     Plaintiffs seek injunctive relief, actual damages, and statutory damages to compensate themselves and the Class for the injury inflicted on them by DraftKings and to prevent DraftKings from continuing to deceive consumers. Plaintiffs also may seek punitive damages upon obtaining leave to do so.

## JURISDICTION AND VENUE

34.     This Court has jurisdiction over Defendants pursuant to 735 ILCS § 5/2-209 because Defendant conducts business in Illinois, has locations in Illinois, and committed statutory violations alleged herein in Cook County, Illinois. Defendants regularly conduct and/or solicit business in, engage in other persistent courses of conduct in, and derive substantial revenue from products and services directly related to this litigation and provided to persons in Illinois.

7

FILED DATE: 1/8/2025 11:22 AM 2025L000261

35.    Venue is proper in Cook County pursuant to 735 ILCS 5/2-101, because Defendants are doing business in Cook County and thus reside there under § 2-102, and because many of the transactions out of which this action arises occurred in Cook County.

## PARTIES

36.    Plaintiff James Beyer is a resident of Kentucky. Plaintiff Beyer created his first account on DraftKings in Illinois when he was under eighteen years old. Plaintiff Beyer was able to create several accounts on DraftKings and enter free promotions with cash prizes before he turned twenty-one years old.

37.    As soon as Plaintiff Beyer turned twenty-one, he verified his age on DraftKings, deposited money, and began making paid bets on which he has lost a considerable amount of money.

38.    Plaintiff Beyer also responded to DraftKings' Illinois no-risk promotions and, despite being fairly conversant with the world of sports betting—having been introduced to it at a young age by DraftKings—he was misled and surprised to discover that he did not get his original stake back when he lost the first bet he placed pursuant to a no-risk promotion.

39.    Plaintiff Mateen Zafer is a resident of Michigan, living in Ann Arbor. Plaintiff Zafer created and funded an account on DraftKings in January of 2023 in response to a deposit match promotion he had seen advertised on television while watching a Basketball game. Plaintiff Zafer also recalls seeing advertisements around this time that included DraftKings' brand ambassador Kevin Hart.

40.    As a result of his reliance on the deposit match promotion advertisement, Plaintiff Zafer deposited more money that he otherwise would have into DraftKings. Plaintiff Zafer did not satisfy the confusing terms of the promotion and did not get his entire initial

8

FILED DATE: 1/8/2025 11:22 AM   2025L000261

deposit matched, as DraftKings had promised to do.

41.     Plaintiff Zafer also responded to DraftKings advertising he saw for promotions that represented he could place a bet at no risk to him, but after losing his bet, he learned that DraftKings would not return him to the position he was in when he initially placed the bet.

42.     Plaintiff Corey Davis is a resident of Illinois, living in Chicago. Plaintiff Davis opted into DraftKings' "No Sweat" bet and "Deposit Match" promotions in February 2024. As more fully described below, Plaintiff Davis was misled by DraftKings' advertising for each of these promotions.

43.     Plaintiff Collin Smothers is a resident of Illinois, living in Chicago. While in the state of Illinois, Plaintiff Smothers opened an account on DraftKings in February 2021. Plaintiff Smothers funded his account after viewing advertisements for DraftKings' "Deposit Match" promotions in or around February 2021.

44.     Plaintiff Smothers viewed advertisements for "Risk Free" bets on DraftKings in early 2022. As a result of these advertisements, Plaintiff Smothers opted into a "Risk Free" promotion on DraftKings' platform and placed a bet.

45.     When Plaintiff Smothers lost the bet he placed that DraftKings had informed him was "Risk Free," he was surprised to find that he was not credited the amount he had bet and instead received an expiring "Bonus Bet" with no cash value.

46.     Defendant DraftKings, Inc. is a Nevada gambling and entertainment corporation headquartered in Boston, Massachusetts. As of April 2023, DraftKings is a publicly traded company that trades on the Nasdaq Stock Exchange.

47.     Defendant Casino Queen, Inc. is a company incorporated in Illinois with its headquarters and principal place of business in East St. Louis, Illinois. Casino Queen has

9

FILED DATE: 1/8/2025 11:22 AM   2025L000261

partnered with DraftKings to operate a digital sportsbook "at" Casino Queen, that is available through DraftKings' mobile application to eligible consumers located anywhere in Illinois.

48.     Defendant Crown IL Gaming LLC is a privately held company incorporated in Delaware with its principal place of business in Boston, Massachusetts. Crown IL Gaming LLC is a subsidiary of DraftKings and is the registered management services provider with the Illinois Gaming Board for DraftKings' sportsbook "at" Casino Queen.

49.     Defendant Northside Crown Gaming LLC is a privately held company incorporated in Delaware. On information and belief it is another DraftKings subsidiary with a principal place of business is Boston, Massachusetts. Northside Crown Gaming is DraftKings management services provider for the new DraftKings location at Wrigley field and for associated online sports betting throughout Illinois.

## FACTUAL ALLEGATIONS

### A.  Sports legalization in Illinois and DraftKings' sordid early history in the state

50.     In 2018, the Supreme Court ruled in *Murphy v. National Collegiate Athletic Association*, 138 S. Ct. 1461 (2018), that a federal law could not prohibit states from legalizing sports betting within their borders. State legislatures moved quickly and, as of November 2024, sports betting has been legalized in 38 states and Washington, DC.

51.     As a result, the market for sports betting has exploded. The total US revenue of sportsbooks exploded from $430 million in 2018 to $10.92 billion in 2023.[2]

52.     In June 2019, Illinois became the fifteenth state to legalize sports betting, and

---

[2] Mike Reynolds, *American Gaming Association: Legal sports betting hits record revenue in 2023*, S&P GLOBAL, Feb. 21, 2024, https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/american -gaming-association-legal-sports-betting-hits-record-revenue-in-2023-80522087 (last visited Nov. 27, 2024).

FILED DATE: 1/8/2025 11:22 AM 2025L000261

sportsbooks began operating in the state on March 9, 2020. Illinois is now one of the largest betting markets in the nation with over $11.3 billion wagered by Illinois residents in 2023.[3]

53.     This rapid expansion of the sports betting industry has fueled a race to recruit new consumers. Sportsbook operators have bombarded the state with advertisements and promotions in order to capture valuable market share.

54.     Long before gambling was legalized in Illinois, DraftKings began offering "daily fantasy sports" contests to Illinois consumers, including many who were under the age of twenty-one.

55.     In practice, "daily fantasy sports" is sports betting by another name. In these contests, users bet on the performance of athletes in sporting events, but in doing so they "compete" against each other rather than the sportsbook, which keeps a portion of the pot.

56.     In 2015 Lisa Madigan, then Illinois Attorney General, issued an opinion concluding that DraftKings' daily fantasy sports contests fell within the state's prohibition on gambling.

57.     Rather than comply and cease operations, DraftKings sued the Attorney General, seeking a declaration that she was wrong and that its business was legal.

58.     DraftKings' aggressive approach worked, and no enforcement action was ever taken.

59.     When the legislature legalized sports betting in Illinois, the statute included a "bad actors" clause aimed directly at DraftKings and other companies that had previously taken advantage of the regulatory void in the state to begin reaching Illinois consumers before they had officially been given the green light to do so. This provision delayed for eighteen months

---

[3] *All About Illinois Sports Betting Handle And Revenue*, ILLINOISBET.COM, Mar. 28, 2024, https://www.illinoisbet.com/revenue-report (last visited Nov. 27, 2024).

11

the sports betting licensure of any company that continued offering daily fantasy sports contests in Illinois after the Attorney General's 2015 opinion.

60.     The intended effect was to level the playing field and give other, more law-abiding operators, an opportunity to catch up to the market recognition and customer relationship data that DraftKings already had.

61.     DraftKings, however, leveraged a loophole in the law that allowed it to partner with a local casino, Casino Queen, to operate in Illinois as soon as possible.

62.     Thus, DraftKings never served its prescribed eighteen-month timeout. Instead DraftKings was immediately able to reap the benefits of its existing relationships with Illinois consumers, some of whom began using DraftKings' daily fantasy sports offerings long before they turned twenty-one years old.

63.     DraftKings is also the only sports wagering management services provider with a complaint for disciplinary action filed against it by the Illinois Gaming Board.

64.     In 2020 the Gaming Board found that DraftKings failed to comply with regulations requiring it to promptly disclose any agreements it had formed to serve as the management services provider for sports gambling at Wrigley Field.

**B. DraftKings operates a digital sportsbook in Illinois and reaps massive profits**

65.     Since 2020, DraftKings and Casino Queen have operated an sportsbook in Illinois pursuant to a partnership agreement.

66.     On information and belief, as the Management Services Provider for its operations in Illinois, Crown IL Gaming LLC along with its parent company, DraftKings Inc., has overall responsibility for, among other things: operating the sportsbook, managing the brand, running promotions, and making strategic decisions about customer acquisition and maintenance.

12

FILED DATE: 1/8/2025 11:22 AM 2025L000261

67.     On information and belief, pursuant to its contractual relationship with Casino Queen, the Master Sports Wagering Licensee with the Illinois Gaming Board for DraftKings' Sportsbook in Illinois, DraftKings has responsibility for, among other things: verifying user age, verifying user location within Illinois, crediting and debiting user accounts with winnings and losses from wagers made in Illinois, and ensuring compliance with all applicable Illinois laws and regulations.

68.     In sum, DraftKings runs the sportsbook that is licensed under Casino Queen's name and pays Casino Queen a portion of its revenue for the privilege of doing so. Through this partnership DraftKings offers both on-premise and online sports betting to its customers in Illinois.

69.     The vast majority of DraftKings' business in Illinois comes through its digital sportsbook.

70.     To place bets through DraftKings' online sportsbook, users download DraftKings' mobile application from the Apple App Store or the Google Play Store onto their cellphones, verify that they are located within Illinois by allowing DraftKings' mobile application to access their phone's location, and then can place bets on live and upcoming sporting events.

71.     As a result of this model, bets are frequently placed on DraftKings using cellular data networks.

72.     When a bet is placed using a cellular data network, it is routed through cellular towers according to the cellular networks settings and tower availability. These cellular towers then transmit the bets through fiber-optic or other wired connections to their destination servers.

13

FILED DATE: 1/8/2025 11:22 AM    2025L000261

73.    Even when a bet is placed using a mobile phone located in Illinois and the bet is processed by DraftKings on a server located in Illinois, the bet will often be routed through wired electronic communication infrastructure located in other states.

74.    Take for example a user who places a bet using their mobile phone's cellular network in South Beloit, Illinois. On information and belief, such a bet is virtually certain to be routed through cellular towers in Beloit, Wisconsin.

75.    Likewise, a DraftKings bet placed by a user on their phone at the St. Louis Downtown airport in Illinois is very likely to be routed through cellular towers located in St. Louis, Missouri.

76.    Furthermore, many DraftKings users place bets using home Wi-Fi networks that are connected directly to electronic wires.

77.    On information and belief, the data associated with a substantial portion of DraftKings bets placed on Wi-Fi networks are transmitted on electronic wires across state lines even when the destination server is located in the same state as the user because internet service providers route data traffic to reduce latency and optimize bandwidth and that often results in cross-state data routing.

78.    This incidental interstate transmission would be particularly likely to occur when a user in South Beloit or East St. Louis, Illinois places a bet through a Wi-Fi network because it is likely that the nearest and most efficient intermediate servers will be located in Wisconsin or Missouri.

79.    DraftKings does not prevent data associated with the placing of bets in Illinois— or other states—from crossing into other states, including states where DraftKings is not legally permitted to operate its sportsbook like Missouri and Wisconsin.

14

FILED DATE: 1/8/2025 11:22 AM   2025L000261

80.     DraftKings also uses interstate electronic wires to transmit money earned through its users bets across state lines.

81.     Every user deposit relies on at least one of a variety of methods including credit and debit cards, Venmo, Paypal, electronic wire transfer (for large transfers only), and through a Swedish third-party electronic funds transfer company called Trustly.

82.     Many, if not all, of these methods of funds transfer involve the use of "electronic payment rails" and other wired facilities of interstate commerce.

83.     Furthermore, DraftKings makes money when users place and lose bets on its platform.

84.     When an Illinois user loses a bet on DraftKings' platform, money is transferred into a DraftKings' bank account that is either located in Illinois or another state.

85.     On information and belief, DraftKings does not indefinitely leave the millions of dollars in revenue it earns in Illinois segregated in a bank account located in Illinois. Instead, DraftKings regularly transfers funds it receives from bets in Illinois—and other states—into its general business accounts located in Boston, Massachusetts and elsewhere.

86.     Furthermore, DraftKings permits users to bet with funds deposited in one state while located in another state where DraftKings operates.

87.     For example, Plaintiff Beyer has placed bets on DraftKings' mobile sportsbook while located in Kentucky with money that he deposited while located in Illinois.

88.     According to the Illinois Gaming Board's records, DraftKings saw the largest volume of sports bets, in terms of dollars bet, of any sportsbook in the state of Illinois from December 2023 through November 2024, handling more than $4 billion dollars.

15

FILED DATE: 1/8/2025 11:22 AM   2025L000261

89.     DraftKings reinvests a lot of its revenue in hooking more users on sports betting. DraftKings' sales and marketing expenses totaled $1.2 billion in 2023.[4] DraftKings ran TV, radio, social media, email, billboard, and print advertising. The ads showcased various promotions that DraftKings was running, typically targeting new users and promising bonuses and Risk-Free bets for signing up and making their first deposit.

90.     As DraftKings has repeatedly said in its annual 10–K reports, "Achieving growth in our community of users may require us to increasingly engage in sophisticated and costly sales and marketing efforts."

91.     DraftKings' target audience for these marketing efforts is new users and casual gamblers—those who are most likely to lose money and who might turn into high-value addictive gamblers losing thousands of dollars a month to DraftKings.

92.     In fact, DraftKings, will often limit or even outright ban "sharps," gamblers who are sophisticated and make too many winning bets, while naïve losing consumers are targeted with more and more deceiving promotions to encourage their gambling more money with more frequency.

93.     DraftKings could set standardized bet limits for all its users, but instead it dynamically limits the maximum allowable bet for each individual user in order to maximize the amount more addictive gamblers lose to the company while minimizing the company's exposure to more successful bettors. The practice of dynamically limiting amounts to prevent bettors from winning too much is one more fact that DraftKings does not disclose in its promotions.

---

[4] https://www.statista.com/statistics/1379464/sales-marketing-expenses-draftkings-worldwide/#:~:text=In%202023%2C%20the%20fantasy%20sports,based%20company%20spent%20in%202020

FILED DATE: 1/8/2025 11:22 AM    2025L000261

94.     DraftKings' CEO has admitted that the company is only interested in serving bettors who are likely to lose money on its platform: "This is an entertainment activity. People who are doing this for profit are not the people we want."[5]

95.     DraftKings is not, however, following a traditional "entertainment" industry business model of trying to "entertain" as many customers as possible.

96.     Instead, DraftKings is seeking to exclude customers who are successful at betting while trapping those who are not. The latter customers, many of whom end up losing more than they can afford, are the source of most of DraftKings' revenues.

97.     DraftKings mines its user data to identify the most potentially-lucrative users— those with developing gambling addictions—and then intentionally targets them with personalized outreach to increase the amount and frequency of their wagering on DraftKings.

98.     As further described below, DraftKings designs its promotional offers to lure in and identify those users most likely to become consistent gamblers.

99.     These promotional offers include a deposit match up to $1,000 and "Risk-Free" (later termed "No Sweat") bets. But rather than coming through on the large-print offers made to new users in advertisements for these promotions, DraftKings contradicts the large-print offers by inserting difficult to read, legally-opaque fine print terms hidden behind hyperlinks that are only available when a user is about to opt-in to the promotions and, thereafter, by enforcing complicated rules that DraftKings knows will be overlooked and misunderstood.

100.    Not only do these false promises lure consumers into opening and funding accounts on DraftKings, but they also lure many users into wagering larger amounts and more

---

[5] David Hill, *Is the $11 Billion Online Sportsbook Bubble About to Burst?*, ROLLING STONE, Nov. 17, 2024, https://www.rollingstone.com/culture/culture-sports/sports-betting-law-draftkings-fanduel-1235158334/ (last visited Dec. 10, 2024).

17

FILED DATE: 1/8/2025 11:22 AM 2025L000261

frequently than they otherwise would.

101. This was DraftKings' goal all along. DraftKings knows that the money it invests to sign up a customer often pays for itself many times over. According to McKinsey partner Dan Singer, "When a market opens up, you've got to get out there and start acquiring, because being the first book that someone downloads gives you roughly twice as much action as being the second or the third."[6]

102. As the sports betting market in Illinois becomes more saturated, DraftKings has begun turning its attention from recruiting new customers at any cost to retaining the most vulnerable customers it already has hooked on its platform.

103. The customer retention stage is much more profitable for DraftKings than the initial customer acquisition stage.[7]

104. Originally, DraftKings and other sportsbooks used to make good on the promises they made to new users of cash deposit matches and Risk-Free bets—where you get cash back if you lose. However, to do so, they hemorrhaged profit as they entered new markets.

105. As the Washington Post has reported, "the days of companies giving away straightforward deposit matches worth thousands of dollars are largely over. Instead, sportsbooks are deploying increasingly complicated deals that advertise a big dollar figure but are far less generous [than advertised] upon closer examination."[8]

---

[6] Danny Funt, *Sportsbooks Are Sweating Their Billion Dollar Marketing Bet*, WASHINGTON POST, Sept. 27, 2022, https://www.washingtonpost.com/sports/2022/09/27/caesars-fanduel-draftkings-commercials/ (last visited Nov. 15, 2024).
[7] *Online Sportsbook: A Shift In Player Retention?*, GAMING AMERICA, Mar. 17, 2023 https://gamingamerica.com/magazine/7296/online-sportsbook-a-shift-in-player-retention (last visited Nov. 15, 2024).
[8] *Supra* note 6.

FILED DATE: 1/8/2025 11:22 AM   2025L000261

106.    Some sportsbooks still give cash matching offers in Illinois, but not DraftKings. Instead, while DraftKings still makes the same promises in their ads, now—after making users jump through several unexpected hoops—it gives users "Bonus Bets" and "DK Dollars" that cannot be cashed out and must be used on the platform in accordance with complicated and unintuitive terms.

107.    In an online gambling marketplace saturated by sign-up promotions targeting vulnerable individuals with big "free" or "risk-free" dollar figures—some of which are truly risk-free and some of which, like those offered by DraftKings, are not—consumer confusion reigns. DraftKings exploits that confusion.

### C. DraftKings intentionally targets underage people and grooms them to become addictive gamblers

108.    Gambling products are not typical consumer products. Both the current edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM-V) and the World Health Organization treat addiction to gambling in the same diagnostic category as addiction to heroin, cocaine, and tobacco.

109.    Indeed, as online sportsbooks exploded in 2021, the National Council on Problem Gambling reported overall increases of 43% in calls and 84% in online chats in just one year.[9]

110.    States that have legalized sports betting have seen dramatic increases in calls to gambling addiction helplines. In Connecticut, for example, helpline calls jumped 91% in the

---

[9] *National Problem Gambling Helpline Modernization Project*, NATIONAL COUNCIL ON PROBLEM GAMBLING, https://www.ncpgambling.org/problem-gambling/helpline-modernization/#:~:text=In%202021%2C%20calls%20to%20the%20National%20Problem%20Gambling, we%20expect%20these%20numbers%20to%20continue%20to%20grow (last visited Nov. 21, 2024).

FILED DATE: 1/8/2025 11:22 AM 2025L000261

first year after legalization. In the first year after Virginia legalized sports gambling, calls climbed 387%.

111. Here in Illinois, calls rose a staggering 425% between 2020 and 2022 as DraftKings and other sportsbooks blanketed the airwaves with ads for new users.

112. Gambling addiction is particularly prevalent in young men in their 20s, not coincidentally a key demographic for DraftKings.

113. According to Keith Whyte, executive director of the National Council on Problem Gambling, "We believe that the risks for gambling addiction overall have grown 30 percent from 2018 to 2021, with the risk concentrated among young males 18 to 24 who are sports bettors."[10]

114. And the earlier kids get exposed to gambling through online games and other avenues, studies suggest, the more severe their gambling problems are likely to be later on.[11]

115. According to a spokesperson for Gamblers Anonymous, there has been "a dramatic increase in the number of young men developing compulsive gambling issues and showing up to meetings since online sports gambling became legal."[12]

116. Unsurprisingly, DraftKings's target demographic overlaps heavily with the group most at risk of gambling addiction. As of 2021, 90% of DraftKings' sportsbook users were male and more than half were in their teens, twenties, or early thirties.

---

[10] Meghan Gunn, *These are the Real Dangers of the Sports Betting Boom for Young Men*, NEWSWEEK MAGAZINE, Mar. 22, 2023 https://www.newsweek.com/2023/04/07/sports-betting-boom-linked- rising-gambling-addiction-anxiety-suicide-1789055.html (last visited Nov. 15, 2024)

[11] Ardeshir S. Rahman, et al., *The relationship between age of gambling onset and adolescent problematic gambling severity*, JOURNAL OF PSYCHIATRIC RESEARCH, Vol. 46, No. 5, 2012.

[12] Maxwell Strachan, *The Rise of Mobile Gambling is Leaving People Ruined and Unable to Quit*, VICE, Sept. 6, 2022, https://www.vice.com/en/article/ake7gk/therise-of-mobile-gambling-is-leaving-people-ruined-and-unable-to-quit (last visited Dec. 2, 2024).

FILED DATE: 1/8/2025 11:22 AM    2025L000261

117.    DraftKings touts that its "[s]ophisticated data science drives marketing decisions," which "delivers the right message, to the right user at the right time," to maximize return on investment.[13]

118.    DraftKings targeted marketing often reaches young people, particularly young men, who are not yet old enough to legally gamble.

119.    As one Illinois high-school sophomore told his school newspaper, which published a lengthy investigation of the rise of sports betting among classmates, "[after betting was legalized in Illinois] I saw more posts about it and stuff like that on social media, which made me want to [bet] more just because I saw it more," he said. "Before, I hadn't really seen that sort of thing on social media."[14]

120.    Plaintiff Beyer recalls routinely observing advertisements for DraftKings on his Instagram feed before he turned 21 and even before he turned 18. Plaintiff Beyer also saw ads for DraftKings that were associated with and alongside college sporting events that he followed.

121.    DraftKings' posts on TikTok have received 45.5 million "likes." On information and belief, a substantial portion of these "likes" are from individuals under the age of twenty-one years old who are being intentionally targeted with DraftKings' marketing.

122.    DraftKings also places physical advertising where it knows it will be seen by many underage users. For example, Ohio regulators recently fined the company $250,000 for advertising outside a college football stadium and targeting customers who are under the age of

---

[13] https://www.slidebook.io/company/draftkings/presentation/4482ce71d778bb9781863ed375bebca1-/slide-/4482ce71d7-78bb9781863ed375bebca1_24/ (last visited Nov. 21, 2024).

[14] Alexis Rogers, *"You can just lie, most people do": The rise of underage sports betting,* THE EVANSTONIAN, Apr. 20, 2023, https://www.evanstonian.net/sports/2023/04/20/you-can-just-lie-most-people-do-the-rise-of-underage-sports-betting/ (last visited Nov. 22, 2024).

21

FILED DATE: 1/8/2025 11:22 AM    2025L000261

twenty-one.[15]

123.    DraftKings routinely runs promotions encouraging gambling on collegiate

sporting events.



*Figure 1: A post from DraftKings on X (formerly Twitter) publishing betting odds for the*

*College Football National Championship; dated November 5th, 2024.*

*(https://x.com/DKSportsbook/status/1853961644109382110)*

124.    Not only does DraftKings intentionally target its marketing to boys and young

men, DraftKings also designs its product and its promotions so that once they download the

---

[15] Sean McDonnel, *Ohio: Barstool, DraftKings agree to $750K in fines for targeting underage people, advertising 'free' bets*, CDC GAMING, Feb. 15, 2023, https://cdcgaming.com/brief/ohio-barstool-draftkings-agree-to-750k-in-fines-for-targeting-underage-people-advertising-free-bets/ (last visited Nov. 21, 2024).

FILED DATE: 1/8/2025 11:22 AM    2025L000261

DraftKings app, they quickly form gambling habits, often before they reach legal gambling age.

125.    One example of this, described more fully below, is the way that DraftKings' deposit match promotions work. First, to satisfy the hidden terms of the promotion a user must wager 25x the amount of the bonus, necessitating a long series of bets. Second, if the user completes enough bets, they receive the bonus in "DK Dollars," meaning they then have to place even more wagers in hopes of finally receiving the cash deposit match they were promised.

126.    Digital mediums, like computers and cell phones that host DraftKings, increases the likelihood of habit-forming behavior through portability and connectivity, which provide greater ease-of-use, ready availability, rapid gratification, and a tendency to enable "context-independent" cues that trigger habit response.[16]

127.    Furthermore, habits are most often formed as the result of goal-directed behavior, which DraftKings enables by requiring users to chase arduous playthrough requirements.

128.    Goals drive people to form habits by encouraging repeat actions, even when they are actively aware of not wanting to develop an undesirable habit. Because most people are unaware of the habit-cuing influencing their behavior, they often attribute the formation of an undesirable habit to the pull of temptations or suppressed desires.

129.    DraftKings designs its promotions—which have among the highest playthrough requirements in the industry—to maximize the likelihood that users will begin to develop habits while completing them.

---

[16] Bas Verplanken, *The Psychology of Habit: Theory, Mechanisms, Change, and Contexts*, Springer Nature Switzerland AG, 2018, https://link.springer.com/book/10.1007/978-3-319-97529-0

FILED DATE: 1/8/2025 11:22 AM   2025L000261

130. Perhaps an even more egregious example of how DraftKings intentionally sows problem gambling into Illinois youth is DraftKings' intentional decision to allow users onto its platform, and even into its daily fantasy sports contests with cash prizes, without requiring them to verify their age or identity.

131. DraftKings gives potential future users of DraftKings' sportsbook a taste of gamified sports betting through daily fantasy sports contests that are not materially different from sports betting in terms of their potential to form addictions.

132. DraftKings is aware that underage users, many under eighteen, explore its platform and sometimes enter fantasy sports contests.

133. DraftKings intentionally, recklessly, or negligently chooses procedures that allow this to happen.

134. DraftKings could and should require age and identity verification every time a user creates an account on its platform, as many other sportsbooks do.

135. Instead, DraftKings does not require identity or age verification until a user goes to deposit or withdraw money or has been on the platform for a significant period of time. In this way, DraftKings lowers the barrier of entry for underage users to get introduced to using its products.

136. Furthermore, the daily fantasy sports contests that users can enter on DraftKings without age verification take the gamification of betting to the extreme in a deliberate attempt to appeal to younger users.

137. As one researcher studying the industry put it, "It's a very obvious attempt to hybridize sports, to get conventional sports gambling with mobile gaming to attract a younger

24

FILED DATE: 1/8/2025 11:22 AM   2025L000261

audience. Like, very obvious that that's what that is for."[17]

138.   DraftKings hosts free daily fantasy sports contests with cash awards funded by the company. DraftKings allows people under the age of twenty-one to enter those contests for free and win money that can be credited to their account.

139.   Plaintiff Beyer created his current account on DraftKings when he was nineteen years old. He does not recall being asked to enter his birthday when he created this account. Plaintiff Beyer was not required to verify his age by entering his social security number or uploading a photo ID, which is how DraftKings verifies users' ages before allowing them to make cash deposits or withdrawals for its sportsbook.

140.   Like many other DraftKings users in Illinois, Plaintiff Beyer frequently entered into free daily fantasy sports contests on DraftKings in Illinois before he was of legal gambling age.

141.   Plaintiff Beyer and his friends also used DraftKings features to facilitate betting with each other. They would track bets on DraftKings and would settle-up off-platform.

142.   DraftKings allows and even encourages underage users to access its platform in this way so that they are more likely to use its services upon reaching legal gambling age.

143.   None of this would have been possible had DraftKings made Plaintiff Beyer and his friends verify their ages and identities in order to create accounts. DraftKings deliberately chose not to require such verification.

144.   Immediately after Plaintiff Beyer turned twenty-one years old, he verified his account and began placing paid bets on DraftKings.

---

[17] Harrison Zuritsky, *Sports betting companies are targeting underage fans, experts say. Northeastern students are among those getting hooked.*, HUNTINGTON NEWS, May 12, 2024, https://huntnewsnu.com/78268/lifestyle/tech/sports-betting-companies-are-targeting-underage-fans-experts-say-northeastern-students-are-among-those-getting-hooked/ (last visited Nov. 21, 2024).

FILED DATE: 1/8/2025 11:22 AM  2025L000261

145.     Plaintiff Beyer recalls being "very excited" to get into sports betting as soon as he turned twenty-one after using a "lite" version of DraftKings' platform for several years previously.

146.     DraftKings was also able to secure Plaintiff Beyer's loyal business because it lured him onto its platform before he was of legal betting age. Plaintiff Beyer never considered signing up for FanDuel or any of DraftKings other competitors because he'd been using DraftKings for so many years by the time he turned twenty-one.

147.     Plaintiff Beyer, like many young men targeted by DraftKings, has lost a significant amount of money gambling on DraftKings' sportsbook.

### D. DraftKings' "Risk-Free Bet" promotions

148.     DraftKings offers a variety of promotions to new users that falsely state they can try out the platform without any risk of losing money. The dollar amount that can be placed "Risk-Free" varies but can be as much as $1,000.

149.     Such tantalizing offers have been effective at persuading new users to open betting accounts they may not otherwise have opened and to wager amounts they may not otherwise have risked. That is what happened to Plaintiffs Smothers, Beyer, Davis, and Zafer. After DraftKings' lured Plaintiffs and others into placing bets based on the promise that they would be risk-free, Plaintiffs discovered that the money they wagered had in fact been lost.

150.     Since at least 2020, DraftKings has advertised no-risk gambling promotions to countless people watching MLB, NFL, NBA, and NHL games on television.

FILED DATE: 1/8/2025 11:22 AM 2025L000261





*Figure 2: Screenshots from an advertisement typical of those broadcasted by DraftKings on television and digital media in Illinois during the Class Period.*

27

FILED DATE: 1/8/2025 11:22 AM    2025L000261

151.    For those not watching televised sports, DraftKings ads for risk-free promotions were inescapable on I-94 billboards and CTA trains and buses.

152.    DraftKings has also advertised risk-free betting on Twitter, Instagram, Facebook, and TikTok feeds of millions of potential users through direct advertising and paid partnerships with influencers.



*Figure 3: Post on Twitter (now X) from user @SoManyWays2Joey (host of a popular NHL podcast on a network partnered with DraftKings) advertising a "Risk-Free Bet" up to $1,000; dated July 14, 2022. (https://x.com/SoManyWays2Joey/status/1547647893254746116)*

153.    Finally, DraftKings has, from time to time, directly emailed its users including Plaintiffs encouraging them to log in and place risk-free bets.

154.    For example, Plaintiff Smothers received an email in November of 2022 encouraging him to place an "NFL Thanksgiving Risk-Free Bet." The email did disclosed that the offer was risk-free only insofar as if Plaintiff Smothers lost he would receive a "Free Bet" (later termed a "Bonus Bet") rather than his money back, but it did not disclose that, as described below, this "Free Bet" expired and would not pay out like his original bet that was staked with cash.

28



FILED DATE: 1/8/2025 11:22 AM 2025L000261

FILED DATE: 1/8/2025 11:22 AM 2025L000261

ADDITIONAL INFO

*All Week 12 NFL games (11/24/22 - 11/28/22). Opt-In and place a bet on any Week 12 NFL game. If your first qualifying bet after opting in loses, we'll credit your bet back as a Free Bet up to $10. One qualifying bet per user during the promotional period. Includes single bets, SGPs, SGPx's and traditional parlays where all legs are NFL. Includes pre-game and live bets. Excludes cash out bets, voided bets, profit boosts, and odds boosts. Wagering on this promotion must use funds from your cash balance or DK Dollars to qualify. Free Bet issued after qualifying bet settlement. Must be 21+, unless otherwise stated, and located in AZ, ONT (19+), CT, CO, IA, IL, IN, KS, LA, MD, MI, NH (18+), NJ, NY, OR, PA, TN, VA, WV, or WY (18+). DraftKings Sportsbook Online only. DraftKings.com reserves the right to change or cancel this promotion in its entirety at any time or exclude any individual(s) from participation, if it determines at its sole discretion there are any irregularities or abuses occurring in connection with the promotion. If you have any questions, please contact sportsbook@draftkings.com.

DRAFTKINGS

DFS | Sportsbook | Casino | Marketplace

DraftKings Inc. is a US-based company. DraftKings at Casino Queen Sportsbook products are regulated by the Illinois Gaming Board as an internet gaming operator in accordance with The Sports Wagering Act (230 ILCS 45) and its implementing regulations. Our Sportsbook games are tested by Gaming Labs International to provide games that are fair and operate correctly. Only customers 21 and over are permitted to play our Sportsbook games. Subject to regulatory licensing requirements.

DraftKings Inc. is a US-based company. DFS statistics are licensed from STATS LLC.
© DraftKings All Rights Reserved
This email was sent to
This email was sent by: DraftKings Inc

Privacy Policies
Daily Fantasy Sports | Sportsbook/Casino

DraftKings is committed to Responsible Gaming

DraftKings Code of Conduct | DraftKings RG Tools & Resources

To manage your DraftKings email preferences or unsubscribe, click here

*Figure 4: An email received by Plaintiff Smothers on November 24th, 2022, advertising an "NFL Thanksgiving Risk-Free Bet".*

FILED DATE: 1/8/2025 11:22 AM   2025L000261

155.     Plaintiff Smothers received another email from DraftKings in February of 2021 with the subject line "Bet Risk-Free on anything today, [username]!" and header "NO LOSING FOR YOU TODAY!". This email disclosed even fewer material terms regarding how Plaintiff Smothers could "Bet Risk-Free."

156.     These "Risk-Free" bets involve substantially more risk than DraftKings' promotional materials lead customers to believe. When a customer loses their initial bet, they are not in the same position as they were before placing the wager.

157.     DraftKings' advertising misleading implied the contrary and concealed several key feature of the "risk-free" promotion that would have allowed customers to determine that opting into the promotions did, in fact, involve risk of losing their money.

158.     First, DraftKings misrepresented that a user could place a bet at no risk to themselves when there was necessarily risk, because a consumer cannot simply cash out a refund if they lose, but instead must place another bet (the so-called "Bonus Bet") that they receive in the event they lost their original wager.

159.     Second, DraftKings misleadingly implied that a user could be restored to their original position if they original bet lost because they would receive a "Bonus Bets."

160.     When a user places a bet as part of a "Risk-Free" promotion, they are wagering their own money.  If the customer loses their initial bet, their account is debited the amount of their loss in U.S. dollars (in this case $100), and their account is credited with a "Bonus Bet" of the same amount. But a "Bonus Bet" is not worth its cash equivalent even when placed on an even-odds winning bet.

161.     According to DraftKings itself, "Bonus Bets," have no cash value, are non-transferrable, have an expiration date, and cannot be withdrawn from the account. Thus, in

31

FILED DATE: 1/8/2025 11:22 AM    2025L000261

order to turn a "Bonus Bet" into U.S. dollars that can be deposited back into a bank account, a user must use the "Bonus Bet" to place an additional wager within the specified time limit *and win.*

162.    Furthermore, even when a customer wins a bet with the "Bonus Bet", they do not receive the stake back—which is what DraftKings purportedly gave them for free. If a customer uses a $100 "Bonus Bet" on a winning wager with 50/50 odds, they are paid out $91 ($100 winnings, minus 9% vig, without a return of the $100 stake). Of course, there is no guarantee that a user will win the "Bonus Bet". If a "Bonus Bet" loses, the user will be paid out nothing.

163.    Finally, DraftKings misrepresented there was no risk because there is the risk of losing all the money originally wagered. If a user loses their "Bonus Bet," they have no further means of recouping the initial amount they wagered.

164.    The false promise of "Risk-Free Bets" was strategically and misleadingly designed to overcome new users' skepticism of gambling and to grab market share in the freshly legal sports betting industry.

165.    DraftKings was aware of the effects of such promises on new users' thinking: "If it's Risk-Free, why not bet more?"

166.    DraftKings deliberately tricked gambling-naive customers in Illinois into falling for these promotions by not clearly communicating that customers signing up for the "Risk-Free Bet" promotion were, in fact, at risk of losing their money. Customers relying on their commonsense understanding of the "Risk-Free" offer on promotional materials—and not understanding the complex terms laid out several layers deep in fine print that contradict DraftKings' large-print promises—were surprised to discover upon losing their "Risk-Free Bet"

32

FILED DATE: 1/8/2025 11:22 AM  2025L000261

that, in order to get *some* of their money back, they needed to make an additional, successful wager. DraftKings intentionally supplemented this confusion by using the dollar symbol ($) in its promotional materials.

167.    As alleged above, DraftKings advertised these "Risk-Free Bets" or "No Sweat Bets" to Illinois users on numerous occasions, often targeted specifically to new customers or existing customers who had not placed a certain type of bet before.



*Figure 5: A March 2024 advertisement promoting a "No Sweat Bet" of up to $1,000 for new customers used by DraftKings in various digital advertising media including on Twitter.*

33

FILED DATE: 1/8/2025 11:22 AM   2025L000261



*Figure 6: DraftKings made attempts to appeal to fans of the country's largest sports leagues.*

*This post from the official DraftKings Twitter account, dated October 22, 2021, promises a*

*"Risk-Free Bet" for NBA games. (https://x.com/DKSportsbook/status/1451600275861540867)*

34

FILED DATE: 1/8/2025 11:22 AM 2025L000261



*Figure 7: Twitter post, dated April 19, 2022, promoting a "Risk-Free Bet".*
*(https://x.com/DKSportsbook/status/1516544714425708552)*

168. Some of DraftKings' advertisements for no-risk promotions include very small print referencing other terms.

169. In fact, DraftKings goes to great lengths to make it onerous to even comprehend that fine print terms apply. First, the link to the terms of the promotion are not even made available to a user until after the customer has already logged into the platform in response to an off-platform advertisement for the promotion and clicked through several steps to get to the point of placing the supposedly risk-free bet.

170. Even then, DraftKings buries the most important term—that if you lose your original bet you only get an expiring "Bonus Bet" back which is not treated like a normal bet in how it is paid out. The vital information—which contradicts the large print promises that the

35

FILED DATE: 1/8/2025 11:22 AM   2025L000261

customer is not at risk if they lose—only appears behind a tiny hyperlinked information symbol and then, if the symbol is clicked, deep in very small text below several blocks of much larger text focusing on other aspects of the promotion.



*Figure 8: Screenshot taken November 11, 2024, of the DraftKings user interface for placing a "No Sweat" bet. No terms and conditions are displayed. Instead, they are obscured by an easy-to-miss hyperlink, seen here as the almost imperceptible "i" with a small green circle around it next to "NBA No Sweat SGP or SGPx"*

171.    A user need not—and Plaintiffs did not—ever see the full terms before opting in to the promotion on the basis of DraftKings' advertising that led them to believe they could place a bet risk-free.

36

FILED DATE: 1/8/2025 11:22 AM    2025L000261

172.    For example, a user could opt into a "No Sweat" NBA same game parlay on DraftKings by flipping the green switch in the app shown above without ever clicking the tiny I symbol. Otherwise, they are never shown this disclosure of the promotion's full terms, which itself buries the lead:



FILED DATE: 1/8/2025 11:22 AM 2025L000261

11:13 

years of age or older (18+ if in DC/KY/NH/WY) (19+ if in CA-ONT). Any customer who is found to be ineligible to play on DraftKings (i.e., by way of self-exclusion from gaming, restriction due to employment, or otherwise) may not participate in this Promotion and immediately forfeits any bonus rewards which have been awarded under this Promotion.

In addition to the eligibility requirements set forth above and in the DraftKings Terms of Use, to participate in this Promotion, customers must (1) be a registered DraftKings Sportsbook customer with an active account, (2) receive an offer to participate in this Promotion, and (3) opt-in by clicking on the appropriate link or button within the Promotional Period.

NO SWEAT BET REDEMPTION

Upon completion of the promotion requirements, eligible customers will be awarded one (1) No Sweat Bet (the "Token"). Token valid only on 11/27 NBA bets (the "Qualifying Bet"). Maximum odds per leg of -500 or longer. Cashed-out bets and void tickets will void the Promotion. Bets placed with bonus rewards, including but not limited to Bonus Bets, Odds-Boosts/Surges, Profit Boosts, etc.) are not valid. Token expires at the conclusion of the final 11/27 NBA game. Qualifying Bet must be placed using cash from your cash balance or DK Dollars. Maximum reward limits apply and vary by customer cohort. Maximum reward limits will be clearly and conspicuously disclosed to the customer upon opting in.

No Sweat Bet: Tokens are single-use, non-withdrawable, and have no cash value. Must meet Qualifying Bet criteria and select Token BEFORE placing Qualifying Bet. Token only applies to Qualifying Bet. Reward issued only if Qualifying Bet loses after applying Token. Reward issued as Bonus Bet(s) based on the amount of losing Qualifying Bet. No Sweat Bets may not be combined with other bonus rewards and may not be eligible for use on all promotions and/or betting markets.

REWARD LIMITATIONS

Bonus Bets are single use, non-transferable, non-withdrawable, and have no cash value. Bonus Bets are valid for seven (7) days (168 hours) from the time they are credited to customers' accounts. Customers can choose when to use Bonus Bets and must select the Bonus Bet at the outset before placing a wager. Failure to use a Bonus Bet before expiration will void the reward. Payouts from Bonus Bet wagers will be transferred to the customer's cash balance and do not include the Bonus Bet stake. Ex: If a $10 bonus bet is placed at +100 odds and

11:13 

bet slip before placing a wager. Failure to use a Bonus Bet before expiration will void the reward. Payouts from Bonus Bet wagers will be transferred to the customer's cash balance and do not include the Bonus Bet stake. Ex: If a $10 bonus bet is placed at +100 odds and wins, only the profit of $10 will be credited to the customer's account. Bonus Bets may not be combined with other bonus rewards and may not be eligible for use on all promotions and/or betting markets.

GENERAL TERMS

Limit one (1) offer per customer. Customers must opt-in to this Promotion each time it is offered. Opting-in to this Promotion during a single day will only void during that day and does not opt the customer into future periods. See DraftKings Sportsbook Terms of Use for information and redemptions on wagering. Each customer will be notified when they have received an award by (1) a bell notification that is a red token this designates at balance on the home page of the DraftKings Sportsbook app and website that can be clicked on to view short on-the-menu copy and time and/or (2) an automatically triggered email. If the customer successfully entered the promotion and completed the promotion requirements. Whether a customer has committed abuse of this Promotion violated the Promotion Terms or DraftKings Terms of Use, will be determined by DraftKings in its sole discretion, for any reason or no reason at all. Should you wish to cancel your participation in this promotion at any time, please contact customer experience at support@us draftkings.com. Upon cancellation, you may withdraw any remaining funds deposited in connection with this promotion subject to DraftKings Terms of Use. Any wager placed on DraftKings Sportsbook in connection with the promotion cannot be refunded once it has been placed. However, any applicable bonus rewards in your account shall be void, subject to forfeiture, and may not be transferred or withdrawn. All promotions are subject to the DraftKings Terms of Use and Privacy Policy. By accepting any bonus rewards, registered customers agree to abide by the terms and conditions of this Promotion. Promotional offer is subject to regulatory approval. Void where prohibited by law. DraftKings accounts holders are residents of the any and all local, state, or federal taxes. DraftKings is not liable for computer or program malfunctions, nor for errors or bonus rewards. DraftKings reserves the right to exclude or remove certain customers from this Promotion, as well as the right to withhold bonus rewards if you have violated or attempted to violate the Promotion Terms or DraftKings Terms of Use, including but not limited to sharing account credentials with other individuals, placing wagers on behalf of other individuals, circumventing DraftKings' age and location verification procedures, and abusing the DraftKings Platform, the Services, or any bonuses, the refer-a-friend program, or

FILED DATE: 1/8/2025 11:22 AM 2025L000261



*Figure 9: The full terms of use for the promotion pictured in Figure 7. If a user navigates to these terms through the obscured hyperlink, they are met with an impractically small font size.*

173. Regulators are increasingly catching on to the misleading language DraftKings and other sportsbooks use in advertising "risk-free" bets. Several illustrative examples are discussed below.

174. In Ohio gambling regulators have said such "free" or "risk-free" inducements are "false, misleading and explicitly against" state law. Matthew Schuler, executive director of Ohio's Casino Control Commission, recently said: "If something is claiming to be free or risk-free, then it has to absolutely not require the patron to incur any loss or risk their own money." Disclosing the risks within the terms and conditions isn't good enough, he added. "We are not

39

FILED DATE: 1/8/2025 11:22 AM 2025L000261

supportive of trying to put the truth in small print."[18]

175.  DraftKings was sent a notice of violation by the Ohio Casino Control Commission which included a penalty of $150,000 for the use of "Risk-Free Bet" language. Previously, DraftKings had received a notice of violation from the same commission for advertising to individuals under the age of 21.

176.  In 2022, the New York Attorney General's office admonished: "Since online sports gambling became legal in New York last month, New Yorkers have been bombarded with misleading ads on social media and streaming sites that claim 'risk-free' bets and '$1,000 welcome offers,' which sound like free money, but often come with strings attached without consumers' awareness."[19]

177.  The Massachusetts Gaming Commission prohibits sportsbooks from running promotions advertised as "free" or "risk-free" if a bettor needs to risk their own money as part of the promotion. *See* 205 Mass. Code Regs. § 256.04. Colorado has imposed a similar prohibition. *See* 1 Colo. Code Regs. § 207-2:9.4

178.  Even the NBA took a stance on the "risk-free" language, banning it on platforms operated by the NBA or its franchises in February of 2023.[20]

179.  And, importantly, in September 2024, the Illinois Gaming Board voted to ban gambling advertisers from using the words "free", "cost free", or any language taken to mean

---

[18] Danny Funt, *Sportsbooks call them risk-free bets. Just don't read the fine print.*, WASHINGTON POST, Dec. 26, 2022, https://www.washingtonpost.com/sports/2022/12/26/risk-free-bets-mgm-draft-kings-fanduel-caesars/ (last visited Nov. 17, 2024).

[19] *CONSUMER ALERT: Attorney General James Warns New Yorkers of Deceptive Online Sports Betting Companies Ahead of Super Bowl*, NEW YORK ATTORNEY GENERAL, Feb. 10, 2022, https://ag.ny.gov/press-release/2022/consumer-alert-attorney-general-james-warns-new-yorkers-deceptive-online-sports#:~:text=Since%20online%20sports%20gambling%20became,strings%20attached%20-without%20consumers'%20awareness (last visited Nov. 17, 2024).

[20] Bill King, *Concerned about betting's inherent dangers, NBA to ban 'risk free' advertising*, SPORTS BUSINESS JOURNAL, Feb. 6, 2023 https://www.sportsbusinessjournal.com/Journal/Issues/2023/02/06/Upfront/betting.aspx (last accessed Nov. 21, 2024).

"free of risk" in promotional materials.[21]

FILED DATE: 1/8/2025 11:22 AM 2025L000261

180.    Many of the sportsbooks, including DraftKings, started to quietly move away from explicit "risk-free" language in late 2022. In that year, DraftKings pivoted to labeling these offers "No Sweat" bets. These promotions are materially no different, and just as misleading, as their "Risk-Free" predecessors, particularly considering that consumers in Illinois still associate these offers, however labeled, with the "Risk-Free" promotion campaigns that were incessantly advertised on countless NFL, NBA, NHL, and MLB games. Despite Illinois Gaming Board's new regulations, DraftKings has continued to imply that betting on its platform in Illinois can be no-risk as recently as December 2024.

---

[21] *Regular Meeting Open Session Minutes*, ILLIOIS GAMING BOARD, Sept. 12, 2024, https://igb.illinois.gov/content/dam/soi/en/web/igb/documents/board-meetings/minutes/2024/20240912-open-meeting-minutes.pdf (last access Nov. 21, 2024).

FILED DATE: 1/8/2025 11:22 AM   2025L000261



*Figure 10: A "No Sweat" NBA offer on the DraftKings Sportsbook app from December 4, 2024.*

181.    According to a Washington Post article, industry participants admitted publicly that advertising offers as no-risk was "unclear".

182.    Nevertheless, DraftKings continued to make these offers because it expected and intended consumers to be misled by its "Risk-Free" and "No Sweat" promotions.

42

183.    At no time in DraftKings' marketing or during DraftKings' sign-up process were Plaintiff and the Class Members warned of the true financial risks of using DraftKings' services to place a bet, including the immediate and acute risk of losing the entire amount in that initial bet, the risk that losses would never be reimbursed by Defendant and the longer term financial and psychological risks of developing a gambling addiction.

184.    As described above, Defendants' marketing (including during the user sign-up process) misrepresented and omitted several key facts about the "Risk-Free" and "No Sweat" bet promotions.

185.    Because a "Bonus Bet" must be gambled quickly and cannot be deposited in the customer's bank account as cash, there is nothing "Risk-Free" about the transaction.

186.    However, customers like Plaintiffs who were misled into thinking that they could bet without risk and then lost their bet ended up losing a substantial portion of their initial stake.

187.    Had the Plaintiffs and Class Members understood the true risk inherent in making these "risk-free bets," they would have acted differently and not lost as much money.

**E.  DraftKings' $1,000 sign-up bonus promotions**

188.    "Risk-Free Bet" offers are not the only deceptive promotions that DraftKings employs. For several years, DraftKings has also been offering a bonus of up to $1,000 for new customers who opened accounts and deposited money.

189.    Since at least 2020, DraftKings has advertised their promises of a "1,000 Sign Up Bonus" to countless Illinoisans watching televised MLB, NFL, NBA, and NHL games, and have made themselves regulars on the Twitter, Instagram, Facebook, and TikTok feeds of their millions of followers.

43

FILED DATE: 1/8/2025 11:22 AM 2025L000261

190. DraftKings also advertised sign-up bonuses on I-94 billboards and CTA trains and buses.

191. The unfair and deceptive terms of this promotion, which they offer to this day, make it inordinately unlikely for a user to obtain the advertised $1,000. Omitted from the promising headline is the reality that DraftKings will only match 20% of a user's deposit and will require a user to play through (and risk) 25x the amount of bonus money rewarded.

192. In plain terms—which the fine print regarding this promotion deliberately obscures and the large-print advertisements for this promotion completely misrepresent—in order for a user to get a $1,000 bonus, they actually need to deposit five times that amount ($5,000), and then, within 90 days, *risk $25,000 on DraftKings sports bets*.

193. Additionally, in order to satisfy the playthrough requirement, DraftKings requires that these bets be placed at minimum odds of -300 (meaning a bettor must risk $300 to win $100). This means bettors must place a series of highly risky bets to satisfy the playthrough requirements.

194. None of the foregoing is adequately disclosed to the customer.

195. A new user is statistically likely, even using the most conservative betting approach, to lose money trying to satisfy the playthrough requirement.

196. But even if they make it through all those steps, the $1,000 bonus is not rewarded as withdrawable cash funds, but rather as "DK Dollars" that hold no cash value, are non-withdrawable, non-transferable, non-refundable, and can only be used for further gambling.

197. DraftKings' advertising of the Bonus is also unfair and deceptive because an eligible consumer who is often a new participant in sports betting, would be unlikely to understand the cost and risk involved in qualifying for the $1,000 Bonus. In fact, if the

44

FILED DATE: 1/8/2025 11:22 AM 2025L000261

Plaintiffs had understood the cost or the odds of winning the Bonus, they would not have acted upon the promotion.

198. DraftKings advertised the "$1,000 Bonus" as a reward for signing up for its Sportsbook platform in these terms:



*Figure 11: DraftKings post on Twitter, dated February 15, 2022, using fan-favorite NBA player Paul Pierce to promote false promises of a "Deposit Bonus up to $1,000".*

*(https://x.com/DKSportsbook/status/1493660970870312967)*

FILED DATE: 1/8/2025 11:22 AM 2025L000261



*Figure 12: Screenshot from an advertisement typical of those broadcasted by DraftKings on television and digital media in Illinois during the Class Period.*

46

FILED DATE: 1/8/2025 11:22 AM   2025L000261



*Figure 13: A Twitter post, dated April 20, 2022, featuring rapper Lil Wayne and promising customers that they can simply "Download the [DraftKings] app today and get a deposit bonus up to $1,000". (https://x.com/DKSportsbook/status/1516830656721993729)*

199.    Plaintiffs Zafer, Davis, and Smothers all saw advertisements on television or social media for DraftKings' sign-up bonus promotion shortly before they funded their accounts on DraftKings.

47

FILED DATE: 1/8/2025 11:22 AM   2025L000261

200.    These Plaintiffs were misled by the advertising for the promotion and, as a result, they deposited more money than they would have with DraftKings had they been informed of the actual terms of the promotion.

201.    As with the no-risk promotion advertisements, the terms of this promotion are not fully disclosed in the advertisements and, to the extent that they are communicated, they appear in an illegibly small font-size—an order of magnitude smaller than the misleading text advertising the promotion—and are confusingly worded.

202.    Plaintiffs and many other users signed up for DraftKings and funded their account anticipating that their deposit would be "matched" in full up to $1,000.

203.    Plaintiffs and most users never became aware that there were additional terms much less saw the full terms of the promotion or learned that their funds would not be matched in U.S. Dollars, not be matched on a 1:1 basis, and would only be matched at a rate of one DK Dollar for every $25 USD wagered.

204.    Notwithstanding the large text of DraftKings' advertisements, a new customer of DraftKings was never going to simply receive "up to $1,000" in exchange for signing up for the sportsbook platform and depositing $1,000, as the ads implied. In order for a new customer to obtain the "$1,000 Bonus," he or she would have to satisfy three very onerous requirements, explained only in the unreadably small font size above:

      a.   They would have to deposit $5,000 up front;

      b.   They would have to bet $25,000 within 90 days;

      c.   Their $25,000 in bets would have to be placed on wagers with odds of "-300 or longer."

48

FILED DATE: 1/8/2025 11:22 AM 2025L000261

205. The Plaintiffs and other users could not reasonably have been expected to understand from the face of DraftKings' advertisements that, in order to receive a $1,000 bonus, he or she needed to immediately deposit $5,000, because the bonus amount is calculated as 20% of the consumer's first deposit.

206. The Plaintiffs could not reasonably have been expected to understand from the face of DraftKings' advertisements that the $1,000 bonus would not be provided at the time of their initial deposit, but that instead he or she would earn the bonus only $1 at a time for every $25 wagered. Thus, to receive the $1,000 bonus, the new customer would have to risk $25,000 within 90 days on bets that DraftKings' odds-makers consider to have a less-than-75% likelihood of winning (−300 odds or longer).

207. The Plaintiffs did not understand and could not reasonably have been expected to understand based on DraftKings' advertisements that, in order to place bets for at least $25,000 over 90 days to qualify for the Bonus, they would have had to wager an average of more than $276 gambling on sports every day for three months.

208. Plaintiffs also did not understand that, even if they met the $5,000 initial deposit and $25,000 of gambling in 90 days requirements, the Bonus would not be awarded in funds that could be withdrawn, but only as a non-withdrawable credit ("DK Dollars") to be used for further gambling.

209. Plaintiffs and Class Members also could not reasonably be expected to understand that they would be required to make bets with a high level of risk to satisfy the play-through requirements. They could not have been expected to understand that, contrary to the express terms of the advertisements for the "Bonus Match" promotion, not all bets they made on DraftKings Sportsbook would count toward the $1,000 bonus. In fact, any bets that

49

FILED DATE: 1/8/2025 11:22 AM  2025L000261

DraftKings' oddsmakers believe have a greater than ~75% chance of winning would not count toward the required total bets of $25,000 within 90 days.

210. Gambling regulators, like the New York Attorney General, have sounded warning bells about the misleadingness and illegality of deposit match promotions just like the ones DraftKings used on Illinois residents.

211. DraftKings knew, or should have known, that its advertisement and promotion was deceptive to its target customers, who were customers new to sports betting and who were extremely unlikely to understand the details of the promotion, even if it were in readable English on the company's platform or in a font size that a reasonable consumer could be expected to read.

212. DraftKings knowingly and intentionally designed this promotion to maximize the number of consumers that would sign up for its sports gambling platform, the number of bets that would be placed through the platform, and the amount of money that would be placed on bets through its platforms.

**F. DraftKings designed its interface to prevent users from learning of the additional terms and understanding that promises in its advertisements were false**

213. Consumer psychology research has identified several factors that decrease people's likeliness to read the fine print of consumer contracts.[22] First, researchers point out that when contract forms are intentionally made not user-friendly, consumers are less likely to

---

[22] Meirav Furth-Matzkin & Roseanna Sommers, , *Fool Me Once, Shame On Me: How Consumers And Lawyers Perceive The Fine Print In Deception Cases*, HARVARD JOHN M. OLIN CENTER FOR LAW, ECONOMICS, AND BUSINESS - FELLOWS' DISCUSSION PAPER SERIES, June 2018, https://www.law.harvard.edu/programs/olin_center/felows_papers/pdf/Furth_82.pdf (last visited Dec. 10, 2024); Florencia Marotta-Wurgler, , *Will Increased Disclosure Help? Evaluating the Recommendations of the ALI's "Principles of the Law of Software Contracts"*, U. CHI. L. REV., Feb. 6, 2011, https://lawreview.uchicago.edu/sites/default/files/78-1-Increased%20Disclosure%20in%20Software%20Contracts-Marotta-Wurgler.pdf (last visited Dec. 10, 2024).

FILED DATE: 1/8/2025 11:22 AM 2025L000261

engage with them.

214.    For example, researchers at New York University note that "Font sizes are often very small and the clauses within sentences can be very long which can make it physically difficult and taxing for consumers to read."[23]

215.    The terms of a "Risk-Free Bet" and "Sign Up Bonus" are often over one thousand words long with small font sizes and lengthy sentences that make it excessively taxing for users to follow.

216.    The NYU researchers' paper goes on to mention that "Even if consumers were able to dissect the legalese in which contracts are written, the process of doing so would be exceedingly difficult especially since relevant passages are often buried in other language."

217.    DraftKings only reveals the truth of its unfavorable promotions after multiple paragraphs describing age and location requirements for betting on their platform. Even if a user is able to hunt down language that describes the promotion's reality, it is written in a way that makes it unlikely that a layperson—who is eager to get gambling—will understand.

218.    Furthermore, according to the NYU researchers, "consumers will also often have difficulty imagining problems that might arise. That is, scenarios under which things can go wrong never enter their minds."

219.    After exposure to DraftKings promising headlines, consumers are unlikely to predict that redeeming these promotions will entail such onerous requirements and fruitless rewards.

---

[23] Debra Pogrund Stark & Jessica M. Choplin, *A License to Deceive: Enforcing Contractual Myths Despite Consumer Psychological Realities*, NYU JOURNAL OF L. AND BUS., Feb. 9, 2009, https://papers.ssrn.com/-sol3/papers.cfm?abstract_id=1340166 (last visited Dec. 10, 2024).

FILED DATE: 1/8/2025 11:22 AM   2025L000261

220.    The authors also write that "even if some consumers manage to foresee the possibility of potential negative consequences, they will often be overly optimistic in assessing the probability of those negative consequences once they have invested even a small amount of time, effort, or other resources pursuing a goal."

221.    By the time a user is presented with the full terms of a promotion, they have grown excited about DraftKings' alluring promises and have put time and effort into navigating to the platform's compelling offer.

222.    Moreover, research shows that social norms often discourage reading the fine print of a contract. Consumers believe that DraftKings, a company operating in a heavily regulated industry, can be trusted for the promises it's making in its advertisements. Consumers do not think, therefore, that they need to carefully read pages of fine print to protect themselves.

223.    Finally, DraftKings' contract is one of adhesion with terms that are non-negotiable, "[a]nother major reason why people might not read the contracts that they sign… [is that t]he consumers' choice is to accept the offered agreement or go elsewhere." DraftKings customers understand that reading the fine print will not lend itself to mediating a more favorable deal.

224.    DraftKings exploits these factors and misleads consumers about material aspects of its promotions, secure in the knowledge that few consumers will notice if the fine print contradicts what they believed they had signed up for.

## CLASS ALLEGATIONS

225.    Plaintiffs bring this action on behalf of themselves, and all others similarly situated pursuant to under ILCS § 5/2-801, as representatives of the following class and subclasses, for which Plaintiff seeks certification, defined as follows:

FILED DATE: 1/8/2025 11:22 AM  2025L000261

226.     **No-Risk Promotion Class:** Any person who opted into a DraftKings promotion advertising a "Risk-Free" or "No Sweat" bet with Defendant and lost their bet.

> a.  **Illinois Subclass:** Any person who wagered in the state of Illinois and utilized a DraftKings promotion advertising a "Risk-Free" or "No Sweat" bet with Defendant and lost their first bet within the applicable statute of limitations period.

227.     **Signup Bonus Promotion Class:** Any person who opened an account and deposited money in response to a DraftKings "$1,000 Bonus" promotion for new customers.

> a.  **Illinois Subclass:** Any person who opened an account and deposited money while in the state of Illinois in response to a DraftKings "$1,000 Bonus" promotion for new customers.

228.     **Targeted Underage Users Class:** Any person who opened an account and entered free promotions on DraftKings' platform before turning twenty-one years old and then placed paid bets on DraftKings after turning twenty-one years old.

> a.  **Illinois Subclass:** Any person who opened an account and entered free promotions on DraftKings' platform while in the state of Illinois before turning twenty-one years old and then placed paid bets on DraftKings after turning twenty-one years old.

229.     Excluded from these Classes are (a) Defendants and any of their members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; (b) class counsel and their employees; and (c) the judicial officers and Court staff assigned to this case and their immediate family members.

FILED DATE: 1/8/2025 11:22 AM   2025L000261

230.     The Class Period for each promotion class is tolled to the earliest date of DraftKings' distribution of each of the relevant promotions under the continuing violation doctrine. DraftKings has engaged in an ongoing scheme to mislead consumers regarding the true terms of its promotions. As described more fully above, Plaintiffs have been misled and injured by the cumulative effect of DraftKings' misleading advertisements since gambling was legalized in Illinois.

231.     Alternatively, the Class Period extends from the relevant statutory limitations period for each cause of action through the date of judgment in this case and includes any continuing violations that DraftKings engages in while this litigation is pending.

232.     This case is properly brought as a class action for the following reasons:

a.   **Ascertainability:** The Class Members can be readily identified through Defendants' records which will include a record of all those users who signed up for various promotions and must also track customer's state of residence. The members will be identified by filtering DraftKings' records for Illinois users who entered into each of the identified promotions and lost money.

b.   **Numerosity:** The Class is so numerous that joinder of all members in this action is impracticable. The exact number and identity of all Class Members is unknown by Plaintiff at this time. However, Plaintiffs believes there are tens of thousands and potentially even hundreds of thousands of Class Members. The number and identity of Class Members can be determined through discovery of Defendant.

c.   **Commonality and Predominance:** Plaintiffs and Class Members were all injured by the same unlawful conduct. Therefore, this action involved common questions of law and fact, which predominate over any questions affecting only

54

FILED DATE: 1/8/2025 11:22 AM   2025L000261

individual Class Members, including, without limitation:

- Whether DraftKings misrepresented in its advertisements that the Plaintiffs and the other No-Risk Promotion Class Members would not be at risk of losing money when they made a deposit and placed a first bet;

- Whether DraftKings intentionally designed its advertisements for the no-risk bet in such a way as to mislead the Plaintiffs and the other No-Risk Promotion Class Members in order to induce them to sign up and wager;

- Whether DraftKings' representations and omissions about the No-Risk Promotions are false, misleading, deceptive, or likely to deceive;

- Whether DraftKings misrepresented in its advertisements the Bonus it was offering to the Plaintiffs and the other Signup Bonus Promotion Class Members

- Whether DraftKings intentionally designed its advertisements for the signup bonus promotions in such a way as to mislead the Plaintiffs and the other Signup Bonus Promotion Class Members in order to induce them to sign up and wager;

- Whether DraftKings' representations and omissions about the Signup Bonus Promotion are false, misleading, deceptive, or likely to deceive;

- Whether DraftKings adequately disclosed the facts and/or risks concerning the use of its sportsbook service;

- Whether DraftKings' actions violate Illinois statutory law regarding

FILED DATE: 1/8/2025 11:22 AM   2025L000261

unfair business practices invoked herein;

- Whether DraftKings' actions violate the Illinois common law causes of action invoked herein; and

- The appropriate measure of damages to award Plaintiffs and the other Class Members.

d. The appropriate injunctive relief to which Plaintiffs and the other Class Members are entitled.

e. **Typicality:** Plaintiffs' claims are typical of those of the other Class Members' claims because Plaintiffs and each of the other Class Members were induced to transact on DraftKings by one or more of the identified promotions. The promotions identified were widely distributed by DraftKings over a long period of time and the promotion that the Plaintiffs responded to does not materially differ from promotions that any other Class member would have responded to. The misrepresentations at issue were substantially uniform in content, presentation, and impact upon Plaintiff and Class Members. Plaintiffs' injury has been caused by the same conduct of DraftKings, which would provide the same basis for a claim for all Class Members.

f. **Adequacy of Representation:** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class Members whom they seek to represent. Plaintiffs intend to vigorously prosecute this action, and Class Members' interests will be fairly and adequately protected by Plaintiffs and their chosen counsel. Plaintiffs have retained counsel that is competent and experienced in complex class action and consumer protection and

56

FILED DATE: 1/8/2025 11:22 AM    2025L000261

Plaintiffs' counsel will devote the time and financial resources necessary to vigorously prosecute this action. Neither Plaintiffs nor their counsel have any interests adverse to the Class.

g.  **Superiority:** A class action is superior to individual adjudications because joinder of all Class Members is impracticable, would create a risk of inconsistent or varying adjudications, and would impose an enormous burden on the judicial system. Furthermore, the amount-in-controversy for each individual class member is likely relatively small, and if each Class member were required to file an individual lawsuit, Defendant would necessarily gain a significant and unfair advantage since it would be able to exploit and overwhelm the limited resources of each individual plaintiff with its vastly superior financial and legal resources. As such, a class action presents far fewer management difficulties than individual adjudications, preserves the resources of the parties and the judiciary, and protects the rights of each class member. This is an appropriate forum in which to litigate these claims, as the Illinois state population and the Class Members are concentrated in this forum. Finally, there are no particular difficulties presented by the management or trial of this action as a class action.

h.  **Declaratory and Injunctive Relief**: DraftKings acted or refused to act on grounds generally applicable to Plaintiffs and the other Class Members, such that final injunctive and declaratory relief is appropriate with respect to the Class as a whole.

FILED DATE: 1/8/2025 11:22 AM  2025L000261

## CAUSES OF ACTION
## FIRST CAUSE OF ACTION
### Violation of Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS §§ 505/1, *et seq.*, (Asserted on behalf of No-Risk Promotion Illinois Sub-Class)

233.    Plaintiffs repeat and reallege the other allegations in this Complaint as if fully set forth herein.

234.    Plaintiffs James Beyer, Collin Smothers, and Corey Davis bring this claim against DraftKings under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505, et seq., individually and on behalf of the No-Risk Promotion Illinois Sub-Class.

235.    The ICFA declares unlawful "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS § 505/2.

236.    DraftKings is a "person" as defined by 815 ILCS § 505/1(c)

237.    Plaintiffs, as well as each member of the No-Risk Promotion Class, are "person[s]" as defined by 815 ILCD § 505/1(c) as well as actual or potential "consumer[s]" of the products and services offered by DraftKings, or are successors in interest to actual persons or consumers as defined by 815 ILCS § 505/1(e).

238.    The circumstances that relate to the transactions giving rise to this claim occurred primarily and substantially in Illinois because DraftKings caused to be disseminated throughout the state of Illinois through advertising, marketing, and other publications, statements that were deceptive and misleading, and which it intended would mislead consumers in Illinois.

FILED DATE: 1/8/2025 11:22 AM   2025L000261

239.   DraftKings's course of conduct involved trade or commerce, as defined by 815 ILCS § 505/1(f) as its actions were taken in the course of its business in Illinois.

240.   DraftKings' conduct was unfair and deceptive in that DraftKings used and employed deception, fraud, false promises, and misrepresentations about the nature of the no-risk promotions.

241.   DraftKings' conduct was also unfair and deceptive in that DraftKings used and employed concealment, suppression, and omission of material facts as to the nature of the no-risk promotions.

242.   DraftKings' conduct violated Illinois law because its advertisements represent that its promotion contains characteristics that it does not have. DraftKings represented that consumers could place bets without risking their own money when, in fact, this was not the case.

243.   DraftKings' conduct also violates the Illinois Gaming Board's regulations regarding advertising, Title 11, Chapter I, Section 1900.340 as amended by the Board on September 12, 2024, to prohibit false and deceptive claims and specifically the promotion of "events as free of risk."

244.   DraftKings advertised its promotion with no intent to sell its services as advertised.

245.   DraftKings's advertisements and promotions created a likelihood of confusion and misunderstanding among consumers.

246.   DraftKings's misrepresentations were material because they were likely to deceive reasonable consumers—uninitiated in the new industry of online sports gambling—about the nature of its no-risk offers inducing them into spending money and placing bets on its

platform. These misrepresentations were substantially uniform in content, presentation, and impact upon Plaintiff and Class Members.

247. DraftKings intended that the Plaintiffs and Class Members be misled by the misrepresentations and omissions in its no-risk promotions.

248. DraftKings induced the Plaintiffs and Class Members to rely on its misrepresentations and omissions.

249. Without the misrepresentation and omissions in DraftKings advertising, the Plaintiffs and No-Risk Promotion Class Members would not have created accounts with DraftKings and/or would not have deposited as much money into their DraftKings accounts and/or placed bets on DraftKings' platform.

250. As a direct and proximate result of DraftKings' unfair and deceptive practices, Plaintiffs and No-Risk Promotion Class Members suffered injuries in the form of monetary losses when they failed to receive cash refunds for bets they placed and lost in reliance on DraftKings "Risk-Free" and "No Sweat" promotions.

251. These acts caused substantial monetary injury to Plaintiffs and the members of the No-Risk Promotion Class that they could not reasonably avoid.

252. DraftKings knew or should have known that its misrepresentations and omissions would deceive Plaintiffs and the No-Risk Promotion Class. DraftKings's actions in engaging in the above-named unfair practices and deceptive acts were willful, intention, and/or done with reckless indifference with respect to the rights of Plaintiffs and the No-Risk Promotion Class.

253. DraftKings's conduct has caused and is causing immediate and irreparable injury to Plaintiffs and the Illinois Subclass and will continue to both damage Plaintiffs and the No-

FILED DATE: 1/8/2025 11:22 AM   2025L000261

Risk Promotion Class and deceive the public unless enjoined by this Court.

254.    Plaintiffs and the Illinois Subclass seek relief under the ICFA, including (but not limited to) actual damages, compensatory damages, statutory damages, restitution, penalties, injunctive relief, punitive damages, and attorney's fees and costs.

## SECOND CAUSE OF ACTION
### Violation of Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS §§ 505/1, *et seq.*, (Asserted on behalf of Signup Bonus Promotion Illinois Sub-Class)

255.    Plaintiffs repeat and reallege the other allegations in this Complaint as if fully set forth herein.

256.    Plaintiffs Corey Davis, Colin Smothers and Mateen Zafer bring this claim against DraftKings under the ICFA, 815 ILCS 505, *et seq.*, individually and on behalf of the Signup Bonus Promotion Illinois Sub-Class.

257.    DraftKings's conduct was unfair and deceptive in that DraftKings used and employed deception, fraud, false promises, and misrepresentations about the nature of the signup bonus promotions.

258.    DraftKings' conduct was also unfair and deceptive in that DraftKings used and employed concealment, suppression, and omission of material facts as to the nature of the signup bonus promotions.

259.    DraftKings' "$1,000 Bonus" offer is also unfair and deceptive because the Plaintiffs and the members of the Class were required to act differently than they could reasonably expect in order to obtain the promised bonus. Plaintiffs and the members of the Class were required to deposit and wager large sums of money in a manner designed by Defendant to induce repeated exposure to a known addictive product.

FILED DATE: 1/8/2025 11:22 AM    2025L000261

260.     DraftKings' conduct violated Illinois law because its advertisements represent that its promotion contains characteristics that it does not have. DraftKings represented that consumers would receive a cash-value match of their deposit when, in fact, this was not the case.

261.     DraftKings advertised its promotion with no intent to sell its services as advertised.

262.     DraftKings's advertisements and promotions created a likelihood of confusion and misunderstanding among consumers.

263.     DraftKings's misrepresentations were material because they were likely to deceive reasonable consumers—uninitiated in the new industry of online sports gambling— about the nature of its signup bonus offers inducing them into spending money and placing bets on its platform. These misrepresentations were substantially uniform in content, presentation, and impact upon Plaintiffs and Class Members.

264.     DraftKings intended that the Plaintiffs and Class Members be misled by the misrepresentations and omissions in its signup bonus promotions.

265.     DraftKings induced the Plaintiffs and Class Members to rely on its misrepresentations and omissions.

266.     Without the misrepresentations and omissions in DraftKings advertising, the Plaintiffs and Signup Bonus Promotion Class Members would not have created accounts with DraftKings and/or would not have deposited as much money into their DraftKings accounts and/or placed bets on DraftKings' platform.

267.     As a direct and proximate result of DraftKings unfair and deceptive practices, Plaintiffs and Signup Bonus Promotion Class Members suffered injuries in the form of

FILED DATE: 1/8/2025 11:22 AM   2025L000261

monetary losses when they failed to receive a cash deposit match for the funds they deposited in their DraftKings accounts.

268.     These acts caused substantial injury to Plaintiffs and the members of the Signup Bonus Promotion Class that they could not reasonably avoid.

269.     DraftKings knew or should have known that its misrepresentations and omissions would deceive Plaintiffs and the Signup Bonus Promotion Class. DraftKings's actions in engaging in the above-named unfair practices and deceptive acts were willful, intention, and/or done with reckless indifference with respect to the rights of Plaintiffs and the Signup Bonus Promotion Class.

270.     DraftKings's conduct has caused and is causing immediate and irreparable injury to Plaintiffs and the Illinois Subclass and will continue to both damage Plaintiffs and the Signup Bonus Promotion Class and deceive the public unless enjoined by this Court.

271.     Plaintiffs and the Illinois Subclass seek relief under the ICFA, including (but not limited to) actual damages, compensatory damages, statutory damages, restitution, penalties, injunctive relief, punitive damages, and attorney's fees and costs.

### THIRD CAUSE OF ACTION
**Violation of Illinois Consumer Fraud and Deceptive Business Practices Act,
815 ILCS §§ 505/1, *et seq.*, (Asserted on behalf of Targeted Underage User Illinois
Sub-Class)**

272.     Plaintiffs repeat and reallege the other allegations in this Complaint as if fully set forth herein.

273.     Plaintiff James Beyer brings this claim against DraftKings under the ICFA, 815 ILCS 505, *et seq.*, on behalf of themselves and the Targeted Underage User Illinois Sub-Class.

274.     DraftKings's conduct was unfair and unconscionable because DraftKings targeted minors and those under the age of twenty-one years old, which is contrary to

63

FILED DATE: 1/8/2025 11:22 AM   2025L000261

established Illinois public policy (specifically, but not exclusively, 230 ILCS 10/11(10) and Illinois Administrative Code Title 11, Chapter I, Section 1900.340(e)), is immoral, unethical, oppressive, and outrageous, and is substantially injurious to young people in Illinois who become hooked on sports betting on DraftKings platform before they are even of legal gambling age.

275.    DraftKings' conduct was unfair and deceptive because, as alleged more fully above, DraftKings targeted underage users with its advertising, knew or was reckless to the fact that underage users were on its platform, and took advantage of the relationships it had with underage user of its daily fantasy sports contests to inculcate gambling habits in its users that allowed it to quickly turn a profit off of them once they turned twenty-one years old.

276.    DraftKings intended that the Plaintiffs and Class Members view its advertisements, interact with its platform and form gambling habits before they reached legal gambling age.

277.    DraftKings' advertisements and conduct towards underage users created a likelihood of harm among those consumers who the legislature has made a judgment are not yet mature enough to engage in the dangerous act of sports betting. These actions caused substantial harm that greatly outweighs any possible utility from the conduct.

278.    DraftKings' actions induced Plaintiffs and Class Members to gamble on DraftKings immediately upon coming of age and lose money doing so.

279.    DraftKings actions also led Plaintiffs to develop unhealthy gambling habits that have substantially and negatively impacted their finances and wellbeing.

280.    DraftKings's actions actually and proximately caused actual damages to Plaintiffs and Class Members. Absent DraftKings' unfair and deceptive conduct, Plaintiffs and

64

FILED DATE: 1/8/2025 11:22 AM   2025L000261

Class Members would have behaved differently and would not have engaged in sports betting on DraftKings' platform or would have gambled less money and less frequently. DraftKings' conduct with respect to underage users was substantially uniform in content and impact upon Plaintiffs and Class Members.

281.    These acts caused substantial injury to Plaintiffs and the members of the Targeted Underage User Class that they could not reasonably avoid.

282.    DraftKings's actions in engaging in the above-named unfair practices and deceptive acts were willful, intentional, and/or done with reckless indifference with respect to the rights of Plaintiffs and the Targeted Underage User Class.

283.    DraftKings's conduct has caused and is causing immediate and irreparable injury to Plaintiffs and the Targeted Underage Users Class and will continue to damage Plaintiffs, the Class and the public unless enjoined by this Court.

284.    Plaintiffs and the Illinois Subclass seek relief under the ICFA, including (but not limited to) actual damages, compensatory damages, statutory damages, restitution, penalties, injunctive relief, punitive damages, and attorney's fees and costs.

### FOURTH CAUSE OF ACTION
**Intentional Misrepresentation (Asserted on behalf of No-Risk Promotion Class)**

285.    Plaintiffs repeat and reallege the other allegations in this Complaint as if fully set forth herein.

286.    DraftKings has intentionally represented that it will ensure that customers will not be liable for losing initial bets. Although DraftKings advertised that consumers could place a "risk free" or "no sweat" bet these representations were false. Despite this representation, the promotions in fact carry a substantial risk of loss and when users lose their first bet, they receive credits with no cash value that may never allow them to recoup their initial losses.

65

FILED DATE: 1/8/2025 11:22 AM   2025L000261

Therefore, Defendants misrepresented the promotional offers.

287.     These representations were material, in that a reasonable viewer would rely on them when deciding to proceed with creating and funding an account on DraftKings's platform, and placing an initial bet in reliance on the promotion.

288.     Defendants, in promoting and marketing DraftKings to consumers, had a duty of care to reasonably disclose and inform customers of material dangers and risks of the DraftKings service and to not mislead its customers and the public at large about its offerings, particularly as a leading competitor in a highly regulated industry.

289.     At all relevant times when Defendants made such representations, Defendants knew that the representations were misleading, or acted recklessly in making the representations, without regard for their truth or falsity.

290.     DraftKings knew and intended that Plaintiffs and members of the Classes would rely upon its misrepresentations when deciding whether to wager on DraftKings.

291.     DraftKings intended its consumers to rely on these misrepresentations. It could have honestly represented the terms of its promotion: "if you lose, you'll get an expiring bonus bet that will not pay back the stake if it wins." But DraftKings knew that such an offer would not entice customers to bet more money or more frequently.

292.     Plaintiffs and Class Members did rely on these misrepresentations in placing bets on DraftKings' platform.

293.     Plaintiffs and Class Members reasonably and justifiably relied on Defendants' intentional misrepresentations when placing bets via its promotions. Among other things, this reliance was justified because consumers were entitled to understand that these advertisements would comply with applicable law in a highly regulated industry.

FILED DATE: 1/8/2025 11:22 AM   2025L000261

294.     As a state licensed sports betting platform, DraftKings knew or should have known that its representations in marketing materials about its service being without risk are inaccurate and misleading. DraftKings had no reasonable grounds for believing its misrepresentations were not false or misleading and was careless and negligent in not ascertaining the truth of its misrepresentations and their effect on consumers before making them.

295.     Plaintiffs and Class Members acted in reliance upon Defendants' false and misleading statements by signing up for and using the DraftKings service to make initial bets.

296.     Neither Plaintiffs nor any reasonable consumer would have used DraftKings in the same way if they had known of the true operation and risks of DraftKings's service—risks the Defendants alone were aware of and misrepresented.

297.     As a direct and proximate result of DraftKings's misrepresentations, Plaintiffs and members of the Classes were induced into using DraftKings's service and have been harmed and suffered actual damages in the amount of unrecouped losses incurred as a result of an initial bet.

298.     Plaintiffs seek all available remedies, damages, and awards as a result of Defendants' negligent misrepresentations, including compensatory damages and costs.

## FIFTH CAUSE OF ACTION
**Intentional Misrepresentation (Asserted on behalf of Signup Bonus Promotion Class)**

299.     Plaintiffs repeat and reallege the other allegations in this Complaint as if fully set forth herein.

300.     DraftKings has intentionally misrepresented that it will ensure that customers would receive a cash match of their initial deposit up to $1,000. These representations were false. Consumers actually received only a percentage of their deposit *only if* they wagered their

FILED DATE: 1/8/2025 11:22 AM    2025L000261

initial deposit amount twenty-five times on long-odds bets. Even then, consumers only received "DK Dollars", not redeemable for cash and not treated like normal bets. Therefore, Defendants misrepresented the promotional offers.

301.    These representations were material in that a reasonable viewer would rely on them when deciding to proceed with creating and funding an account on DraftKings's platform and placing an initial bet in reliance on the promotion.

302.    Defendants, in promoting and marketing DraftKings to consumers, had a duty of care to reasonably disclose and inform customers of material dangers and risks of the promotion and to not mislead its customers and the public at large about its offerings, particularly as a leading competitor in a highly regulated industry.

303.    At all relevant times when Defendants made such representations, Defendant knew that the representations were misleading, or acted recklessly in making the representations, without regard for their truth or falsity.

304.    DraftKings knew and intended that Plaintiffs and members of the Classes would rely upon its misrepresentations when deciding whether to deposit and wager on DraftKings.

305.    Plaintiffs and Class Members reasonably and justifiably relied on Defendants' intentional misrepresentations when placing bets via its promotions. Among other things, this reliance was justified because consumers were entitled to understand that these advertisements would comply with applicable law in a highly regulated industry.

306.    As a state licensed sports betting platform, DraftKings knew or should have known that its representations in marketing materials about deposit matches are inaccurate and misleading. DraftKings had no reasonable grounds for believing its misrepresentations were not false or misleading and was intentional or reckless in advertising those misrepresentations.

68

307. Plaintiffs and members of the Classes acted in reliance upon Defendants' false and misleading statements by signing up for and using the DraftKings service to make initial bets. prior to making them.

308. Neither Plaintiffs nor any reasonable consumer would have initially deposited as much money on DraftKings if they had known the true terms of the signup bonus promotion that DraftKings misrepresented.

309. As a direct and proximate result of DraftKings's misrepresentations, Plaintiffs and members of the Classes were induced into wagering more money and more frequently than they otherwise would have and have been harmed and suffered actual damages in the amount of unrecouped losses incurred as a result.

310. Plaintiffs seek all available remedies, damages, and awards as a result of Defendants' negligent misrepresentations, including compensatory damages and costs.

### SIXTH CAUSE OF ACTION
**Fraudulent Inducement (Asserted on behalf of All Classes)**

311. Plaintiffs repeat and reallege the other allegations in this Complaint as if fully set forth herein.

312. Plaintiffs bring this claim against Defendants individually and on behalf of all Class Members.

313. Defendants misrepresented multiple material facts about its promotional offers, as described throughout this Complaint.

314. Plaintiffs and Class Members relied on Defendants' misrepresentations and omissions in creating accounts on DraftKings and in placing wagers on the platform in reliance on the promotions.

315. Plaintiffs and Class Members were justified in so relying, because they were

69

FILED DATE: 1/8/2025 11:22 AM   2025L000261

entitled to believe that DraftKings, a leader in a highly regulated industry, would not violate the law by failing to make requisite disclosures to its consumers, or to misrepresent the nature of its advertised offers.

316.    At the time Defendants made these misrepresentations to consumers, it knew them to be false.

317.    At the time Defendants made these misrepresentations to consumers, it had no present intent to fulfil the terms of the promotional offers as advertised to consumers.

318.    As a result of Defendants' misrepresentations, Plaintiffs and Class Members sustained monetary damages amounting to the total losses each sustained in reliance on funding accounts and placing bets in response to the unlawful promotions discussed herein.

319.    Absent these misrepresentations, Plaintiffs and the Class Members would not have created accounts or placed bets on DraftKings's platform.

320.    Therefore, as a direct and proximate result of Defendant's intentional misrepresentations, Plaintiffs and Class Members have suffered economic losses and other general and specific damages, including, but not limited to, the amounts paid to Defendant for placing bets in the first place, as well as losses associated with any subsequent bets placed in an effort to recover their original funds.

## SEVENTH CAUSE OF ACTION
### Unjust Enrichment (Asserted on behalf of All Classes)

321.    Plaintiffs repeat and reallege the other allegations in this Complaint as if fully set forth herein.

322.    Plaintiffs bring this claim against DraftKings individually and on behalf of all Class Members.

70

FILED DATE: 1/8/2025 11:22 AM   2025L000261

323.    As alleged herein, Defendant has intentionally and/or recklessly made misleading misrepresentations to Plaintiffs and Class Members to induce them to create accounts and place bets on its platform.

324.    As further alleged herein, DraftKings created and implemented a scheme to increase its share of the legal gambling market through a pervasive pattern of deceptive and unfair conduct including with deceptive advertising and the deliberate targeting of minors and underage users.

325.    DraftKings was unjustly enriched as a result of its wrongful conduct, including through the false and misleading advertisements regarding (i) that certain bets on DraftKings could be placed at no-risk to the user and (ii) that DraftKings would give users an amount equal in U.S. dollar value to their deposit.

326.    DraftKings was also unjustly enriched as a result of its wrongful conduct of targeting underage users with its advertising and intentionally allowing them to use its platform without adequate age verification.

327.    Plaintiffs and the Class Members have reasonably relied on these misleading representations and have not received the benefits promised by Defendant.

328.    Plaintiffs and the Class Members therefore have been induced by DraftKings' misleading and deceptive representations about the promotional offers and its deceptive and unfair targeting of minors and have paid more money to DraftKings to place bets than they otherwise would and/or should have paid.

329.    Plaintiffs and the Class Members have conferred a benefit upon Defendant as Defendant has retained monies paid to them by Plaintiffs and the Class Members.

FILED DATE: 1/8/2025 11:22 AM    2025L000261

330.    The money DraftKings received was obtained under circumstances that were at the expense of Plaintiffs and the members of the Class Members. In other words, Plaintiffs and the Class Members did not receive the full value of the benefit conferred upon DraftKings.

331.    Therefore, it is inequitable and unjust for DraftKings to retain the profit, benefit, or compensation conferred upon it without paying Plaintiffs and the Class Members back for the difference of the full value of the benefits compared to the value actually received.

332.    As a direct and proximate result of DraftKings' unjust enrichment, Plaintiffs and Class Members are entitled to restitution, disgorgement, and/or the imposition of a constructive trust upon all profits, benefits, and other compensation obtained by DraftKings from its deceptive misleading, and unlawful conduct as alleged herein.

333.    Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

## EIGHTH CAUSE OF ACTION
### Civil Conspiracy (Asserted on behalf of all Classes Against DraftKings, Inc., Crown IL Gaming LLC, and Casino Queen, Inc.)

334.    Plaintiffs reassert, reallege, and incorporate by reference all other paragraphs in the complaint.

335.    Plaintiffs bring this claim individually and on behalf of all other Class Members.

336.    As alleged above, DraftKings and Casino Queen have a contractual arrangement such that Casino Queen is the license-holder for DraftKings's online sportsbook in Illinois.

337.    Casino Queen has knowledge of, participates in, and profits from the fraudulent, deceptive, and unfair business practices engaged in by DraftKings and alleged more fully above. DraftKings's deceptive and unfair schemes could not work without the infrastructure and support Casino Queen provides.

FILED DATE: 1/8/2025 11:22 AM   2025L000261

338.     For example, Casino Queen enforces the terms of DraftKings's various deceptive promotions against Plaintiffs and Class Members who have been lured into placing more wagers, more frequently by DraftKings's misrepresentations and omissions by collecting money from them.

339.     The contractual arrangement between DraftKings and Casino Queen is an agreement between two or more persons or entities, for the purpose of profiting from sports betting in Illinois procured both through legitimate customer acquisition and through fraudulent, deceptive, and unfair acts and practices.

340.     As a direct and proximate result of the conspiracy between DraftKings and Casino Queen, Plaintiffs and Class Members have suffered and will continue to suffer injury in that they have suffered economic losses and other general and specific damages, including, but not limited to, the amounts paid to Defendants for placing bets in the first place, as well as losses associated with any subsequent bets placed in an effort to recover their original funds.

341.     Plaintiffs and Class Members seek compensatory and punitive damages, injunctive relief, and reasonable attorney's fees, costs, and expenses relating to this action.

## NINTH CAUSE OF ACTION
### Declaratory Judgment, 735 ILCS 5/2-701 (Asserted on behalf of all classes)

342.     Plaintiffs reassert, reallege, and incorporate by reference all other paragraphs in the complaint.

343.     Plaintiffs bring this claim individually and on behalf of all other Class Members.

344.     DraftKings is contractually bound to comply with the Apple App Store and Google Play Store requirements for smartphone applications and their developers.

345.     In relevant part, Apple's Developer License Agreement, which DraftKings agreed to in order to list its app on the Apple App Store, prohibits DraftKings from engaging

"in any unlawful, unfair, misleading, fraudulent, improper, or dishonest acts or business practices relating to" its app.

346.    Apple's Developer License Agreement also incorporates Apple's App Review Guidelines which further warns developers that "marketing your app in a misleading way, such as by promoting content or services that it does not actually offer . . . or promoting a false price, whether within or outside of the App Store, is grounds for removal of your app from the App Store," and that "If your app engages in misleading marketing practices, scams, or fraud in relation to the entitlement, your app will be removed from the App Store."

347.    Similarly, DraftKings is bound by the terms of the Google Play Developer Distribution Agreement and the incorporated Google Play Store Developer Guidelines, which prohibit "apps that directly or indirectly engage in, or benefit from promotion practices (such as ads) that are deceptive or harmful to users."

348.    These terms are intended to protect and benefit the users of applications that are listed on the Apple App Store.

349.    Plaintiffs and Class Members are among the intended beneficiaries of these contractual requirements and are directly harmed by DraftKings' failure to comply with them.

350.    Due to the conduct alleged above, DraftKings is in breach of its contractual obligations under the Apple Developer License Agreement and the Google Play Developer Distribution Agreement to honestly advertise its promotions to its users who download its mobile app through Apple and Google's app stores.

351.    Plaintiffs seek a declaratory judgment that Google is in breach of these contractual obligations.

74

FILED DATE: 1/8/2025 11:22 AM   2025L000261

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, demands a jury trial on all claims so triable and judgment as follows:

A. Certifying the proposed Classes, appointing Plaintiffs James Beyer, Collin Smothers, and Corey Davis as representatives of the No-Risk Promotion Class, appointing Plaintiff Corey Davis, Colin Smothers and Mateen Zafer as representatives of the Signup Bonus Promotion Class, appointing Plaintiff James Beyer as a representative of the Targeted Underage User Class and appointing counsel for Plaintiffs as Class Counsel;

B. Declaring that Defendants are financially responsible for notifying the Class Members of the pendency of this suit;

C. Declaring that Defendant's policies and practices as described herein constitute a violation of the ICFA;

D. Enjoining Defendant from the wrongful conduct as described herein;

E. Entering a declaratory judgment that DraftKings is in breach of its obligations under the Apple Developer License Agreement;

F. Entering a declaratory judgment that DraftKings is in breach of its obligations under the Google Play Developer Distribution Agreement;

G. Awarding actual and/or compensatory, multiple, punitive (upon obtaining leave of court), and statutory damages in an amount according to proof but exceeding $50,000;

H. Awarding Plaintiffs their reasonable costs and expenses of suit, including attorneys' fees;

FILED DATE: 1/8/2025 11:22 AM   2025L000261

I.   Awarding pre- and post-judgment interest to the extent the law allows; and

J.   Awarding such further relief as this Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiff hereby demands trial by jury on all issues in this Class Action Complaint that are so triable.

Dated: January 7, 2025                    Respectfully submitted,

                                          /s/ Michael Kanovitz

Michael Kanovitz
Jon Loevy
Isaac Green
LOEVY & LOEVY
311 N. Aberdeen, 3rd FL
Chicago, IL 60607
(312) 243-5900