**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| James Beyer, Collin Smothers, Mateen Zafer, Corey Davis, and Dashawn Bell, individually and on behalf of all others similarly situated, <br><br> *Plaintiff*, <br><br> v. <br><br> DraftKings, Inc.; Crown IL Gaming LLC d/b/a DraftKings, Casino Queen Inc., and Northside Crown Gaming LLC, <br><br> *Defendants*. | Case No. 1:25-cv-01336 <br><br><br> **FIRST AMENDED CLASS ACTION COMPLAINT** <br><br> JURY TRIAL DEMANDED |

Plaintiffs James Beyer, Collin Smothers, Mateen Zafer, Corey Davis, and Dashawn Bell ("Plaintiffs"), individually and on behalf of all others similarly situated, brings this class action against Defendants DraftKings, Inc., and its above-named subsidiaries and affiliates (collectively "DraftKings" or "Defendants"). Plaintiffs make the following allegations based on personal knowledge as to their own acts, and upon information and belief and the investigation of counsel as to all other matters.

## <u>INTRODUCTION</u>

1.      Online sports gambling was legalized in Illinois only five years ago, but it is already a massive industry. Illinois citizens wager almost $40 billion on sports each year. Almost all that money goes to a few companies that dominate the industry. Those companies split the revenues from legalized gambling, over $3.5 billion for Illinois operators annually. The largest of these companies in terms of "handle" in Illinois is the Defendant in this case, DraftKings.

1

2.      More than 96% of sports betting customers lose money, which is a natural
deterrent to continuing as a customer of DraftKings.[1] Thus, unlike with other industries, where
a customer, once acquired, will reliably provide repeat business, most of DraftKings's
customers will be incentivized to stop using the platform, all things being equal. Those who
irrationally keep betting despite the losses—often because of a gambling addiction—will
eventually "crap out," meaning that DraftKings will lose the customer. Thus, DraftKings's
business model requires it to find ways to keep customers betting even as they lose money and
to recruit new bettors to its platform. DraftKings manages to keep the customers flowing
through carefully designed promotions and user interfaces that make it easy to start gambling
and hard to stop.

3.      Plaintiffs bring this action because DraftKings has crossed the line in its efforts
to recruit fresh blood, deceiving Illinois citizens and misleading them into betting more money
and more frequently and resulting in their losing large amounts of money.

4.      To further these goals, DraftKings advertises an all-upside gambling experience,
falsely promising new users that they will get free money which they can wager without any
risk. In reality DraftKings has created an all-upside opportunity only for itself: the promotions
require new users to deposit and gamble almost exclusively with their own money, which they
almost always lose. DraftKings also engages in other manipulative tactics that are intentionally
designed to inculcate gambling addiction and extract as much money as possible from users
who are identified as particularly vulnerable.

5.      These unethical and fraudulent practices by DraftKings are the present face of

---

[1] Wayne J. Taylor, et al., *Online Gambling Policy Effects on Tax Revenue and Irresponsible Gambling*, SMU Cox
School of Business Research Paper No. 24-7, Jun. 10, 2024, https://dx.doi.org/10.2139/ssrn.4856684 (last visited
Dec. 15, 2024).

competition in the obscenely profitable, and formerly illegal, industry.

6.      DraftKings's business model has long involved pushing the boundaries of the law, misleading consumers, and luring naïve gamblers into developing addictions.

7.      DraftKings began operating long before the Supreme Court's 2018 decision, originally running daily fantasy sports contests that, as explained further below, were sports gambling under another name.

8.      Many regulators, including those in Illinois, tried to crack down on these contests, but DraftKings managed to evade any real sanctions. As a result, it developed a brand and customer relationships that positioned it to capitalize on the tidal wave of sports betting legalization that followed the Supreme Court's 2018 decision in *Murphy v. NCAA*, which held that the Professional and Amateur Sports Protection Act was unconstitutional insofar as it purported to prohibit states from "authorizing" sports betting.

9.      In June of 2019 Illinois became the fifteenth state to legalize online sports betting.

10.     DraftKings seized the opportunity to cash in on amateur Illinois gamblers— citizens who tend to be young men with limited experience or savvy.

11.     DraftKings uses false promises of the opportunity to win big with no risk to lure these naïve users into committing more money to the platform than they otherwise would, based on the false impression that the money was not at risk. DraftKings uses these tactics to identify and cultivate the people it wants on its platform: those who are susceptible to these sorts of advertisements and most likely to lose a lot of money sports betting. In other words, marks.

12.     DraftKings's activities in Illinois are a textbook example of its pattern of skirting

and sometimes flat-out ignoring laws and regulations intended to protect consumers.

13.　　DraftKings targeted its promotions at new customers who may have been cautious about risking their money but had the potential to become cash cows for the company, regularly placing losing bets on sporting events.

14.　　Rather than put its own money on the line to give customers a genuine all-upside taste of gambling, as its advertisements suggest, DraftKings is using misleading promotions to lure new users into believing that creating and funding an account on DraftKings is far more financially advantageous than it is.

15.　　Only after new users sign up, make their first deposit, and start losing bets does the true nature of their bargain with DraftKings become clear. At that point, DraftKings attempts to instill long-term gambling habits in the new user by forcing them to make many bets to comply with the fine print—many more bets than they initially were led to believe would be required—while chasing the promises DraftKings made in its advertisement and new-user promotions.

16.　　Most users do not recoup their money, let alone win the additional money they were promised by DraftKings's misleading advertisements.

17.　　Indeed, despite DraftKings advertising the chance for customers to win and win big, the company is really only interested in keeping customers gambling wildly and therefore eventually losing big. And as soon as a user reveals a propensity to consistently make better bets—meaning bets that take advantage of an arbitrage in DraftKings's odds-making—the company drastically limits the size and frequence of bets that user can make so that they can't cost the company too much money.

18.　　In short, while DraftKings advertises an all-upside gambling experience to new

4

users, it is actually offering one that is almost all down-side.

19.     One of DraftKings's deceptive practices is a promotion that promises users the chance to place bets at no risk to them ("Risk-Free Bet" or, later "No Sweat First Bet").

20.     These purportedly no-risk bets, however, are not as advertised. The promotion requires that the customer deposit funds and place the bet with their own money.  If a customer loses their bet, they are not returned to their original position. Instead, their accounts are credited with an expiring "Bonus Bet" rather than the amount the user initially wagered in U.S. dollars.

21.     Receiving "Bonus Bets" when the original bet loses does not make the original bet "Risk-Free" as advertised.  "Bonus Bets" cannot be withdrawn for cash. Instead, they must be both wagered and won before they have any cash value.

22.     Furthermore, wagers made with Bonus Bets are not paid out like wagers made with U.S. dollars. A winning $100 bet made with U.S. dollars at even odds recovers the $100 stake plus the $100 winnings less the sportsbook's cut (known as the "vig" or "rake") of ~9%, which results in a payment of approximately $191. By contrast, a winning bet made with a $100 Bonus Bet converts only to $100 US dollars less vig, which results in a payment of approximately $91.

23.     Thus, the customer responding to the advertisement can get their "risk free" money back only if they win their second bet, which is not risk free, and even then, with the vig subtracted, which is not their complete money back.

24.     The Bonus Bet is thus worth significantly less than the initial bet, meaning that the money the Plaintiffs and other customers were induced to deposit was never in fact risk-free as advertised.

25. DraftKings further engages in deceptive practices through its near-ubiquitous advertisements that offer to match a new user's first deposit up to $1,000. This promotion, too, is misleading and inaccurate.

26. In order to receive the promised matching amount, users have to deposit up to 5x the matching amount and then bet up to 25x the matching amount on long-shot bets that users have low odds of winning, all within a relatively short period of time. Even then, and even if they win, customers do not actually receive a cash match of their deposit as the promotion implies. Instead, they receive "DK Dollars" equal to their deposit amount. Like "Bonus Bets," "DK Dollars" are not redeemable for cash and must be wagered and won before they have any value.

27. Consumers who try to satisfy the playthrough requirements often develop addictions that, as DraftKings intends, result in them gambling far beyond their means on DraftKings.

28. DraftKings has invested heavily in large-scale marketing, including television and print advertisements, in-arena marketing, and extensive internet and social media advertising to publicize each of these materially deceptive promotions.

29. These advertisements allowed DraftKings to sign up a multitude of new customers, including Plaintiffs. But little did these new customers know that the representations and omissions upon which they relied were misleading and false.

30. DraftKings's actions in promulgating these marketing representations and omissions violate Illinois consumer protection statutes as well as Illinois common law, as discussed in detail below.

31. Reasonable consumers, including Plaintiffs, were misled to their detriment.

They did not receive the advertised benefit of the promotions, and, in many cases, they placed larger bets and more bets than they would have but-for the misleading advertising.

32.     DraftKings intentionally designs its app and promotions to instill an impulse to gamble more and more and to overcome users' ability to resist this impulse.

33.     DraftKings also designs its so called "Responsible Gaming" tools so that they are not as effective as they reasonably could be in helping users stop gambling beyond their means. For example, DraftKings touts the ability to set a daily, weekly, or monthly deposit limit, but allows users to change deposit limits whenever they want to. Plaintiff Bell set his deposit limits to ten cents in December of 2024 but then returned and removed these limits later the same day. He proceeded to deposit over $100,000 in the next month.

34.     As of May 6, 2025, the link on the DraftKings app's "Responsible Gaming Center" to self-exclude in Illinois is broken and links to a Illinois.gov webpage that says "Page Not Found."

35.     Additionally, the maximum period a user can "Cool Off" using DraftKings's own tool is four weeks. DraftKings could easily allow users to select a longer, safer "Cool Down" period, but chooses not to.

36.     DraftKings knows, from its internal research and date, that its tools are unlikely to be effective in preventing gambling addicts from developing addictions and continuing to use its product.[2]

37.     DraftKings top executives know that a substantial portion of its revenue comes from gambling addicts but rather than cautioning users of the risks of developing a harmful gambling addiction, DraftKings proclaims on its website that it is "committed to educating and

---

[2] Flora I. Matheson et al., *The use of self-management strategies for problem gambling: a scoping*, 19 BMC PUB. HEALTH 445, 7 https://bmcpublichealth.biomedcentral.com/articles/10.1186/s12889-019-6755-8/

empowering" customers to gamble responsibly. The truth is DraftKings uses its "Responsible Gaming" tools to give customers and prospective customers a false sense of security around the risks associated with using its platform.

38.     DraftKings also deliberately targeted and groomed underage Illinoisans to join its platform and to play daily fantasy sports contests before they were of legal sports betting age. DraftKings intentionally marketed to underage users and cultivated relationships with them to encourage them to develop sports betting habits and an affinity for DraftKings before they were even old enough to bet. Then, as soon as these young people turned twenty-one, DraftKings converted them into its target customer: naïve young people willing to deposit funds and spend a significant amount of time and money on sports betting despite losing more than they win.

39.     DraftKings also deliberately targets players it should know are experiencing gambling addictions. Rather than cutting a user off when they begin showing signs of a gambling problem, DraftKings pairs them with "VIP Hosts" who milk them for every dollar they have, often by encouraging them to use more misleading promotions like those described herein.

40.     DraftKings trains its VIP Hosts to deploy a specific playbook of tactics including contacting their assigned users when they have not logged on to the platform in a few days or have just experienced a sizeable loss and luring them back with offers of promotions that require them to deposit more of their own money and place more bets.

41.     As expected, some of these targeted people developed debilitating gambling addictions as a result of DraftKings's carefully orchestrated schemes to draw them in with misrepresentations and then force them to engage in habit-forming behavior to meet the

promotional terms as they chase after DraftKings's illusory promises.

42.     Plaintiffs seek injunctive relief, actual damages, and statutory damages to compensate themselves and the Class for the injury inflicted on them by DraftKings and to prevent DraftKings from continuing to deceive consumers. Plaintiffs also may seek punitive damages upon obtaining leave to do so.

## JURISDICTION AND VENUE

43.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and this is a class action in which at least one member of the class is a citizen of a different state than Defendant. The number of members of each proposed class in aggregate exceeds 100 users. 28 U.S.C. § 1332(d)(5)(B).

44.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant does business in this District and because, given that each Plaintiff placed bets in this District, a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

45.     Plaintiff James Beyer is a resident of Kentucky. Plaintiff Beyer created his first account on DraftKings in Illinois when he was under eighteen years old. Plaintiff Beyer was able to create several accounts on DraftKings and enter free promotions with cash prizes before he turned twenty-one years old.

46.     As soon as Plaintiff Beyer turned twenty-one, he verified his age on DraftKings, deposited money, and began making paid bets on which he has lost a considerable amount of money.

9

47. Plaintiff Beyer also responded to DraftKings's Illinois no-risk promotions and, despite being fairly conversant with the world of sports betting—having been introduced to it at a young age by DraftKings—he was misled and surprised to discover that he did not get his original stake back when he lost the first bet he placed pursuant to a no-risk promotion.

48. Plaintiff Dashawn Bell is a resident of Illinois, living in the Chicago suburbs. Plaintiff Bell created and funded an account on DraftKings around February 5, 2021.

49. Before creating an account on DraftKings Plaintiff Bell had not struggled with gambling addictions. But DraftKings's promotions, including the Deposit Match and No-Risk Promotions described below, and that app design quickly turned him from a casual sports enthusiast to an addict, unable to control the compulsion to gamble that DraftKings intentionally instilled in him.

50. As a result of DraftKings's promotions and app design, which caused a devastating gambling addiction, Plaintiff Bell has lost hundreds of thousands of dollars on DraftKings, has filed for bankruptcy, is facing the possible foreclosure on his house, devastated his mental health, hurt his career as a salesman, and severely damaged his relationship with his wife and kids.

51. Plaintiff Mateen Zafer is a resident of Michigan, living in Ann Arbor. Plaintiff Zafer frequently travels back and forth between Michigan and Illinois, where he visits family. In January 2023, when he created his DraftKings account, he was frequently in Illinois, saw advertisements for DraftKings in Illinois, and opted-in to promotions and placed bets on DraftKings will physically present in Illinois.

52. Plaintiff Zafer created and funded an account on DraftKings in January of 2023 in response to a deposit match promotion he had seen advertised on television while watching a

Basketball game. Plaintiff Zafer also recalls seeing advertisements around this time that included DraftKings's brand ambassador Kevin Hart.

53.    As a result of his reliance on the deposit match promotion advertisement, Plaintiff Zafer deposited more money that he otherwise would have into DraftKings. Plaintiff Zafer did not satisfy the confusing terms of the promotion and did not get his entire initial deposit matched, as DraftKings had promised to do.

54.    Plaintiff Zafer also responded to DraftKings advertising he saw for promotions that represented he could place a bet at no risk to him. On information and belief, Plaintiff Zafer placed his first such bets while present in Illinois. After losing his bet, he learned that DraftKings would not return him to the position he was in when he initially placed the bet.

55.    Plaintiff Corey Davis is a resident of Illinois, living in Chicago.

56.    Plaintiff Davis opened an account on DraftKings while in Illinois on November 2nd, 2023 after seeing advertisements for DraftKings's new customer "Deposit Match" bonus across various platforms including on Twitter. After seeing further advertisements, including in the DraftKings app, Plaintiff Davis made his first deposit under the "Deposit Match" promotion on February 23, 2024. Plaintiff Davis would not have opened an account on DraftKings or made as large of a promotion were it not for DraftKings's misleading advertising regarding the Deposit Match Promotion.

57.    Plaintiff Davis shortly thereafter also opted-in to a misleading no-risk promotion after seeing it advertised both in the DraftKings app and in other digital media. As more fully described below, Plaintiff Davis was misled by DraftKings's advertising for each of these promotions.

58.    Plaintiff Collin Smothers is a resident of Illinois, living in Chicago.

59.     While in the state of Illinois, Plaintiff Smothers opened an account on DraftKings in February 2021. Plaintiff Smothers funded his account after viewing advertisements described below for DraftKings's "Deposit Match" promotions in or around February 2021.

60.     Plaintiff Smothers viewed advertisements for "Risk Free" bets on DraftKings in early 2022. As a result of these advertisements, Plaintiff Smothers opted into a "Risk Free" promotion on DraftKings's platform and placed a bet.

61.     When Plaintiff Smothers lost the bet he placed that DraftKings had informed him was "Risk Free," he was surprised to find that he was not credited the amount he had bet and instead received an expiring "Bonus Bet" with no cash value.

62.     Plaintiff Smothers has lost thousands on DraftKings and has experienced pain and suffering as a result of the compulsive gambling habits that DraftKings's product trained into him.

63.     Defendant DraftKings, Inc. is a Nevada gambling and entertainment corporation headquartered in Boston, Massachusetts. As of April 2023, DraftKings is a publicly traded company that trades on the Nasdaq Stock Exchange.

64.     Defendant Casino Queen, Inc. is a company incorporated in Illinois with its headquarters and principal place of business in East St. Louis, Illinois. Casino Queen has partnered with DraftKings to operate a digital sportsbook "at" Casino Queen, that is available through DraftKings's mobile application to eligible consumers located anywhere in Illinois.

65.     Defendant Crown IL Gaming LLC is a privately held company incorporated in Delaware with its principal place of business in Boston, Massachusetts. Crown IL Gaming LLC is a subsidiary of DraftKings and is the registered Management Services Provider with the

Illinois Gaming Board for DraftKings's sportsbook "at" Casino Queen.

66.     Defendant Northside Crown Gaming LLC is a privately held company incorporated in Delaware. On information and belief it is another DraftKings subsidiary with a principal place of business is Boston, Massachusetts. Northside Crown Gaming is DraftKings Management Services Provider for the new DraftKings location at Wrigley field and for associated online sports betting throughout Illinois.

## FACTUAL ALLEGATIONS

### A.  Sports legalization in Illinois and DraftKings's sordid early history in the state

67.     In 2018, the Supreme Court ruled in *Murphy v. National Collegiate Athletic Association*, 138 S. Ct. 1461 (2018), that a federal law could not prohibit states from legalizing sports betting within their borders. State legislatures moved quickly and, as of November 2024, sports betting has been legalized in 38 states and Washington, DC.

68.     As a result, the market for sports betting has exploded. The total US revenue of sportsbooks exploded from $430 million in 2018 to $10.92 billion in 2023.[3]

69.     In June 2019, Illinois became the fifteenth state to legalize sports betting, and sportsbooks began operating in the state on March 9, 2020. Illinois is now one of the largest betting markets in the nation with over $11.3 billion wagered by Illinois residents in 2023.[4]

70.     This rapid expansion of the sports betting industry has fueled a race to recruit new consumers. Sportsbook operators have bombarded the state with advertisements and

---

[3] Mike Reynolds, *American Gaming Association: Legal sports betting hits record revenue in 2023*, S&P GLOBAL, Feb. 21, 2024, https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/american-gaming-association-legal-sports-betting-hits-record-revenue-in-2023-80522087 (last visited Nov. 27, 2024).
[4] *All About Illinois Sports Betting Handle And Revenue*, ILLINOISBET.COM, Mar. 28, 2024, https://www.illinoisbet.com/revenue-report (last visited Nov. 27, 2024).

promotions in order to capture valuable market share.

71.     Long before gambling was legalized in Illinois, DraftKings began offering "daily fantasy sports" contests to Illinois consumers, including many who were under the age of twenty-one.

72.     In practice, "daily fantasy sports" is sports betting by another name. In these contests, users bet on the performance of athletes in sporting events, but in doing so they "compete" against each other rather than the sportsbook, which keeps a portion of the pot.

73.     In 2015 Lisa Madigan, then Illinois Attorney General, issued an opinion concluding that DraftKings's daily fantasy sports contests fell within the state's prohibition on gambling.

74.     Rather than comply and cease operations, DraftKings sued the Attorney General, seeking a declaration that she was wrong and that its business was legal.

75.     DraftKings's aggressive approach worked, and no enforcement action was ever taken.

76.     When the legislature legalized sports betting in Illinois, the statute included a "bad actors" clause aimed directly at DraftKings and other companies that had previously taken advantage of the regulatory void in the state to begin reaching Illinois consumers before they had officially been given the green light to do so. This provision delayed for eighteen months the sports betting licensure of any company that continued offering daily fantasy sports contests in Illinois after the Attorney General's 2015 opinion.

77.     The intended effect was to level the playing field and give other, more law-abiding operators, an opportunity to catch up to the market recognition and customer relationship data that DraftKings already had.

14

78.     DraftKings, however, leveraged a loophole in the law that allowed it to partner with a local casino, Casino Queen, to operate in Illinois as soon as possible.

79.     Thus, DraftKings never served its prescribed eighteen-month timeout. Instead DraftKings was immediately able to reap the benefits of its existing relationships with Illinois consumers, some of whom began using DraftKings's daily fantasy sports offerings long before they turned twenty-one years old.

80.     DraftKings is also the only sports wagering Management Services Provider with a complaint for disciplinary action filed against it by the Illinois Gaming Board.

81.     In 2020 the Gaming Board found that DraftKings failed to comply with regulations requiring it to promptly disclose any agreements it had formed to serve as the Management Services Provider for sports gambling at Wrigley Field.

**B. DraftKings operates a digital sportsbook in Illinois and reaps massive profits by misleading gambling naïve consumers and addicting people to its products**

82.     Since 2020, DraftKings and Casino Queen have operated an sportsbook in Illinois pursuant to a partnership agreement.

83.     On information and belief, as the Management Services Provider for its operations in Illinois, Crown IL Gaming LLC along with its parent company, DraftKings Inc., has overall responsibility for, among other things: operating the sportsbook, managing the brand, running promotions, and making strategic decisions about customer acquisition and maintenance.

84.     On information and belief, pursuant to its contractual relationship with Casino Queen, the Master Sports Wagering Licensee with the Illinois Gaming Board for DraftKings's Sportsbook in Illinois, DraftKings has responsibility for, among other things: verifying user age, verifying user location within Illinois, crediting and debiting user accounts with winnings

15

and losses from wagers made in Illinois, and ensuring compliance with all applicable Illinois laws and regulations.

85.     In sum, DraftKings runs the sportsbook that is licensed under Casino Queen's name and pays Casino Queen a portion of its revenue for the privilege of doing so. Through this partnership DraftKings offers both on-premise and online sports betting to its customers in Illinois.

86.     The vast majority of DraftKings's business in Illinois comes through its digital sportsbook.

87.     To place bets through DraftKings's online sportsbook, users download DraftKings's mobile application from the Apple App Store or the Google Play Store onto their cellphones, verify that they are located within Illinois by allowing DraftKings's mobile application to access their phone's location, and then can place bets on live and upcoming sporting events.

88.     According to the Illinois Gaming Board's records, DraftKings saw the largest volume of sports bets, in terms of dollars bet, of any sportsbook in the state of Illinois from December 2023 through November 2024, handling more than $4 billion dollars.

89.     DraftKings reinvests a lot of its revenue in hooking more users on sports betting. DraftKings's sales and marketing expenses totaled $1.2 billion in 2023.[5] DraftKings ran TV, radio, social media, email, billboard, and print advertising. The ads showcased various promotions that DraftKings was running, typically targeting new users and promising bonuses and Risk-Free bets for signing up and making their first deposit.

---

[5] https://www.statista.com/statistics/1379464/sales-marketing-expenses-draftkings-worldwide/#:~:text=In%202023%2C%20the%20fantasy%20sports,based%20company%20spent%20in%202020

90.    As DraftKings has repeatedly said in its annual 10–K reports, "Achieving growth in our community of users may require us to increasingly engage in sophisticated and costly sales and marketing efforts."

91.    DraftKings's target audience for these marketing efforts is new users and casual gamblers—those who are most likely to lose money and who might turn into high-value addictive gamblers losing thousands of dollars a month to DraftKings.

92.    In fact, DraftKings, will often limit or even outright ban "sharps," gamblers who are sophisticated and make too many winning bets, while naïve losing consumers are targeted with more and more deceiving promotions to encourage their gambling more money with more frequency.

93.    DraftKings could set standardized bet limits for all its users, but instead it dynamically limits the maximum allowable bet for each individual user in order to maximize the amount more addictive gamblers lose to the company while minimizing the company's exposure to more successful bettors. The practice of dynamically limiting amounts to prevent bettors from winning too much is one more fact that DraftKings does not disclose in its promotions.

94.    DraftKings's CEO, Jason Robins, has admitted that the company is only interested in serving bettors who are likely to lose money on its platform: "This is an entertainment activity. People who are doing this for profit are not the people we want."[6]

95.    Professional gamblers know that DraftKings is looking to exclude them in favor of problem gamblers and they therefore attempt to mimic the behavior of gambling addicts in

---

[6] David Hill, *Is the $11 Billion Online Sportsbook Bubble About to Burst?*, ROLLING STONE, Nov. 17, 2024, https://www.rollingstone.com/culture/culture-sports/sports-betting-law-draftkings-fanduel-1235158334/ (last visited Dec. 10, 2024).

their app use. For example, reporting indicates that professional gamblers try to take advantage of DraftKings's customer data by logging into their accounts repeatedly late at night, to appear like they are interrupting their sleep to compulsively check their bets, or opting into and then out of deposit limits to appear like they are unable to control themselves from depositing more and more.[7]

96.     DraftKings is not, however, following a traditional "entertainment" industry business model of trying to "entertain" as many customers as possible.

97.     Instead, DraftKings is seeking to exclude customers who are successful at betting while trapping those who are not. The latter customers, many of whom end up losing more than they can afford, are the source of most of DraftKings's revenues.

98.     Addicted gamblers represent the most important demographic for DraftKings and, under its present business model, are a key driver of its profitability.

99.     On information and belief, more than 80% of DraftKings's revenue comes from just 5% of its users, most of whom are addicted gamblers or at high risk of becoming addicted gamblers.

100.     DraftKings mines its user data to identify the most potentially-lucrative users— those with developing gambling addictions—and then intentionally targets them with personalized outreach to increase the amount and frequency of their wagering on DraftKings.

101.     DraftKings could easily use this data to identify users who are gambling compulsively and cut them off. Indeed, Robins, when asked by a reporter about the prevalence of gambling addictions on his platform, stated that "we have models that we build that help us

---

[7] Isaac Rose-Berman, *Why Professional Gamblers Act like Addicts,* HOW GAMBLING WORKS (Sept. 10, 2024), https://howgamblingworks.substack.com/p/why-professional-gamblers-act-like (last visited April 7, 2025).

understand and flag risky behavior."[8] However those models are either ignored or intentionally designed to miss clear signs of gambling addiction in the user data that DraftKings has ready access to. DraftKings's demonstrated ability to identify and limit the gambling of "sharps" belies any suggestion that it could not reasonably do more to identify users like Plaintiff Bell and others who are gambling compulsively on their platform.

102.    In fact, DraftKings intentionally does not collect certain data—that some of its competitors do collect—to allow the company to deny that it knows it is taking every dollar its customers have. For example, DraftKings has a policy of not conducting income verification checks for its users who are frequent, high-volume gamblers even though doing so is common in the casino industry.

103.    As further described below, DraftKings designs its promotional offers to lure in and identify those users most likely to become consistent gamblers.

104.    These promotional offers include a deposit match up to $1,000 and "Risk-Free" (also sometimes termed "No Sweat") bets. But rather than coming through on the large-print offers made to new users in advertisements for these promotions, DraftKings contradicts the large-print offers by inserting difficult to read, legally-opaque fine print terms hidden behind hyperlinks that are only available when a user is about to opt-in to the promotions and, thereafter, by enforcing complicated rules that DraftKings knows will be overlooked and misunderstood.

105.    Not only do these false promises lure consumers into opening and funding accounts on DraftKings, but they also lure many users into wagering larger amounts and more frequently than they otherwise would.

106.    This was DraftKings's goal all along. DraftKings knows that the money it

---

[8] *DraftKings Wants People to Gamble Responsibly, CEO Says*, Bᴌᴏᴏᴍʙᴇʀɢ Tᴇʟᴇᴠɪsɪᴏɴ, Sept. 6, 2024, https://www.youtube.com/watch?v=tq011JIlEzU (last accessed May 1, 2025).

invests to sign up a customer often pays for itself many times over. According to McKinsey partner Dan Singer, "When a market opens up, you've got to get out there and start acquiring, because being the first book that someone downloads gives you roughly twice as much action as being the second or the third."[9]

107.    These promotions are designed to do one thing: get customers to form a habit of betting on DraftKings.

108.    DraftKings wants these promotions to be as habit-forming as possible—which is why they require users to place many bets to satisfy them and to engage in dangerous behavior like loss-chasing—because retaining customers is much more profitable for DraftKings than constantly having to recruit new customers who bet infrequently.[10]

109.    Originally, DraftKings and other sportsbooks used to make good on the promises they made to new users of cash deposit matches and Risk-Free bets—where you get cash back if you lose. However, to do so, they hemorrhaged profit as they entered new markets.

110.    As the Washington Post has reported, "the days of companies giving away straightforward deposit matches worth thousands of dollars are largely over. Instead, sportsbooks are deploying increasingly complicated deals that advertise a big dollar figure but are far less generous [than advertised] upon closer examination."[11]

111.    Some sportsbooks still give cash matching offers in Illinois, but not DraftKings. Instead, while DraftKings still makes the same promises in their ads, now—after making users

---

[9] Danny Funt, *Sportsbooks Are Sweating Their Billion Dollar Marketing Bet*, WASHINGTON POST, Sept. 27, 2022, https://www.washingtonpost.com/sports/2022/09/27/caesars-fanduel-draftkings-commercials/ (last visited Nov. 15, 2024).
[10] *Online Sportsbook: A Shift In Player Retention?*, GAMING AMERICA, Mar. 17, 2023 https://gamingamerica.com/magazine/7296/online-sportsbook-a-shift-in-player-retention (last visited Nov. 15, 2024).
[11] *Supra* note 9.

jump through several unexpected hoops—it gives users "Bonus Bets" and "DK Dollars" that cannot be cashed out and must be used on the platform in accordance with complicated and unintuitive terms.

112.    In an online gambling marketplace saturated by sign-up promotions targeting vulnerable individuals with big "free" or "risk-free" dollar figures—some of which are truly risk-free and some of which, like those offered by DraftKings, are not—consumer confusion reigns. DraftKings exploits that confusion.

**C. DraftKings intentionally targets young men and other susceptible people and grooms them to become addictive gamblers**

113.    Gambling products are not typical consumer products. Both the current edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM-V) and the World Health Organization treat addiction to gambling in the same diagnostic category as addiction to heroin, cocaine, and tobacco.

114.    Gambling addiction causes more than just financial loss. Like any physiological addiction, it can interfere with one's professional, family, and internal well-being and substantially increases the risk of suicide. However, many people do not understand that gambling can be "addictive and harmful in many of the same ways as drugs are."[12]

115.    As online sportsbooks exploded in 2021, the National Council on Problem Gambling reported overall increases of 43% in calls and 84% in online chats in just one year.[13]

116.    States that have legalized sports betting have seen dramatic increases in calls to

---

[12] Gambling Disorder, YALE MED., https://www.yalemedicine.org/conditions/gamblingdisorder (last visited May 1, 2025) (if link ends in landing page, navigate by clicking "Mental Health" and then "Gambling Disorder").

[13] *National Problem Gambling Helpline Modernization Project*, NATIONAL COUNCIL ON PROBLEM GAMBLING, https://www.ncpgambling.org/problem-gambling/helpline-modernization/#:~:text=In%202021%2C%20calls%20to%20the%20National%20Problem%20Gambling,we%20expect%20these%20numbers%20to%20continue%20to%20grow (last visited Nov. 21, 2024).

gambling addiction helplines. In Connecticut, for example, helpline calls jumped 91% in the first year after legalization. In the first year after Virginia legalized sports gambling, calls climbed 387%.

117.    Here in Illinois, calls rose a staggering 425% between 2020 and 2022 as DraftKings and other sportsbooks blanketed the airwaves with ads for new users.

118.    Gambling addiction is particularly prevalent in young men in their 20s, not coincidentally a key demographic for DraftKings.

119.    According to Keith Whyte, executive director of the National Council on Problem Gambling, "We believe that the risks for gambling addiction overall have grown 30 percent from 2018 to 2021, with the risk concentrated among young males 18 to 24 who are sports bettors."[14]

120.    And the earlier kids get exposed to gambling through online games and other avenues, studies suggest, the more severe their gambling problems are likely to be later on.[15]

121.    According to a spokesperson for Gamblers Anonymous, there has been "a dramatic increase in the number of young men developing compulsive gambling issues and showing up to meetings since online sports gambling became legal."[16]

122.    Unsurprisingly, DraftKings's target demographic overlaps heavily with the group most at risk of gambling addiction. As of 2021, 90% of DraftKings's sportsbook users were male and more than half were in their teens, twenties, or early thirties.

---

[14] Meghan Gunn, *These are the Real Dangers of the Sports Betting Boom for Young Men*, NEWSWEEK MAGAZINE, Mar. 22, 2023 https://www.newsweek.com/2023/04/07/sports-betting-boom-linked- rising-gambling-addiction-anxiety-suicide-1789055.html (last visited Nov. 15, 2024)
[15] Ardeshir S. Rahman, et al., *The relationship between age of gambling onset and adolescent problematic gambling severity*, JOURNAL OF PSYCHIATRIC RESEARCH, Vol. 46, No. 5, 2012.
[16] Maxwell Strachan, *The Rise of Mobile Gambling is Leaving People Ruined and Unable to Quit*, VICE, Sept. 6, 2022, https://www.vice.com/en/article/ake7gk/therise-of-mobile-gambling-is-leaving-people-ruined-and-unable-to-quit (last visited Dec. 2, 2024).

123.    DraftKings touts that its "[s]ophisticated data science drives marketing decisions," which "delivers the right message, to the right user at the right time," to maximize return on investment.[17]

124.    DraftKings targeted marketing often reaches young people, particularly young men, who are not yet old enough to legally gamble.

125.    As one Illinois high-school sophomore told his school newspaper, which published a lengthy investigation of the rise of sports betting among classmates, "[after betting was legalized in Illinois] I saw more posts about it and stuff like that on social media, which made me want to [bet] more just because I saw it more," he said. "Before, I hadn't really seen that sort of thing on social media."[18]

126.    Plaintiff Beyer recalls routinely observing advertisements for DraftKings on his Instagram feed before he turned 21 and even before he turned 18. Plaintiff Beyer also saw ads for DraftKings that were associated with and alongside college sporting events that he followed.

127.    DraftKings's posts on TikTok have received 45.5 million "likes." On information and belief, a substantial portion of these "likes" are from individuals under the age of twenty-one years old who are being intentionally targeted with DraftKings's marketing.

128.    DraftKings also places physical advertising where it knows it will be seen by many underage users. For example, Ohio regulators recently fined the company $250,000 for advertising outside a college football stadium and targeting customers who are under the age of

---

[17] https://www.slidebook.io/company/draftkings/presentation/4482ce71d778bb9781863ed375bebca1-/slide-/4482ce71d7-78bb9781863ed375bebca1_24/ (last visited Nov. 21, 2024).
[18] Alexis Rogers, *"You can just lie, most people do": The rise of underage sports betting,* THE EVANSTONIAN, Apr. 20, 2023, https://www.evanstonian.net/sports/2023/04/20/you-can-just-lie-most-people-do-the-rise-of-underage-sports-betting/ (last visited Nov. 22, 2024).

twenty-one.[19]

129.    DraftKings routinely runs promotions encouraging gambling on collegiate sporting events.



*Figure 1: A post from DraftKings on X (formerly Twitter) publishing betting odds for the College Football National Championship; dated November 5th, 2024.*

*(https://x.com/DKSportsbook/status/1853961644109382110)*

130.    Not only does DraftKings intentionally target its marketing to boys and young men, DraftKings also designs its product and its promotions so that once they download the

---

[19] Sean McDonnel, *Ohio: Barstool, DraftKings agree to $750K in fines for targeting underage people, advertising 'free' bets*, CDC GAMING, Feb. 15, 2023, https://cdcgaming.com/brief/ohio-barstool-draftkings-agree-to-750k-in-fines-for-targeting-underage-people-advertising-free-bets/ (last visited Nov. 21, 2024).

DraftKings app, they quickly form gambling habits, often before they reach legal gambling age.

131.    One example of this, described more fully below, is the way that DraftKings's deposit match promotions work. First, to satisfy the hidden terms of the promotion a user must wager 25x the amount of the bonus, necessitating a long series of bets. Second, if the user completes enough bets, they receive the bonus in "DK Dollars," meaning they then have to place even more wagers in hopes of finally receiving the cash deposit match they were promised.

132.    Digital mediums, like computers and cell phones that host DraftKings, increases the likelihood of habit-forming behavior through portability and connectivity, which provide greater ease-of-use, ready availability, rapid gratification, and a tendency to enable "context-independent" cues that trigger habit response.[20]

133.    Furthermore, habits are most often formed as the result of goal-directed behavior, which DraftKings enables by requiring users to chase arduous playthrough requirements.

134.    Goals drive people to form habits by encouraging repeated actions, even when they are actively aware of not wanting to develop an undesirable habit. Because most people are unaware of the habit-cuing influencing their behavior, they often attribute the formation of an undesirable habit to the pull of temptations or suppressed desires.

135.    DraftKings designs its promotions—which have among the highest playthrough requirements in the industry—to maximize the likelihood that users will develop habits while completing them.

136.    Perhaps an even more egregious example of how DraftKings intentionally sows

---

[20] Bas Verplanken, *The Psychology of Habit: Theory, Mechanisms, Change, and Contexts*, Springer Nature Switzerland AG, 2018, https://link.springer.com/book/10.1007/978-3-319-97529-0

problem gambling into Illinois youth is DraftKings's intentional decision to allow users onto its platform, and even into its daily fantasy sports contests with cash prizes, without requiring them to verify their age or identity.

137.    DraftKings gives potential future users of DraftKings's sportsbook a taste of gamified sports betting through daily fantasy sports contests that are not materially different from sports betting in terms of their potential to form addictions.

138.    DraftKings is aware that underage users, many under eighteen, explore its platform and sometimes enter fantasy sports contests.

139.    DraftKings intentionally, recklessly, or negligently chooses procedures that allow this to happen because early exposure to betting on sports increases the likelihood that they will develop gambling addictions later on.[21]

140.    DraftKings could and should require age and identity verification every time a user creates an account on its platform, as many other sportsbooks do.

141.    Instead, DraftKings does not require identity or age verification until a user goes to deposit or withdraw money or has been on the platform for a significant period of time. In this way, DraftKings lowers the barrier of entry for underage users to get introduced to using its products.

142.    Furthermore, the daily fantasy sports contests that users can enter on DraftKings without age verification take the gamification of betting to the extreme in a deliberate attempt to appeal to younger users.

143.    As one researcher studying the industry put it, "It's a very obvious attempt to hybridize sports, to get conventional sports gambling with mobile gaming to attract a younger

---

[21] Emily Sohn, *How gambling affects the brain and who is most vulnerable to addiction*, 54 MONITOR ON PSYCH. 5, 62 (July 1, 2023) (available at https://www.apa.org/monitor/2023/07/how-gambling-affects-the-brain/).

audience. Like, very obvious that that's what that is for."[22]

144.    DraftKings hosts free daily fantasy sports contests with cash awards funded by the company. DraftKings allows people under the age of twenty-one to enter those contests for free and win money that can be credited to their account.

145.    Plaintiff Beyer created his current account on DraftKings when he was nineteen years old. He does not recall being asked to enter his birthday when he created this account. Plaintiff Beyer was not required to verify his age by entering his social security number or uploading a photo ID, which is how DraftKings verifies users' ages before allowing them to make cash deposits or withdrawals for its sportsbook.

146.    Like many other DraftKings users in Illinois, Plaintiff Beyer frequently entered into free daily fantasy sports contests on DraftKings in Illinois before he was of legal gambling age.

147.    Plaintiff Beyer and his friends also used DraftKings features to facilitate betting with each other. They would track bets on DraftKings and would settle-up off-platform.

148.    DraftKings allows and even encourages underage users to access its platform in this way so that they are more likely to use its product upon reaching legal gambling age.

149.    None of this would have been possible had DraftKings made Plaintiff Beyer and his friends verify their ages and identities in order to create accounts. DraftKings deliberately chose not to require such verification.

150.    Immediately after Plaintiff Beyer turned twenty-one years old, he verified his account and began placing paid bets on DraftKings.

---

[22] Harrison Zuritsky, *Sports betting companies are targeting underage fans, experts say. Northeastern students are among those getting hooked.*, HUNTINGTON NEWS, May 12, 2024, https://huntnewsnu.com/78268/lifestyle/tech/sports-betting-companies-are-targeting-underage-fans-experts-say-northeastern-students-are-among-those-getting-hooked/ (last visited Nov. 21, 2024).

151.    Plaintiff Beyer recalls being "very excited" to get into sports betting as soon as he turned twenty-one after using a "lite" version of DraftKings's platform for several years previously.

152.    DraftKings was also able to secure Plaintiff Beyer's loyal business because it lured him onto its platform before he was of legal betting age. Plaintiff Beyer never considered signing up for FanDuel or any of DraftKings other competitors because he'd been using DraftKings for so many years by the time he turned twenty-one.

153.    Plaintiff Beyer, like many young men targeted by DraftKings, has lost a significant amount of money gambling on DraftKings's sportsbook.

154.    DraftKings also leverages its data identifies users who exhibit the potential to gamble lots of money very quickly sends them escalating promotions and assigns them "VIP Hosts:" DraftKings employees who are trained and incentivized to get users to gamble more and more money.

155.    DraftKings uses its data on users' betting and activity patterns to deploy its VIP Hosts, push notifications, emails, and other means of reaching a user to ensure that even when a user has just experienced a large loss or is trying to take a break from the platform, they get a message that will ensure they are back on the platform as soon as possible.

156.    For example, DraftKings targets push notifications to users who bet frequently but have not recently logged on to the platform in order to lure them back, even though DraftKings knows this undermines compulsive gamblers' efforts to resist gambling.

157.    Additionally, DraftKings frequently offers users a deposit match promotion after they have experienced a large loss or have been absent from the platform for several days.

158.    DraftKings does this because it knows that doing so make a user more likely to

continue gambling, engage in loss-chasing, and to gamble larger amounts despite having an adverse experience from a loss.

159.     In short, DraftKings uses its data and designs its app and user outreach in ways that are intentionally designed to induce rather than prevent problem gambling.

### D.  DraftKings's "Risk-Free Bet" promotions

160.     DraftKings offers a variety of promotions to new users that falsely state they can try out the platform without any risk of losing money. The dollar amount that can be placed "Risk-Free" varies but can be as much as $1,000.

161.     These tantalizing offers have been effective at persuading new users to open betting accounts they may not otherwise have opened and persuading existing users to wager amounts they would not otherwise have risked. That is what happened to Plaintiffs Smothers, Beyer, Davis, Zafer, and Bell. After DraftKings's lured Plaintiffs and others into placing bets based on the promise that they would be risk-free, Plaintiffs discovered that the money they wagered had in fact been lost.

162.     Since at least 2020, DraftKings has advertised no-risk gambling promotions to countless people watching professional and collegiate sports on television.





*Figure 2: Screenshots from an advertisement typical of those broadcasted by DraftKings on television and digital media in Illinois during the Class Period.*

163.    For those not watching televised sports, DraftKings ads for risk-free promotions
were inescapable on I-94 billboards and CTA trains and buses.

164.    DraftKings has also advertised risk-free betting on Twitter, Instagram,
Facebook, and TikTok feeds of millions of potential users through direct advertising and paid
partnerships with influencers.



*Figure 3: Post on Twitter (now X) from user @SoManyWays2Joey (host of a popular NHL
podcast on a network partnered with DraftKings) advertising a "Risk-Free Bet" up to $1,000;
dated July 14, 2022. (https://x.com/SoManyWays2Joey/status/1547647893254746116)*

165.    Plaintiff Davis recalls seeing ads similar to this one on Twitter that lead him to
opt-into purportedly no-risk promotions shortly after he funded his account.

166.    This marketing was omnipresent in digital media during the Class Period. Each
of the Plaintiffs saw these advertisements in more than one media format around the time they
began using DraftKings and relied on the large-print and spoken promises in them to place bets
they believed to be without risk.

167.    For example, Plaintiff Bell recalls seeing advertisements for no risk bets on
television, on his Instagram and Facebook feeds, and in the DraftKings app itself. The

cumulative effect of all of these advertisements caused him to place bets, and subsequently drove him back to the platform chasing his losses.

168. Plaintiff Zafer meanwhile saw ads for no-risk bets on DraftKings on TV while watching basketball.

169. Plaintiff Smothers saw DraftKings's advertisements of no-risk bets on Twitter.

170. Plaintiff Smothers also received push notifications from the DraftKings app that advertised no-risk promotions.

171. Finally, DraftKings has, from time to time, directly emailed its users including Plaintiffs encouraging them to log in and place risk-free bets.

172. For example, Plaintiff Smothers received an email in November of 2022 encouraging him to place an "NFL Thanksgiving Risk-Free Bet." The email did disclosed that the offer was risk-free only insofar as if Plaintiff Smothers lost he would receive a "Free Bet" (later termed a "Bonus Bet") rather than his money back, but it did not disclose that, as described below, this "Free Bet" expired and would not pay out like his original bet that was staked with cash.







*Figure 4: An email received by Plaintiff Smothers on November 24th, 2022, advertising an*

*"NFL Thanksgiving Risk-Free Bet".*

173.    Plaintiff Smothers received another email from DraftKings in February of 2021

with the subject line "Bet Risk-Free on anything today, [username]!" and header "NO LOSING FOR YOU TODAY!". This email disclosed even fewer material terms regarding how Plaintiff Smothers could "Bet Risk-Free."

174.    Plaintiff Smothers placed bets that he thought were "risk free" in reliance on these advertisements and lost at least one of those bets.

175.    The bets placed pursuant to these promotions involve substantially more risk than DraftKings's promotional materials lead customers to believe. When a customer loses their initial bet, they are not in the same position as they were before placing the wager.

176.    DraftKings's advertising misleadingly implied the contrary and concealed several key features of the "risk-free" promotion that would have allowed customers to determine that using the promotions did, in fact, put them at risk of losing their money.

177.    First, DraftKings misrepresented that a user could place a bet at no risk to themselves when there was necessarily risk, because a consumer cannot simply cash out a refund if they lose but instead must place another bet (the so-called "Bonus Bet") that they receive in the event they lost their original wager.

178.    Second, and more deceptively, DraftKings misleadingly implied that a user could be restored to their original position if their original bet lost because they would receive a "Bonus Bets."

179.    When a user places a bet as part of a no-risk promotion, they are wagering their own money and their account is debited the amount of the bet in U.S. dollars (in this case $100). If they lose, that money is not credited back to their account (as it would be if the bet was actually without risk), instead they are given a "Bonus Bet" of the same amount. But what DraftKings consistently fails to disclose is that a "Bonus Bet" is not worth its cash equivalent.

180.    "Bonus Bets," have no cash value, are non-transferrable, have an expiration date, and cannot be withdrawn from the account.

181.    In order to turn a "Bonus Bet" into U.S. dollars that can make them whole for their prior loss, a user must use the "Bonus Bet" to place an additional wager within a specified time limit *and win*.

182.    Furthermore, even when a customer places and wins a "Bonus Bet", they do not receive the stake back—which is what DraftKings purportedly gave them to make up for their loss. For example, if a customer uses a $100 "Bonus Bet" on a winning wager with 50/50 odds, they are paid out $91 ($100 winnings, minus 9% vig, without a return of the $100 stake).

183.    And of course, there is no guarantee that a user will win the "Bonus Bet". If a "Bonus Bet" loses, the user will be paid out nothing.

184.    DraftKings thus misrepresented there was no risk because there is the risk of losing all the money originally wagered. If a user loses their "Bonus Bet," they have no further means of recouping the initial amount they wagered.

185.    The false promise of "Risk-Free" and "No Sweat" bets was strategically and misleadingly designed to overcome new users' skepticism of gambling, identify users who could be converted into high-value addicted gamblers, and to grab market share in the New Jersey sports betting industry.

186.    DraftKings was aware of the effects of such promises on new users'—including Plaintiffs'—thinking: "If it's no-risk, why not bet more?"

187.    DraftKings deliberately tricked gambling-naive customers in Illinois into falling for these promotions by not clearly communicating that customers signing up for the "Risk-Free" and "No Sweat" promotions were, in fact, at risk of losing their money. Customers

relying on their commonsense understanding of the "Risk-Free" and "No Sweat" offers on promotional materials—and not understanding the complex terms laid out several layers deep in fine print that contradict DraftKings's large-print promises—were surprised to discover upon losing their bets that, in order to get *some* of their money back, they needed to make an additional, successful wager. DraftKings intentionally supplemented this confusion by using the dollar symbol ($) in its promotional materials, misleadingly indicating that customers could be a specific dollar about, without risk of losing that amount of money.

188.   As alleged above, DraftKings advertised these "Risk-Free Bets" or "No Sweat Bets" to Illinois users on numerous occasions, often targeted specifically to new customers or existing customers who had not placed a certain type of bet before.



*Figure 5: A March 2024 advertisement promoting a "No Sweat Bet" of up to $1,000 for new customers used by DraftKings in various digital advertising media including on Twitter.*



*Figure 6: DraftKings made attempts to appeal to fans of the country's largest sports leagues. This post from the official DraftKings Twitter account, dated October 22, 2021, promises a "Risk-Free Bet" for NBA games. (https://x.com/DKSportsbook/status/1451600275861540867)*



*Figure 7: Advertisement for "Risk-Free Bet" appearing on DraftKings affiliate marketing websites in March 2025.*

189.    Some of DraftKings's advertisements for no-risk promotions include very small

print referencing other terms.

190.    In fact, DraftKings goes to great lengths to make it onerous to even comprehend that fine print terms apply. First, the link to the terms of the promotion are not even made available to a user until after the customer has already logged into the platform in response to an off-platform advertisement for the promotion and clicked through several steps to get to the point of placing the supposedly risk-free bet.

191.    Even then, DraftKings buries the most important term—that if you lose your original bet you only get an expiring "Bonus Bet" back which is not treated like a normal bet in how it is paid out. This vital information—which contradicts the large print promises that the customer is not at risk if they lose—only appears behind a tiny hyperlinked information symbol and then, if the symbol is clicked, deep in very small text below several blocks of much larger text focusing on other aspects of the promotion.



*Figure 8: Screenshot taken November 11, 2024, of the DraftKings app for placing a "No Sweat" bet. No terms and conditions are displayed. Instead, they are obscured by an easy-to-miss hyperlink, seen here as the almost imperceptible "i" with a small green circle around it next to "NBA No Sweat SGP or SGPx"*

192. A user need not—and Plaintiffs did not—ever see the full terms before opting in to the promotion on the basis of DraftKings's advertising that led them to believe they could place a bet risk-free.

193. For example, a user could opt into a "No Sweat" NBA same game parlay on DraftKings by flipping the green switch in the app shown above without ever clicking the tiny I symbol. Otherwise, they are never shown this disclosure of the promotion's full terms, which

themselves bury the lead:



11:13 🌙

years of age or older (18+ if in DC/KY/NH/WY) (19+ if in CA-ONT). Any customer who is found to be ineligible to play on DraftKings (i.e., by way of self-exclusion from gambling, restriction due to employment, or otherwise) may not participate in this Promotion and immediately forfeits any bonus rewards which have been awarded under this Promotion.

In addition to the eligibility requirements set forth above and in the DraftKings Terms of Use, to participate in the Promotion, customers must (1) be a registered DraftKings Sportsbook customer with an active account; (2) receive an offer to participate in this Promotion; and (3) opt-in by clicking on the appropriate link or button within the Promotional Period.

NO SWEAT BET REDEMPTION

Upon completion of the promotion requirements, eligible customers will be awarded one (1) No Sweat Bet (the "Token"). Token valid only on 11/27 NBA bets (the "Qualifying Bet"). Minimum odds per leg of -500 or longer. Cashed-out bets and voided bets will void this Promotion. Bets placed with bonus rewards (including but not limited to Bonus Bets, Odds Boosts/Surges, Profit Boosts, etc.) are not valid. Token expires at the conclusion of the final 11/27 NBA game. Qualifying Bet must be placed using cash from your cash balance or DK Dollars. Maximum reward limits apply and vary by customer cohort. Maximum reward limits will be clearly and conspicuously disclosed to the customer upon opting in.

No Sweat Bet Tokens are single-use, non-withdrawable, and have no cash value. Must meet Qualifying Bet criteria and select Token BEFORE placing Qualifying Bet. Token only applies to Qualifying Bet. Reward issued only if Qualifying Bet loses after applying Token. Reward issued as Bonus Bet(s) based on the amount of losing Qualifying Bet. No Sweat Bets may not be combined with other bonus rewards and may not be eligible for use on all promotions and/or betting markets.

REWARD LIMITATIONS

Bonus Bets are single-use, non-transferable, non-withdrawable, and have no cash value. Bonus Bets are valid for seven (7) days (168 hours) from the time they are credited to customers' accounts. Customers can choose when to use Bonus Bets and must select the Bonus Bet in their betslip before placing a wager. Failure to use a Bonus Bet before expiration will void the reward. Payouts from Bonus Bet wagers will be transferred to the customer's cash balance and do not include the Bonus Bet stake. Ex: If a $10 bonus bet is placed at +100 odds and

---

11:13 🌙

betslip before placing a wager. Failure to use a Bonus Bet before expiration will void the reward. Payouts from Bonus Bet wagers will be transferred to the customer's cash balance and do not include the Bonus Bet stake. Ex: If a $10 bonus bet is placed at +100 odds and wins, only the profit of $10 will be credited to the customer's account. Bonus Bets may not be combined with other bonus rewards and may not be eligible for use on all promotions and/or betting markets.

GENERAL TERMS

Limit one (1) offer per customer. Customers must opt-in to this Promotion each time it is offered. Opting-in to this Promotion during a single day is only valid during that day and does not opt the customer into future periods. See DraftKings Sportsbook Terms of Use for information and limitations on wagering. Each customer will be notified when they have received an award by (1) a bell notification (this is a notification that displays as a bell icon on the home page of the DraftKings Sportsbook app and website that can be clicked on to view short confirmation copy and terms) and/or (2) an automatically triggered email if the customer successfully entered the promotion and completed the promotion requirements. Whether a customer has committed abuse of this Promotion, violated the Promotion Terms or DraftKings Terms of Use, will be determined by DraftKings in its sole discretion, for any reason or no reason at all. Should you wish to cancel your participation in this promotion at any time, please contact customer experience at sportsbook@draftkings.com. Upon cancellation, you may withdraw any remaining funds deposited in connection with this promotion subject to DraftKings Terms of Use. Any wager placed on DraftKings Sportsbook in connection with the promotion cannot be rescinded once it has been placed. However, any applicable bonus rewards in your account shall be void, subject to forfeiture, and may not be transferred or withdrawn. All promotions are subject to the DraftKings Terms of Use and Privacy Policy. By accepting any bonus rewards, registered customers agree to abide by the terms and conditions of this Promotion. Promotional offer is subject to regulatory approval. Void where prohibited by law. DraftKings account holders are responsible for any and all local, state, or federal taxes. DraftKings is not liable for computer or program malfunctions, nor for errors in bonus rewards. DraftKings reserves the right to exclude or remove certain customers from this Promotion, as well as the right to withhold bonus rewards if you have violated or attempted to violate the Promotion Terms or DraftKings Terms of Use, including but not limited to sharing account credentials with other individuals, placing wagers on behalf of other individuals, circumventing DraftKings age and location verification procedures, and abusing the DraftKings Platform, the Services, or any bonuses, the refer-a-friend program, or



*Figure 9: The full terms of use for the promotion pictured in Figure 7. If a user navigates to these terms through the obscured hyperlink, they are met with an impractically small font size.*

194.    Regulators are increasingly catching on to the misleading language DraftKings and other sportsbooks use in advertising "risk-free" bets. Several illustrative examples are discussed below.

195.    In Ohio gambling regulators have said such "free" or "risk-free" inducements are "false, misleading and explicitly against" state law. Matthew Schuler, executive director of Ohio's Casino Control Commission, recently said: "If something is claiming to be free or risk-free, then it has to absolutely not require the patron to incur any loss or risk their own money." Disclosing the risks within the terms and conditions isn't good enough, he added. "We are not

supportive of trying to put the truth in small print."[23]

196.    DraftKings was sent a notice of violation by the Ohio Casino Control Commission which included a penalty of $150,000 for the use of "Risk-Free Bet" language. Previously, DraftKings had received a notice of violation from the same commission for advertising to individuals under the age of 21.

197.    In 2022, the New York Attorney General's office admonished: "Since online sports gambling became legal in New York last month, New Yorkers have been bombarded with misleading ads on social media and streaming sites that claim 'risk-free' bets and '$1,000 welcome offers,' which sound like free money, but often come with strings attached without consumers' awareness."[24]

198.    The Massachusetts Gaming Commission prohibits sportsbooks from running promotions advertised as "free" or "risk-free" if a bettor needs to risk their own money as part of the promotion. *See* 205 Mass. Code Regs. § 256.04. Colorado has imposed a similar prohibition. *See* 1 Colo. Code Regs. § 207-2:9.4

199.    Even the NBA took a stance on the "risk-free" language, banning it on platforms operated by the NBA or its franchises in February of 2023.[25]

200.    And, importantly, in September 2024, the Illinois Gaming Board voted to ban gambling advertisers from using the words "free", "cost free", or any language taken to mean

---

[23] Danny Funt, *Sportsbooks call them risk-free bets. Just don't read the fine print.*, WASHINGTON POST, Dec. 26, 2022, https://www.washingtonpost.com/sports/2022/12/26/risk-free-bets-mgm-draft-kings-fanduel-caesars/ (last visited Nov. 17, 2024).
[24] *CONSUMER ALERT: Attorney General James Warns New Yorkers of Deceptive Online Sports Betting Companies Ahead of Super Bowl*, NEW YORK ATTORNEY GENERAL, Feb. 10, 2022, https://ag.ny.gov/press-release/2022/consumer-alert-attorney-general-james-warns-new-yorkers-deceptive-online-sports#:~:text=Since%20online%20sports%20gambling%20became,strings%20attached%20without%20consumers%20awareness (last visited Nov. 17, 2024).
[25] Bill King, *Concerned about betting's inherent dangers, NBA to ban 'risk free' advertising*, SPORTS BUSINESS JOURNAL, Feb. 6, 2023 https://www.sportsbusinessjournal.com/Journal/Issues/2023/02/06/Upfront/betting.aspx (last accessed Nov. 21, 2024).

"free of risk" in promotional materials.[26]

201.    Many of the sportsbooks, including DraftKings, started to quietly move away from explicit "risk-free" language in late 2022. In that year, DraftKings pivoted to labeling some of these offers "No Sweat" bets. These promotions are materially no different, and just as misleading, as their "Risk-Free" analogs, particularly considering that consumers in Illinois still associate these offers, however labeled, with the "Risk-Free" promotion campaigns that were incessantly advertised on countless NFL, NBA, NHL, and MLB games and that continue to be advertised with DraftKings's imprimatur in the last few months. *See Figure 7.* Despite Illinois Gaming Board's new regulations, DraftKings has continued to imply that betting on its platform in Illinois can be no-risk as recently as December 2024.

---

[26] *Regular Meeting Open Session Minutes*, ILLINOIS GAMING BOARD, Sept. 12, 2024, https://igb.illinois.gov/content/dam/soi/en/web/igb/documents/board-meetings/minutes/2024/20240912-open-meeting-minutes.pdf (last access Nov. 21, 2024).



*Figure 10: A "No Sweat" NBA offer on the DraftKings Sportsbook app from December 4, 2024.*

202.    According to a Washington Post article, industry participants admitted publicly that advertising offers as no-risk was "unclear".

203.    Nevertheless, DraftKings continued to make these offers because it expected and intended consumers to be misled by its "Risk-Free" and "No Sweat" promotions.

46

204.    At no time in DraftKings's marketing or during DraftKings's sign-up or promotion opt-in processes were Plaintiff and the Class Members warned of the true financial risks of using DraftKings to place a bet, including the immediate and acute risk of losing the entire amount in that initial bet, the risk that losses would never be reimbursed by Defendant and the financial and psychological risks of developing a gambling addiction.

205.    As described above, Defendants' marketing (including during the user sign-up process) misrepresented and omitted several key facts about the "Risk-Free" and "No Sweat" bet promotions.

206.    Because a "Bonus Bet" must be gambled quickly and cannot be deposited in the customer's bank account as cash, there is nothing "Risk-Free" about the transaction.

207.    However, customers like Plaintiffs who were misled into thinking that they could bet without risk and then lost their bet ended up losing a substantial portion of their initial stake.

208.    Had the Plaintiffs and Class Members understood the true risk inherent in making these "risk-free bets," they would have acted differently and not lost as much money.

**E.  DraftKings's $1,000 Deposit Match Promotions**

209.    No-risk bet offers are not the only deceptive promotions that DraftKings sportsbook employs. For several years, DraftKings has also been offering deposit match bonuses often, but not always, targeting new customers.

210.    Since at least 2020, DraftKings has advertised their promises of a "$1,000 Sign Up Bonus" to countless Illinoisans watching televised sports, and have made themselves regulars on the Twitter, Instagram, Facebook, and TikTok feeds of their millions of followers.

211.    DraftKings also advertised sign-up bonuses on I-94 billboards and CTA trains and buses.

212. Through at least the summer of 2023, the top banner on DraftKings' website read:



*Figure 11: Screen Capture from DraftKings's Website on June 21, 2023*

*(*https://web.archive.org/web/20230621141013/https://sportsbook.draftkings.com/featured*)*

213. Likewise, any user who downloaded the DraftKings app around the time Plaintiffs Zafer, Smothers, Bell, and Davis did was met with the following offer:



*Figure 12: Screen Capture of first page user saw in 2023 upon opening DraftKings's app.*

214. DraftKings also ran TV advertisements for this promotion that began with a woman's voice saying, "with DraftKings Sportsbook you get out what you put in, like a 100% deposit match up to $1,000."

215. Plaintiffs Davis, Smothers, Bell, and Zafer each saw this advertising and relied

on it when they created accounts and made deposits. They would not have created accounts on DraftKings and lost money had they not relied on the misleading statements in these advertisements.

216. The unfair and deceptive terms of this promotion, which they offer to this day, make it inordinately unlikely for a user to obtain the advertised $1,000. Omitted from the promising headline is the reality that DraftKings will only match 20% of a user's deposit and will require a user to play through (and risk) 25x the amount of bonus money rewarded.

217. In plain terms—which the fine print regarding this promotion deliberately obscures and the large-print advertisements for this promotion completely misrepresent—in order for a user to get a $1,000 bonus, they actually need to deposit five times that amount ($5,000), and then, within 90 days, *risk $25,000 on DraftKings sports bets*.

218. This playthrough requirement is designed to induce users to form a dangerous habit of gambling on DraftKings. It worked on Plaintiff Bell and on many others.

219. Additionally, in order to satisfy the playthrough requirement, DraftKings requires that these bets be placed at minimum odds of -300 (meaning a bettor must risk $300 to win $100). This means bettors must place a series of highly risky bets to satisfy the playthrough requirements.

220. None of the foregoing is adequately disclosed to the customer.

221. A new user is statistically likely, even using the most conservative betting approach, to lose money trying to satisfy the playthrough requirement.

222. But even if they make it through all those steps, the $1,000 bonus is not rewarded as withdrawable cash funds, but rather as "DK Dollars" that hold no cash value, are non-withdrawable, non-transferable, non-refundable, and can only be used for further gambling.

223.    DraftKings's advertising of the Bonus is also unfair and deceptive because an eligible consumer who is often a new participant in sports betting, would be unlikely to understand the cost and risk involved in qualifying for the $1,000 Bonus. In fact, if the Plaintiffs had been adequately informed of the cost or the odds associated with the promotion, they would not have acted upon it.

224.    DraftKings advertised the "$1,000 Bonus" promotion in a variety of media:



*Figure 13: DraftKings post on Twitter, dated February 15, 2022, using fan-favorite NBA player Paul Pierce to promote false promises of a "Deposit Bonus up to $1,000".*

*(https://x.com/DKSportsbook/status/1493660970870312967)*



*Figure 14: Screenshot from an advertisement typical of those broadcasted by DraftKings on television and digital media in Illinois during the Class Period.*



*Figure 15: A Twitter post, dated April 20, 2022, featuring rapper Lil Wayne and promising customers that they can simply "Download the [DraftKings] app today and get a deposit bonus up to $1,000". (https://x.com/DKSportsbook/status/1516830656721993729)*

225.    Plaintiffs Zafer, Davis, Bell, and Smothers all saw advertisements on television or social media for DraftKings's sign-up bonus promotion shortly before they funded their accounts on DraftKings. They also each saw the offer within the app or on DraftKings's

website when they first went to create an account. None of these advertisements for the promotion included the terms discussed above in readable print.

226.    The Plaintiffs relied on the promise in those advertisements when they made deposits on DraftKings.

227.    These Plaintiffs were misled by the advertising for the promotion and, as a result, they deposited more money than they would have with DraftKings had they been informed of the actual terms of the promotion.

228.    As with the no-risk promotion advertisements, the terms of this promotion are not fully disclosed in the advertisements and, to the extent that they are communicated, they appear in an illegibly small font-size—an order of magnitude smaller than the misleading text advertising the promotion—and are confusingly worded.

229.    Plaintiffs and many other users signed up for DraftKings and funded their account anticipating that their deposit would be "matched" in full up to $1,000.

230.    Plaintiffs and most users never became aware that there were additional terms much less saw the full terms of the promotion or learned that their funds would not be matched in U.S. Dollars, not be matched on a 1:1 basis, and would only be matched at a rate of one DK Dollar for every $25 USD wagered until after they had made their deposits and opted into the promotion.

231.    Notwithstanding the large text of DraftKings's advertisements, the Plaintiffs were never going to simply receive "$1,000" in exchange for signing up for the sportsbook platform and depositing $1,000, as the ads implied. In order for a new customer to obtain the "$1,000 Bonus," he or she would have to satisfy three very onerous requirements, explained only in the unreadably small font size above:

    a.   They would have to deposit $5,000 up front;

    b.   They would have to bet $25,000 within 90 days on wagers with odds of "-300 or longer;

    c.   They would then have to place wagers using their "DK Dollars" and win enough of those to accrue a cash value of $1,000 in their account.

232.    The Plaintiffs and other users could not reasonably have been expected to understand from the face of DraftKings's advertisements that, in order to receive a $1,000 bonus, he or she needed to immediately deposit $5,000, because the bonus amount is calculated as 20% of the consumer's first deposit.

233.    The Plaintiffs could not reasonably have been expected to understand from the face of DraftKings's advertisements that the $1,000 bonus would not be provided at the time of their initial deposit, but that instead he or she would earn the bonus only $1 at a time for every $25 wagered. Thus, to receive the $1,000 bonus, the new customer would have to risk $25,000 within 90 days on bets that DraftKings's odds-makers consider to have a less-than-75% likelihood of winning (–300 odds or longer).

234.    The Plaintiffs did not understand and could not reasonably have been expected to understand based on DraftKings's advertisements that, in order to place bets for at least $25,000 over 90 days to qualify for the Bonus, they would have had to wager an average of more than $276 gambling on sports every day for three months.

235.    Plaintiffs also did not understand that, despite the advertisements using dollar signs and thus conveying that the bonus funds would be in the form of US Dollars, the bonus would actually be awarded, if at all, only as a non-withdrawable credit ("DK Dollars") to be used for further gambling.

236.    Plaintiffs and Class Members also could not reasonably be expected to understand that they would be required to make bets with a high level of risk to satisfy the play-through requirements. They could not have been expected to understand that, contrary to the express terms of the advertisements for the "Bonus Match" promotion, not all bets they made on DraftKings Sportsbook would count toward the $1,000 bonus. In fact, any bets that DraftKings's oddsmakers believe have a greater than ~75% chance of winning would not count toward the required total bets of $25,000 within 90 days.

237.    Gambling regulators, like the New York Attorney General, have sounded warning bells about the misleadingness and illegality of deposit match promotions just like the ones DraftKings used on Illinois residents.

238.    DraftKings knew, or should have known, that its advertisements for this promotion were deceptive to its target customers, who were customers mostly new to sports betting and who were extremely unlikely to understand the details of the promotion, even if it were conveyed clearly and in a font size that a reasonable consumer could be expected to read on the company's advertisements and platform.

239.    DraftKings knowingly and intentionally designed this promotion to maximize the number of consumers that would sign up for its sports gambling platform, the number of bets that would be placed through the platform, and the amount of money that would be placed on bets through its platforms.

**F.  DraftKings designed its interface to addict users and prevent them from understanding the terms of its promotions or the risk of developing addiction to its products.**

240.    DraftKings's gambling products are designed to methodically, but unpredictably, trigger dopamine-triggering rewards with dopamine gaps. The unpredictability is key because, paradoxically, intermittent variable rewards create stronger associations (conditioned changes

in the neural pathway) than fixed rewards. This phenomenon is well understood in behavioral science, and products that use this technique are known to be highly habit forming and ultimately addictive.

241.    There are multiple types of dopamine neurons that are connected with distinct networks in the brain and have distinct roles in motivational control. Apart from the dopamine reward loop triggered by positive feedback, other dopamine neurons are impacted by salient but non-rewarding stimuli and even painful-aversive stimuli.[27] DraftKings's app and promotional practices capitalize on this by giving users a dopamine-payoff involving both highly positive and aversive stimuli associated not just with winning and losing bets but also with being offered and completing or failing to complete promotions.

242.    DraftKings has also designed its app to increase the pace of this dopamine-payoff by offering numerous in-game bets that settle quickly. Gone are the days when sports betting simply involved gambling on the outcome of a game coming up on a Sunday. Now users can wager on the outcome of individual plays and can string these bets together into multi-leg bets every day, all day. This gamification of gambling is intentionally designed to lead to addiction and increase user's spend and time in the app.[28]

243.    DraftKings analyses its user data to plan the nature and timing of app notifications and other outreach to the user, often including large promises and promotional offers in a way that is designed to encourage them to gamble more and more on the platform, including by chasing "VIP" tiers and completing promotions.

---

[27] J.P.H. Verharen, Yichen Zhu, and Stephan Lammel, *Aversion hot spots in the dopamine system* 64 Neurobiology 46-52 (March 5, 2020) https://doi.org/10.1016/j.conb.2020.02.002 (last visited May 7, 2025).
[28] Allison Parshall, *How 'Dark Patterns' in Sports Betting Apps Keep Users Gambling*, SCIENTIFIC AMERICAN, Jan. 23, 2025, https://www.scientificamerican.com/article/how-sports-betting-apps-use-psychology-to-keep-users-gambling/ (last visited May 8, 2025).

244. DraftKings's product is also designed to create and maintain a user's "flow-state": a hyper-focused, hypnotic state, where the user is emersed in the interface and acts reflexively in placing of bets and making deposits. DraftKings does this, in part, by serving rapid fire updates for ongoing bets—with scores and odds constantly refreshing faster than on television to keep users watching the app—and serving users precisely timed pop-ups, often in bright colors with emojis, alerting them of new bets they can place within the sporting event they are already watching or within a new sporting event as soon as the one they are watching has concluded.

245. DraftKings also is intentionally designed to make it very easy to place a bet and make a deposit with a single click, a design decision that "make[s] it nearly impossible to stop" gambling for someone "already struggl[ing] to control the impulse to keep placing bets."[29]

246. Consumer psychology research has identified several factors that decrease people's likeliness to read the fine print of consumer contracts.[30] First, researchers point out that when contract forms are intentionally made not user-friendly with small font and long sentences, consumers are less likely to engage with them."[31]

247. The terms of a "Risk-Free Bet" and "Sign Up Bonus" are often over one-

---

[29] Luke Whelan, *How Smartphones Fuel Gambling Addiction*, UNIVERSITY OF WASHINGTON MEDICINE, May 20, 2024, https://rightasrain.uwmedicine.org/mind/mental-health/sports-betting-smartphone-screen-addiction (last visited May 8, 2025).
[30] Meirav Furth-Matzkin & Roseanna Sommers, , *Fool Me Once, Shame On Me: How Consumers And Lawyers Perceive The Fine Print In Deception Cases*, HARVARD JOHN M. OLIN CENTER FOR LAW, ECONOMICS, AND BUSINESS - FELLOWS' DISCUSSION PAPER SERIES, June 2018, https://www.law.harvard.edu/programs/olin_center/felows_papers/pdf/Furth_82.pdf (last visited Dec. 10, 2024); Florencia Marotta-Wurgler, , *Will Increased Disclosure Help? Evaluating the Recommendations of the ALI's "Principles of the Law of Software Contracts"*, U. CHI. L. REV., Feb. 6, 2011, https://lawreview.uchicago.edu/sites/default/files/78-1-Increased%20Disclosure%20in%20Software%20Contracts-Marotta-Wurgler.pdf (last visited Dec. 10, 2024).
[31] Debra Pogrund Stark & Jessica M. Choplin, *A License to Deceive: Enforcing Contractual Myths Despite Consumer Psychological Realities*, NYU JOURNAL OF L. AND BUS., Feb. 9, 2009, https://papers.ssrn.com/-sol3/papers.cfm?abstract_id=1340166 (last visited Dec. 10, 2024).

thousand words long with small font sizes and lengthy sentences that make it excessively taxing for users to follow.

248.    DraftKings only reveals the truth of its unfavorable promotions after multiple paragraphs describing age and location requirements for betting on their platform. Even if a user is able to hunt down language that describes the promotion's substantive details, it is written in a way that makes it unlikely that a layperson—who is eager to get gambling—will understand.

249.    Additionally, DraftKings' contract is one of adhesion with terms that are non-negotiable, "[a]nother major reason why people might not read the contracts that they sign… [is that t]he consumers' choice is to accept the offered agreement or go elsewhere."[32] DraftKings customers understand that reading the fine print will not lend itself to mediating a more favorable deal.

250.    Furthermore, according to the NYU researchers, "consumers will also often have difficulty imagining problems that might arise. That is, scenarios under which things can go wrong never enter their minds."

251.    After exposure to DraftKings promising headlines, consumers are unlikely to predict that redeeming these promotions will entail such onerous requirements, fruitless rewards, and the risk of developing an addiction.

252.    The authors also write that "even if some consumers manage to foresee the possibility of potential negative consequences, they will often be overly optimistic in assessing the probability of those negative consequences once they have invested even a small amount of time, effort, or other resources pursuing a goal."

---

[32] *Id.*

253.     By the time a user is presented with the full terms of a promotion, they have

created an account on DraftKings, grown excited about the alluring promises made in the

promotions, and have put time and effort into navigating to the platform.

254.     Moreover, research shows that social norms often discourage reading the fine

print of a contract. Consumers believe that DraftKings, the largest company in its industry, that

markets itself as "the safest sports betting platform," and ubiquitously espouses a commitment

to "responsible gambling," can be trusted for the promises it's making in its advertisements and

to put in place common-sense designs that will keep them safe. Consumers do not think,

therefore, that they need to carefully read pages of fine print to understand risks and protect

themselves from danger.

255.     DraftKings exploits these factors and misleads consumers about material aspects

of its promotions, secure in the knowledge that few consumers will notice if the fine print

contradicts what they believed they had signed up for.

256.     DraftKings also exploits the fact that its lip service to "responsible gambling"

misleads customers into thinking that as long as they act "responsibly" they are not at risk to

develop a gambling addiction. DraftKings knows that gambling addiction is a mental health

condition the risk of which is substantially increased by the intentional features embedded in

DraftKings's products.

### G.  DraftKings's dangerously designed app and promotions worked exactly as intended on Plaintiffs Bell and Smothers and many others

257.     Plaintiff Bell began betting on DraftKings in 2021 and used a variety of

promotions including the Deposit Match Promotion. These above-described promotions and

app design features, unknown to Plaintiff Bell, led him to gamble with increasing frequency and

in increasing amounts.

59

258.    Despite never before struggling with gambling addictions, within a few months of creating his account on DraftKings, Plaintiff Bell was compulsively gambling and making numerous deposits every day.

259.    DraftKings's data analytics systems took note of Plaintiff Bell's increasing gambling and he was sent numerous promotions to encourage him to deposit and gamble more and more. Plaintiff Bell was also, more than once, offered to be included in DraftKings's "VIP Program" due to the amount of his gambling.

260.    When Plaintiff Bell went to place bets on DraftKings, the app would default his pending wager to a higher amount of money given his prior betting history. On numerous occasions, Plaintiff Bell had intended to bet far less but could not resist the temptation of the large amount of money—often hundreds of dollars—that DraftKings suggested.

261.    Despite the fact that Plaintiff Bell was gambling with increasing frequency and thousands of dollars in a sitting, DraftKings never did a financial background check or source of funds verification on him.

262.    Plaintiff Bell repeatedly tried to limit his gambling on DraftKings, but for years he was drawn back into a cycle of compulsive gambling on the platform. Plaintiff Bell's gambling addiction became so severe that he had to declare bankruptcy. Even that was not enough to allow Plaintiff Bell to get his addiction under control, and despite his clear pattern of compulsive gambling involving binges and then attempts to stop, DraftKings continued to automatedly solicit Plaintiff Bell to gamble, sending push notifications and emails to him with offers designed to get him to make a new deposit and re-initiate a cycle of compulsive gambling. These intentional tactics worked to draw Plaintiff Bell back to DraftKings's app over and over.

263.    After staying away from DraftKings for most of 2024, Plaintiff Bell was drawn back at the end of the year by emails regarding no-risk bet and deposit match promotions. DraftKings targeted Plaintiff Bell, sending these promotional emails hours after he had set his deposit limit to $0.10 in an attempt to maintain his self-control.

264.    Due to DraftKings's intentionally ineffective "responsible gaming" deposit limitation tool, Plaintiff Bell was able to reset his deposit limit and begin sending far more money than he could afford to the platform.

265.    Over the course of the first 45 days of 2025, Plaintiff Bell spent approximately 150 hours logged onto the DraftKings app (sometimes for most of the day), making 30 or more deposits per day of around $250 each. Plaintiff Bell frequently deposited more than $5,000 per day.

266.    During the last two weeks of January 2025 alone, Plaintiff Bell deposited over $65,000 in DraftKings. This was far more than Plaintiff Bell could afford to lose.

267.    These deposits often were made less than five minutes apart.

268.    During this period, DraftKings often sent Plaintiff Bell notifications and promotions to bring him back to spend even more time on its app, even though it was clear that Plaintiff Bell was compulsively gambling.

269.    These promotions often worked, causing Plaintiff Bell to make yet another deposit, which often lead to more deposits in attempts to win back money lost or satisfy playthrough requirements.

270.    DraftKings never once intervened in Plaintiff Bell's gambling or confirmed that he was gambling responsibly or within his means—it was clear he was not.

271.    No one should have been permitted to make as many large deposits in such a

short period of time as Plaintiff Bell did. Plaintiff Bell's pattern of usage of the DraftKings app, all of which was visible to DraftKings, was a clear sign that he was compulsively gambling.

272.    Plaintiff Bell has now cut himself off from gambling on DraftKings and is in the process of recovery. However, he continues to suffer the financial, professional, emotional, and relational damages caused by his addicted gambling, which DraftKings developed, encouraged, and knowingly perpetuated. This includes a possible foreclosure of Plaintiff Bell's house, poised to cause his family even more hardship, caused directly by financial and professional turmoil from his addictive gambling.

273.    Plaintiff Bell has lost at least $100,000 on DraftKings.

274.    Plaintiff Smothers too has lost thousands on DraftKings as a result of the app's design.

275.    Plaintiff Smothers has struggled with compulsive gambling and was frequently induced to bet on DraftKings with push notifications that were often sent after he had managed to cut himself off from the app for a period of time.

276.    Additionally, Plaintiff Smothers would frequently spend longer betting on DraftKings than he intended, placing bet after bet on various plays in a single game of football. Often Plaintiff Smothers would open the DraftKings app intending to place a single bet, and would end up with it open for an entire football game, watching the odds and scores update live and placing bet after bet on things like whether the next drive would result in a punt, or which player would catch a pass.

277.    Often Plaintiff Smothers would chase his losses in doing so, placing escalating bets on events within a game in an attempt to win back money he'd lost moments before. He was enabled in doing so by the short-event and fast-settling nature of the gamified bets

DraftKings offers on its platform.

278.     DraftKings's data showed that Plaintiff Smothers was betting compulsively on the platform and instead of limiting his betting, connecting him with effective gambling addiction resources, or otherwise interceding in his compulsive use of its product, DraftKings used its intimate knowledge of Plaintiff Smothers's gambling practices to entice him to continue betting with promotional offers and suggested bets it knew he would be susceptible to.

279.     Plaintiff Smothers suffered both economic and non-economic injury from DraftKings negligent design and its failure to adequately warn him about the risks of developing a gambling addiction on its platform.

## CLASS ALLEGATIONS

280.     Plaintiffs bring this action on behalf of themselves, and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), as representatives of the following classes and subclasses, for which Plaintiff seeks certification, defined as follows:

281.     **No-Risk Promotion Class:** Any person who opted into a DraftKings promotion advertising a "Risk-Free" or "No Sweat" bet with Defendant and lost their bet.

   a. **Illinois Subclass:** Any person who wagered in the state of Illinois and utilized a DraftKings promotion advertising a "Risk-Free" or "No Sweat" bet with Defendant and lost their first bet within the applicable statute of limitations period.

282.     **Signup Bonus Promotion Class:** Any person who deposited money in response to a DraftKings "Deposit Match" promotion containing the terms described above.

   a. **Illinois Subclass:** Any person who deposited money while in the state of Illinois

63

in response to a DraftKings "Deposit Match" promotion containing the terms described above.

283.    **Targeted Underage Users Class:** Any person who opened an account and entered free promotions on DraftKings's platform before turning twenty-one years old and then placed paid bets on DraftKings after turning twenty-one years old.

    a.    **Illinois Subclass:** Any person who opened an account and entered free promotions on DraftKings's platform while in the state of Illinois before turning twenty-one years old and then placed paid bets on DraftKings after turning twenty-one years old.

284.    **Product Liability Class:** Any person who compulsively gambled on DraftKings's sportsbook during the Class Period.

    a.    **Illinois Product Liability Class:** Any person who compulsively gambled on DraftKings's sportsbook during the Class Period while located in the state of Illinois.

285.    Excluded from these Classes are (a) Defendants and any of their members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; (b) class counsel and their employees; and (c) the judicial officers and Court staff assigned to this case and their immediate family members.

286.    This case is properly brought as a class action for the following reasons:

    a.    **Ascertainability:** The Class Members can be readily identified through Defendants' records which will include a record of all those users who signed up for various promotions and must also track customer's state of residence. The members will be identified by filtering DraftKings's records for users who

entered into each of the identified promotions and lost money.

b.  **Numerosity:** The Class is so numerous that joinder of all members in this action is impracticable. The exact number and identity of all Class Members is unknown by Plaintiff at this time. However, Plaintiffs believe there are tens of thousands and potentially even hundreds of thousands of Class Members. The number and identity of Class Members can be determined through discovery of Defendant's data.

c.  **Commonality and Predominance:** Plaintiffs and Class Members were all injured by the same unlawful conduct. Therefore, this action involved common questions of law and fact, which predominate over any questions affecting only individual Class Members, including, without limitation:

   •  Whether DraftKings misrepresented in its advertisements that the Plaintiffs and the other No-Risk Promotion Class Members would not be at risk of losing money when they made a deposit and placed a first bet;

   •  Whether DraftKings intentionally designed its advertisements for the no-risk bet in such a way as to mislead the Plaintiffs and the other No-Risk Promotion Class Members in order to induce them to sign up and wager;

   •  Whether DraftKings's representations and omissions about the No-Risk Promotions are false, misleading, deceptive, or likely to deceive;

   •  Whether DraftKings misrepresented in its advertisements the Bonus it was offering to the Plaintiffs and the other Signup Bonus Promotion

65

Class Members

- Whether DraftKings intentionally designed its advertisements for the signup bonus promotions in such a way as to mislead the Plaintiffs and the other Signup Bonus Promotion Class Members in order to induce them to sign up and wager;

- Whether DraftKings's representations and omissions about the Signup Bonus Promotion are false, misleading, deceptive, or likely to deceive;

- Whether DraftKings's product is unreasonably dangerous;

- Whether DraftKings could have implemented reasonably feasible alternative designs to minimize the dangers of its product;

- Whether DraftKings adequately disclosed the facts and/or risks concerning the use of its sportsbook;

- Whether DraftKings's actions violate Illinois statutory law regarding unfair business practices invoked herein;

- Whether DraftKings's actions violate the common law causes of action invoked herein; and

- The appropriate measure of damages to award Plaintiffs and the other Class Members.

d. The appropriate injunctive relief to which Plaintiffs and the other Class Members are entitled.

e. **Typicality:** Plaintiffs' claims are typical of those of the other Class Members' claims because Plaintiffs and each of the other Class Members were induced to transact on DraftKings by one or more of the identified promotions. The

66

promotions identified were widely distributed by DraftKings over a long period of time and the promotion that the Plaintiffs responded to does not materially differ from promotions that any other Class member would have responded to. The misrepresentations at issue were substantially uniform in content, presentation, and impact upon Plaintiff and Class Members. Plaintiffs' injury has been caused by the same conduct of DraftKings, which would provide the same basis for a claim for all Class Members.

f. **Adequacy of Representation:** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class Members whom they seek to represent. Plaintiffs intend to vigorously prosecute this action, and Class Members' interests will be fairly and adequately protected by Plaintiffs and their chosen counsel. Plaintiffs have retained counsel that is competent and experienced in complex class action and consumer protection and Plaintiffs' counsel will devote the time and financial resources necessary to vigorously prosecute this action. Neither Plaintiffs nor their counsel have any interests adverse to the Class.

g. **Superiority:** A class action is superior to individual adjudications because joinder of all Class Members is impracticable, would create a risk of inconsistent or varying adjudications, and would impose an enormous burden on the judicial system. Furthermore, the amount-in-controversy for each individual class member is likely relatively small, and if each Class member were required to file an individual lawsuit, Defendant would necessarily gain a significant and unfair advantage since it would be able to exploit and overwhelm the limited resources

of each individual plaintiff with its vastly superior financial and legal resources. As such, a class action presents far fewer management difficulties than individual adjudications, preserves the resources of the parties and the judiciary, and protects the rights of each class member. This is an appropriate forum in which to litigate these claims, as the Illinois state population and the Class Members are concentrated in this forum. Finally, there are no particular difficulties presented by the management or trial of this action as a class action.

h. **Declaratory and Injunctive Relief**: DraftKings acted or refused to act on grounds generally applicable to Plaintiffs and the other Class Members, such that final injunctive and declaratory relief is appropriate with respect to the Class as a whole.

## TIMELINESS, ACCRUAL, AND TOLLING

287. The Class Period for each promotion class is tolled to the earliest date of DraftKings's distribution of each of the relevant promotions under the continuing violation doctrine. DraftKings has engaged in an ongoing scheme to mislead consumers regarding the true terms of its promotions and risks of using its products.

288. The Class Period for the Product Liability Class has been tolled by operation of the continuing violations doctrine, the discovery rule and by DraftKings's active concealment with respect to the defective design and dangerousness of its products.

289. As described more fully above, Plaintiffs have been misled and injured by the cumulative effect of DraftKings's abusive practices, dangerous design, failure to warn, and misleading advertisements since gambling was legalized in Illinois. DraftKings continues to violate its duties to design safe products and warn of foreseeable risks. These failures continued

to harm Plaintiff Bell and the Class Members throughout the time they were using DraftKings's platform.

290.     Separately, through the exercise of reasonable diligence, Plaintiffs and Class Members did not and could not have discovered that DraftKings's products caused their injuries and/or the effects thereof because, at the time of these injuries and their effects, the cause was unknown to Plaintiffs and Class Members and due to the technical natures of the design features and the effect they had on Plaintiffs and Class Members, they had no reason to suspect that DraftKings had committed the violations alleged herein and they were unable to independently discover that DraftKings's products caused their injuries until less than the applicable limitations period prior to the filing of this action.

291.     In addition, DraftKings' fraudulent concealment and/or other tortious conduct has tolled the running of any statute of limitations.

292.     DraftKings had primary knowledge of the material defects designed and implemented into its products and has at all times through the present maintained the proprietary designs of its products' features as strictly confidential.

293.     DraftKings had a duty to disclose dangerous and defective features that cause foreseeable harm to users.

294.     DraftKings knowingly, affirmatively, and actively concealed from Plaintiffs and Class Members the risks associated with the defects of Defendants' products and that these products caused their injuries.

295.     Defendants committed tortious and/or fraudulent acts that continue to this day. As of the date of this Complaint, DraftKings still has not disclosed, and continue to conceal, that they designed and implemented dangerous features into its products. Despite knowing of

69

the defects and their attendant safety risks, DraftKings continues to market its products while simultaneously omitting the disclosure of known and foreseeable harms to users.

296.     Alternatively, the Class Period is tolled to the earliest limitations in any previously filed class action complaints against DraftKings raising the claims at issue here which, on information and belief, is the statutory limitations period running back from December 8, 2023 as to the Deposit Match Promotion Class.

297.     Each Class Period extends from the relevant limitations period for each cause of action through the date of judgment in this case and includes any continuing violations that DraftKings engages in while this litigation is pending.

**CAUSES OF ACTION**
**FIRST CAUSE OF ACTION**
**Violation of Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS §§ 505/1, *et seq.*, (Asserted on behalf of No-Risk Promotion Illinois Sub-Class)**

298.     Plaintiffs repeat and reallege the other allegations in this Complaint as if fully set forth herein.

299.     Plaintiffs James Beyer, Collin Smothers, Mateen Zafer, Dashawn Bell, and Corey Davis bring this claim against DraftKings under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505, et seq., individually and on behalf of the No-Risk Promotion Illinois Sub-Class.

300.     The ICFA declares unlawful "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS § 505/2.

301.     DraftKings is a "person" as defined by 815 ILCS § 505/1(c)

302.     Plaintiffs, as well as each member of the No-Risk Promotion Class, are "person[s]" as defined by 815 ILCD § 505/1(c) as well as actual or potential "consumer[s]" of the products and offered by DraftKings, or are successors in interest to actual persons or consumers as defined by 815 ILCS § 505/1(e).

303.     The circumstances that relate to the transactions giving rise to this claim occurred primarily and substantially in Illinois because DraftKings caused to be disseminated throughout the state of Illinois through advertising, marketing, and other publications, statements that were deceptive and misleading, and which it intended would mislead consumers in Illinois.

304.     DraftKings's course of conduct involved trade or commerce, as defined by 815 ILCS § 505/1(f) as its actions were taken in the course of its business in Illinois.

305.     DraftKings's conduct was unfair and deceptive in that DraftKings used and employed deception, fraud, false promises, and misrepresentations about the nature of the no-risk promotions.

306.     DraftKings's conduct was also unfair and deceptive in that DraftKings used and employed concealment, suppression, and omission of material facts as to the nature of the no-risk promotions.

307.      DraftKings's conduct violated Illinois law because its advertisements represent that its promotion contains characteristics that it does not have. DraftKings represented that consumers could place bets without risking their own money when, in fact, this was not the case.

308.     DraftKings's conduct also violates the Illinois Gaming Board's regulations regarding advertising, Title 11, Chapter I, Section 1900.340 as amended by the Board on

September 12, 2024, to prohibit false and deceptive claims and specifically the promotion of "events as free of risk."

309.    DraftKings advertised its promotion with no intent to sell its products as advertised.

310.    DraftKings's advertisements and promotions created a likelihood of confusion and misunderstanding among consumers.

311.    DraftKings's misrepresentations were material because they were likely to deceive reasonable consumers—uninitiated in the new industry of online sports gambling—about the nature of its no-risk offers inducing them into spending money and placing bets on its platform. These misrepresentations were substantially uniform in content, presentation, and impact upon Plaintiff and Class Members.

312.    DraftKings intended that the Plaintiffs and Class Members be misled by the misrepresentations and omissions in its no-risk promotions.

313.    DraftKings induced the Plaintiffs and Class Members to rely on its misrepresentations and omissions.

314.    Without the misrepresentation and omissions in DraftKings advertising, the Plaintiffs and No-Risk Promotion Class Members would not have created accounts with DraftKings and/or would not have deposited as much money into their DraftKings accounts and/or placed bets on DraftKings's platform.

315.    As a direct and proximate result of DraftKings's unfair and deceptive practices, Plaintiffs and No-Risk Promotion Class Members suffered injuries in the form of monetary losses when they failed to receive cash refunds for bets they placed and lost in reliance on DraftKings "Risk-Free" and "No Sweat" promotions.

316.    These acts caused substantial monetary injury to Plaintiffs and the members of the No-Risk Promotion Class that they could not reasonably avoid.

317.    DraftKings knew or should have known that its misrepresentations and omissions would deceive Plaintiffs and the No-Risk Promotion Class. DraftKings's actions in engaging in the above-named unfair practices and deceptive acts were willful, intention, and/or done with reckless indifference with respect to the rights of Plaintiffs and the No-Risk Promotion Class.

318.    DraftKings's conduct has caused and is causing immediate and irreparable injury to Plaintiffs and the Illinois Subclass and will continue to both damage Plaintiffs and the No-Risk Promotion Class and deceive the public unless enjoined by this Court.

319.    Plaintiffs and the Illinois Subclass seek relief under the ICFA, including (but not limited to) actual damages, compensatory damages, statutory damages, restitution, penalties, injunctive relief, punitive damages, and attorney's fees and costs.

**SECOND CAUSE OF ACTION**
**Violation of Illinois Consumer Fraud and Deceptive Business Practices Act,**
**815 ILCS §§ 505/1, *et seq.*, (Asserted on behalf of Signup Bonus Promotion Illinois**
**Sub-Class)**

320.    Plaintiffs repeat and reallege the other allegations in this Complaint as if fully set forth herein.

321.    Plaintiffs Corey Davis, Colin Smothers, Dashawn Bell, and Mateen Zafer bring this claim against DraftKings under the ICFA, 815 ILCS 505, *et seq.*, individually and on behalf of the Signup Bonus Promotion Illinois Sub-Class.

322.    DraftKings's conduct was unfair and deceptive in that DraftKings used and employed deception, fraud, false promises, and misrepresentations about the nature of the signup bonus promotions.

73

323.   DraftKings's conduct was also unfair and deceptive in that DraftKings used and employed concealment, suppression, and omission of material facts as to the nature of the signup bonus promotions.

324.   DraftKings's "$1,000 Bonus" offer is also unfair and deceptive because the Plaintiffs and the members of the Class were required to act differently than they could reasonably expect in order to obtain the promised bonus. Plaintiffs and the members of the Class were required to deposit and wager large sums of money in a manner designed by Defendant to induce repeated exposure to a known addictive product.

325.    DraftKings's conduct violated Illinois law because its advertisements represent that its promotion contains characteristics that it does not have. DraftKings represented that consumers would receive a cash-value match of their deposit when, in fact, this was not the case.

326.   DraftKings advertised its promotion with no intent to sell its products as advertised.

327.   DraftKings's advertisements and promotions created a likelihood of confusion and misunderstanding among consumers.

328.   DraftKings's misrepresentations were material because they were likely to deceive reasonable consumers—uninitiated in the new industry of online sports gambling—about the nature of its signup bonus offers inducing them into spending money and placing bets on its platform. These misrepresentations were substantially uniform in content, presentation, and impact upon Plaintiffs and Class Members.

329.   DraftKings intended that the Plaintiffs and Class Members be misled by the misrepresentations and omissions in its signup bonus promotions.

330.    DraftKings induced the Plaintiffs and Class Members to rely on its misrepresentations and omissions.

331.    Without the misrepresentations and omissions in DraftKings advertising, the Plaintiffs and Signup Bonus Promotion Class Members would not have created accounts with DraftKings and/or would not have deposited as much money into their DraftKings accounts and/or placed bets on DraftKings's platform.

332.    As a direct and proximate result of DraftKings unfair and deceptive practices, Plaintiffs and Signup Bonus Promotion Class Members suffered injuries in the form of monetary losses when they failed to receive a cash deposit match for the funds they deposited in their DraftKings accounts.

333.    These acts caused substantial injury to Plaintiffs and the members of the Signup Bonus Promotion Class that they could not reasonably avoid.

334.    DraftKings knew or should have known that its misrepresentations and omissions would deceive Plaintiffs and the Signup Bonus Promotion Class. DraftKings's actions in engaging in the above-named unfair practices and deceptive acts were willful, intention, and/or done with reckless indifference with respect to the rights of Plaintiffs and the Signup Bonus Promotion Class.

335.    DraftKings's conduct has caused and is causing immediate and irreparable injury to Plaintiffs and the Illinois Subclass and will continue to both damage Plaintiffs and the Signup Bonus Promotion Class and deceive the public unless enjoined by this Court.

336.    Plaintiffs and the Illinois Subclass seek relief under the ICFA, including (but not limited to) actual damages, compensatory damages, statutory damages, restitution, penalties, injunctive relief, punitive damages, and attorney's fees and costs.

**THIRD CAUSE OF ACTION**

**Violation of Illinois Consumer Fraud and Deceptive Business Practices Act,
815 ILCS §§ 505/1, *et seq.*, (Asserted on behalf of Targeted Underage User Illinois
Sub-Class)**

337.     Plaintiffs repeat and reallege the other allegations in this Complaint as if fully set

forth herein.

338.     Plaintiff James Beyer brings this claim against DraftKings under the ICFA, 815

ILCS 505, *et seq.*, on behalf of themselves and the Targeted Underage User Illinois Sub-Class.

339.     DraftKings's conduct was unfair and unconscionable because DraftKings

targeted minors and those under the age of twenty-one years old, which is contrary to

established Illinois public policy (specifically, but not exclusively, 230 ILCS 10/11(10) and

Illinois Administrative Code Title 11, Chapter I, Section 1900.340(e)), is immoral, unethical,

oppressive, and outrageous, and is substantially injurious to young people in Illinois who

become hooked on sports betting on DraftKings platform before they are even of legal

gambling age.

340.     DraftKings's conduct was unfair and deceptive because, as alleged more fully

above, DraftKings targeted underage users with its advertising, knew or was reckless to the fact

that underage users were on its platform, and took advantage of the relationships it had with

underage user of its daily fantasy sports contests to inculcate gambling habits in its users that

allowed it to quickly turn a profit off of them once they turned twenty-one years old.

341.     DraftKings intended that the Plaintiffs and Class Members view its

advertisements, interact with its platform and form gambling habits before they reached legal

gambling age.

342.     DraftKings's advertisements and conduct towards underage users created a

likelihood of harm among those consumers who the legislature has made a judgment are not yet

mature enough to engage in the dangerous act of sports betting. These actions caused substantial harm that greatly outweighs any possible utility from the conduct.

343.    DraftKings's actions induced Plaintiffs and Class Members to gamble on DraftKings immediately upon coming of age and lose money doing so.

344.    DraftKings actions also led Plaintiffs to develop unhealthy gambling habits that have substantially and negatively impacted their finances and wellbeing.

345.    DraftKings's actions actually and proximately caused actual damages to Plaintiffs and Class Members. Absent DraftKings's unfair and deceptive conduct, Plaintiffs and Class Members would have behaved differently and would not have engaged in sports betting on DraftKings's platform or would have gambled less money and less frequently. DraftKings's conduct with respect to underage users was substantially uniform in content and impact upon Plaintiffs and Class Members.

346.    These acts caused substantial injury to Plaintiffs and the members of the Targeted Underage User Class that they could not reasonably avoid.

347.    DraftKings's actions in engaging in the above-named unfair practices and deceptive acts were willful, intentional, and/or done with reckless indifference with respect to the rights of Plaintiffs and the Targeted Underage User Class.

348.    DraftKings's conduct has caused and is causing immediate and irreparable injury to Plaintiffs and the Targeted Underage Users Class and will continue to damage Plaintiffs, the Class and the public unless enjoined by this Court.

349.    Plaintiffs and the Illinois Subclass seek relief under the ICFA, including (but not limited to) actual damages, compensatory damages, statutory damages, restitution, penalties, injunctive relief, punitive damages, and attorney's fees and costs.

<u>**FOURTH CAUSE OF ACTION**</u>
**Intentional Misrepresentation (Asserted on behalf of No-Risk Promotion Class)**

350.     Plaintiffs repeat and reallege the other allegations in this Complaint as if fully set forth herein.

351.     Plaintiffs James Beyer, Collin Smothers, Mateen Zafer, Dashawn Bell, and Corey Davis bring this claim against DraftKings individually and on behalf of the No-Risk Promotion Class.

352.     DraftKings has intentionally represented that it will ensure that customers will not be liable for losing initial bets. Although DraftKings advertised that consumers could place a "risk free" or "no sweat" bet these representations were false. Despite this representation, the promotions in fact carry a substantial risk of loss and when users lose their first bet, they receive credits with no cash value that may never allow them to recoup their initial losses. Therefore, Defendants misrepresented the promotional offers.

353.     These representations were material, in that a reasonable viewer would rely on them when deciding to proceed with creating and funding an account on DraftKings's platform, and placing an initial bet in reliance on the promotion.

354.     Defendants, in promoting and marketing DraftKings to consumers, had a duty of care to reasonably disclose and inform customers of material dangers and risks of the DraftKings product and to not mislead its customers and the public at large about its offerings, particularly as a leading competitor in a highly regulated industry.

355.     At all relevant times when Defendants made such representations, Defendants knew that the representations were misleading, or acted recklessly in making the representations, without regard for their truth or falsity.

356.     DraftKings knew and intended that Plaintiffs and members of the Classes would

rely upon its misrepresentations when deciding whether to wager on DraftKings.

357.    DraftKings intended its consumers to rely on these misrepresentations. It could have honestly represented the terms of its promotion: "if you lose, you'll get an expiring bonus bet that will not pay back the stake if it wins." But DraftKings knew that such an offer would not entice customers to bet more money or more frequently.

358.    Plaintiffs and Class Members did rely on these misrepresentations in placing bets on DraftKings's platform.

359.    Plaintiffs and Class Members reasonably and justifiably relied on Defendants' intentional misrepresentations when placing bets via its promotions. Among other things, this reliance was justified because consumers were entitled to understand that these advertisements would comply with applicable law in a highly regulated industry.

360.    As a state licensed sports betting platform, DraftKings knew or should have known that its representations in marketing materials about its product being without risk are inaccurate and misleading. DraftKings had no reasonable grounds for believing its misrepresentations were not false or misleading and was careless and negligent in not ascertaining the truth of its misrepresentations and their effect on consumers before making them.

361.    Plaintiffs and Class Members acted in reliance upon Defendants' false and misleading statements by signing up for and using the DraftKings product to make initial bets.

362.    Neither Plaintiffs nor any reasonable consumer would have used DraftKings in the same way if they had known of the true operation and risks of DraftKings's product—risks the Defendants alone were aware of and misrepresented.

363.    As a direct and proximate result of DraftKings's misrepresentations, Plaintiffs

and members of the Classes were induced into using DraftKings's products and have been harmed and suffered actual damages in the amount of unrecouped losses incurred as a result of an initial bet.

364.    Plaintiffs seek all available remedies, damages, and awards as a result of Defendants' negligent misrepresentations, including compensatory damages and costs.

## FIFTH CAUSE OF ACTION
**Intentional Misrepresentation (Asserted on behalf of Signup Bonus Promotion Class)**

365.    Plaintiffs repeat and reallege the other allegations in this Complaint as if fully set forth herein.

366.    Plaintiffs Corey Davis, Colin Smothers, Dashawn Bell, and Mateen Zafer bring this claim against DraftKings individually and on behalf of the Signup Bonus Promotion Class.

367.    DraftKings has intentionally misrepresented that it will ensure that customers would receive a cash match of their initial deposit up to $1,000. These representations were false. Consumers actually received only a percentage of their deposit *only if* they wagered their initial deposit amount twenty-five times on long-odds bets. Even then, consumers only received "DK Dollars", not redeemable for cash and not treated like normal bets. Therefore, Defendants misrepresented the promotional offers.

368.    These representations were material in that a reasonable viewer would rely on them when deciding to proceed with creating and funding an account on DraftKings's platform and placing an initial bet in reliance on the promotion.

369.    Defendants, in promoting and marketing DraftKings to consumers, had a duty of care to reasonably disclose and inform customers of material dangers and risks of the promotion and to not mislead its customers and the public at large about its offerings, particularly as a leading competitor in a highly regulated industry.

370.    At all relevant times when Defendants made such representations, Defendant knew that the representations were misleading, or acted recklessly in making the representations, without regard for their truth or falsity.

371.    DraftKings knew and intended that Plaintiffs and members of the Classes would rely upon its misrepresentations when deciding whether to deposit and wager on DraftKings.

372.    Plaintiffs and Class Members reasonably and justifiably relied on Defendants' intentional misrepresentations when placing bets via its promotions. Among other things, this reliance was justified because consumers were entitled to understand that these advertisements would comply with applicable law in a highly regulated industry.

373.    As a state licensed sports betting platform, DraftKings knew or should have known that its representations in marketing materials about deposit matches are inaccurate and misleading. DraftKings had no reasonable grounds for believing its misrepresentations were not false or misleading and was intentional or reckless in advertising those misrepresentations.

374.    Plaintiffs and members of the Classes acted in reliance upon Defendants' false and misleading statements by signing up for and using the DraftKings to make initial bets.

375.    Neither Plaintiffs nor any reasonable consumer would have initially deposited as much money on DraftKings if they had known the true terms of the signup bonus promotion that DraftKings misrepresented.

376.    As a direct and proximate result of DraftKings's misrepresentations, Plaintiffs and members of the Classes were induced into wagering more money and more frequently than they otherwise would have and have been harmed and suffered actual damages in the amount of unrecouped losses incurred as a result.

377.    Plaintiffs seek all available remedies, damages, and awards as a result of

Defendants' negligent misrepresentations, including compensatory damages and costs.

## SIXTH CAUSE OF ACTION
### Fraudulent Inducement (Asserted on behalf of All Classes)

378.    Plaintiffs repeat and reallege the other allegations in this Complaint as if fully set forth herein.

379.    Plaintiffs bring this claim against Defendants individually and on behalf of all Class Members.

380.    Defendants misrepresented multiple material facts about its promotional offers, as described throughout this Complaint.

381.    Plaintiffs and Class Members relied on Defendants' misrepresentations and omissions in creating accounts on DraftKings and in placing wagers on the platform in reliance on the promotions.

382.    Plaintiffs and Class Members were justified in so relying, because they were entitled to believe that DraftKings, a leader in a highly regulated industry, would not violate the law by failing to make requisite disclosures to its consumers, or to misrepresent the nature of its advertised offers.

383.    At the time Defendants made these misrepresentations to consumers, it knew them to be false.

384.    At the time Defendants made these misrepresentations to consumers, it had no present intent to fulfil the terms of the promotional offers as advertised to consumers.

385.    As a result of Defendants' misrepresentations, Plaintiffs and Class Members sustained monetary damages amounting to the total losses each sustained in reliance on funding accounts and placing bets in response to the unlawful promotions discussed herein.

386.    Absent these misrepresentations, Plaintiffs and the Class Members would not

have created accounts or placed bets on DraftKings's platform.

387.    Therefore, as a direct and proximate result of Defendant's intentional misrepresentations, Plaintiffs and Class Members have suffered economic losses and other general and specific damages, including, but not limited to, the amounts paid to Defendant for placing bets in the first place, as well as losses associated with any subsequent bets placed in an effort to recover their original funds.

### SEVENTH CAUSE OF ACTION
**Unjust Enrichment (Asserted on behalf of All Classes)**

388.    Plaintiffs repeat and reallege the other allegations in this Complaint as if fully set forth herein.

389.    Plaintiffs bring this claim against DraftKings individually and on behalf of all Class Members.

390.    As alleged herein, Defendant has intentionally and/or recklessly made misleading misrepresentations to Plaintiffs and Class Members to induce them to create accounts and place bets on its platform.

391.    As further alleged herein, DraftKings created and implemented a scheme to increase its share of the legal gambling market through a pervasive pattern of deceptive and unfair conduct including with deceptive advertising and the deliberate targeting of minors and underage users.

392.    DraftKings was unjustly enriched as a result of its wrongful conduct, including through the false and misleading advertisements regarding (i) that certain bets on DraftKings could be placed at no-risk to the user and (ii) that DraftKings would give users an amount equal in U.S. dollar value to their deposit.

393.    DraftKings was also unjustly enriched as a result of its wrongful conduct of

targeting underage users with its advertising and intentionally allowing them to use its platform without adequate age verification.

394.    Plaintiffs and the Class Members have reasonably relied on these misleading representations and have not received the benefits promised by Defendant.

395.    Plaintiffs and the Class Members therefore have been induced by DraftKings's misleading and deceptive representations about the promotional offers and its deceptive and unfair targeting of minors and have paid more money to DraftKings to place bets than they otherwise would and/or should have paid.

396.    Plaintiffs and the Class Members have conferred a benefit upon Defendant as Defendant has retained monies paid to them by Plaintiffs and the Class Members.

397.    The money DraftKings received was obtained under circumstances that were at the expense of Plaintiffs and the members of the Class Members. In other words, Plaintiffs and the Class Members did not receive the full value of the benefit conferred upon DraftKings.

398.    Therefore, it is inequitable and unjust for DraftKings to retain the profit, benefit, or compensation conferred upon it without paying Plaintiffs and the Class Members back for the difference of the full value of the benefits compared to the value actually received.

399.    As a direct and proximate result of DraftKings's unjust enrichment, Plaintiffs and Class Members are entitled to restitution, disgorgement, and/or the imposition of a constructive trust upon all profits, benefits, and other compensation obtained by DraftKings from its deceptive misleading, and unlawful conduct as alleged herein.

400.    Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### EIGHTH CAUSE OF ACTION
**Civil Conspiracy (Asserted on behalf of all Classes Against DraftKings, Inc., Crown IL**

**Gaming LLC, and Casino Queen, Inc.)**

401.   Plaintiffs reassert, reallege, and incorporate by reference all other paragraphs in the complaint.

402.   Plaintiffs bring this claim individually and on behalf of all other Class Members.

403.   As alleged above, DraftKings and Casino Queen have a contractual arrangement such that Casino Queen is the license-holder for DraftKings's online sportsbook in Illinois.

404.   Casino Queen has knowledge of, participates in, and profits from the fraudulent, deceptive, and unfair business practices engaged in by DraftKings and alleged more fully above. DraftKings's deceptive and unfair schemes could not work without the infrastructure and support Casino Queen provides.

405.   For example, Casino Queen enforces the terms of DraftKings's various deceptive promotions against Plaintiffs and Class Members who have been lured into placing more wagers, more frequently by DraftKings's misrepresentations and omissions by collecting money from them.

406.   The contractual arrangement between DraftKings and Casino Queen is an agreement between two or more persons or entities, for the purpose of profiting from sports betting in Illinois procured both through legitimate customer acquisition and through fraudulent, deceptive, and unfair acts and practices.

407.   As a direct and proximate result of the conspiracy between DraftKings and Casino Queen, Plaintiffs and Class Members have suffered and will continue to suffer injury in that they have suffered economic losses and other general and specific damages, including, but not limited to, the amounts paid to Defendants for placing bets in the first place, as well as losses associated with any subsequent bets placed in an effort to recover their original funds.

408.   Plaintiffs and Class Members seek compensatory and punitive damages,

injunctive relief, and reasonable attorney's fees, costs, and expenses relating to this action.

## NINTH CAUSE OF ACTION
### Strict Liability – Design Defect (Asserted on behalf of Product Liability Class)

409.    Plaintiffs Bell and Smothers reassert, reallege, and incorporate by reference all other paragraphs in the complaint.

410.    Plaintiffs Bell and Smothers bring this claim individually and on behalf of all other Product Liability Class Members.

411.    DraftKings app and promotions offered on it constitute a single product that as designed is unreasonably dangerous.

412.    In the alternative, the promotions and features described in this Complaint constitute individual products, which have been designed in ways that are unreasonably dangerous.

413.    DraftKings designed its app including its promotions to addict users and especially those users who were susceptible to developing a gambling addiction

414.    DraftKings defectively designed its application and promotions to take advantage of the chemical reward system of users' brains (especially young users) to create addictive engagement, compulsive use, and additional mental and physical harms.

415.    DraftKings failed to test the safety of its promotions and other features and when it did perform testing, those tests revealed significant risks of its products addictiveness that DraftKings failed to take cost-effective, reasonably feasible steps to remedy.

416.    DraftKings products, including the promotions described herein and its app fail to meet ordinary consumers expectations regarding the propensity of its product to cause addiction when used in an intended or reasonably foreseeable manner. Indeed, DraftKings designs and times promotions to maximize their addictive power and hides that fact from its

consumers. Plaintiffs and other users do not expect that DraftKings app is designed to hack their dopamine system so that they progressively gamble more and more regardless of financial resources or the effect on their mental health.

417.    DraftKings products are likewise defectively designed because they create an inherent risk of danger of addiction, compulsive use, and serious financial, professional, personal and emotional consequences in its users. This inherent risk is not a necessary component of online sports gambling and could be mitigated by reasonable design changes including, without limitation, those described in this complaint.

418.    The risks inherent in the design of DraftKings app and promotions significantly outweigh any benefit of such design.

419.    DraftKings could have made cost-effective, reasonably feasible alternative designs including without limitation the following, none of which has been implemented to-date:

    a.   Robust age verification across products;

    b.   Analyzing user data to identify users compulsively gambling and cut them off and/or otherwise intervene;

    c.   Preventing loss chasing;

    d.   Requiring multiple steps to deposit and place a bet, to facilitate users exercising self-control;

    e.   Tempering suggestions of additional bets after a user places one;

    f.   Designing promotions to avoid encouraging and inculcating loss-chasing habits;

    g.   Tempering deposit match promotions or at least eliminating playthrough requirements above 1x, the sole purpose of which is to encourage habit-

formation;

h.  Clearly disclosing the terms and risks of promotions including the addictive propensity of participating in the intensive gambling required by the terms;

i.  Not marketing gambling as without risk;

j.  Maximum daily and weekly deposit limits that can only be changed through proper financial condition and source-of-funds verification;

k.  Preventing users who set deposit limits from changing them immediately or without verification that the limits are not being removed as a result of a compulsion to gamble;

l.  Easier and more user-friendly access to responsible gaming tools like self-exclusion (including ensuring that links to state self-exclusion programs work);

m.  Session notifications including, but not limited to, amount wagered, amount lost, and time spent on the app;

n.  Advising users of their entire lifetime losses at appropriate junctures;

o.  Preventing users from depositing money into the DraftKings app using funds borrowed on credit, including preventing users from making deposits using a credit card;

p.  Improving training for customer-facing staff and revising policies that allow or encourage these staff to target specific individuals in attempts to entice users to place bets;

q.  Allowing users to opt-into self-exclusion within the DraftKings app itself for a period of longer than 4 weeks; and

r.  Setting a standard minimum amount for bets and deposits, rather than

dynamically setting a suggested default based on a user's individual profile, which leads to anchoring users to deposit a higher amount than they otherwise would have.

420. Alternative designs were available that would reduce users' addictive and compulsive engagement with DraftKings' products, and which would have served effectively the legitimate purposes of DraftKings' products while reducing the gravity and severity of danger posed by those products' defects;

421. Plaintiffs used Defendants' respective products as intended or in reasonably foreseeable ways.

422. The physical, emotional, and economic injuries of Plaintiffs and Class Members were reasonably foreseeable to DraftKings when it developed, designed, advertised, marketed, promoted, and distributed its products.

423. DraftKings's products were defective and unreasonably dangerous when they were deployed by DraftKings. The defects continued to exist through the products' distribution to and use by Plaintiffs and Class Members, who used the products without any substantial change in the products' condition.

424. As a direct and proximate result of DraftKings products' defective design, Plaintiffs and Class Members suffered serious injuries including both economic injuries and non-economic pain and suffering injuries not all of which can be wholly remedied by monetary relief.

425. Some Plaintiffs and Class Members continue to use DraftKings's products. When Plaintiffs use DraftKings's products, they will not be independently able to verify whether the products continue to pose an unreasonable risk.

426.    As described above, DraftKings's conduct was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, and warrants an award of punitive damages in an amount sufficient to punish DraftKings and deter others from like conduct.

427.    Plaintiffs demand judgment against each Defendant for injunctive relief and for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### TENTH CAUSE OF ACTION
### Strict Liability – Failure to Warn (Asserted on behalf of Product Liability Class)

428.    Plaintiffs Bell and Smothers reassert, reallege, and incorporate by reference all other paragraphs in the complaint.

429.    Plaintiffs Bell and Smothers bring this claim individually and on behalf of all other Product Liability Class Members.

430.    DraftKings knew or should have known of the unreasonably dangerous properties of its app and promotions including their potential to inculcate gambling addictions and compulsive gambling habits in users and the harms associated with these conditions.

431.    DraftKings's app and promotions are dangerous to an extent beyond that contemplated by the ordinary user, who would not reasonably be expected to understand that they encourage and inculcate addictive engagement and compulsive use when used in a manner reasonably foreseeable to DraftKings.

432.    DraftKings's app and promotions are defective and unreasonably dangerous because, among other reasons described throughout this Complaint, DraftKings failed to

exercise reasonable care to inform users that:

      a. The promotions cause addiction and compulsive gambling, which are associated with concomitant physical and mental injuries;

      b. The promotions inculcate habits like loss-chasing, escalating bets, and extended gambling sessions;

      c. Use of the app causes addiction and compulsive gambling, which are associated with concomitant physical and mental injuries;

      d. Contrary to their advertising, there are numerous risks of gambling on DraftKings; and

      e. DraftKings analyses user data and deploys promotions in ways that increase a user's risk of addiction to its products.

433. Had Plaintiffs and Class Members received proper or adequate warnings or instructions as to the risks of using DraftKings products, they would have heeded the warning and not have become addicted to gambling, lost as much money, and suffered the foreseeable consequences of doing so.

434. DraftKings's failures to adequately warn Plaintiffs and Class Members about the risks of its defective products was a direct and proximate cause and a substantial factor in the injuries sustained by Plaintiffs and Class Members.

435. Some Plaintiffs and Class Members continue to use DraftKings's products. When Plaintiffs use DraftKings's products, they will not be independently able to verify whether the products continue to pose an unreasonable risk.

436. As described above, DraftKings's conduct was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an

entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, and warrants an award of punitive damages in an amount sufficient to punish DraftKings and deter others from like conduct.

437.    Plaintiffs demand judgment against each Defendant for injunctive relief and for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## ELEVENTH CAUSE OF ACTION
### Negligence – Design Defect (Asserted on behalf of Product Liability Class)

438.    Plaintiffs Bell and Smothers reassert, reallege, and incorporate by reference all other paragraphs in the complaint.

439.    Plaintiffs Bell and Smothers bring this claim individually and on behalf of all other Product Liability Class Members.

440.    DraftKings knew or could reasonably foresee that its products were designed in a way that made them dangerous and likely to cause harm to a substantial portion of users.

441.    The risks associated with DraftKings products was knowable to DraftKings in light of DraftKings's own internal data and knowledge regarding its products and promotions at the time of their design, marketing, and deployment.

442.    DraftKings knew, or by the exercise of reasonable care, should have known that ordinary consumers such as Plaintiffs and Class Members would not have realized the potential risks and dangers of its products including the risk of developing and exacerbating gambling addictions and the cascade of negative consequences that flow from such addictions including profound financial, mental, and emotional distress.

443.    DraftKings owed a duty to all reasonably foreseeable users of its products to

design products that were reasonably safe.

444.    DraftKings owed a heightened duty to those users who, as a result of DraftKings's deliberate actions in designing promotions meant to inculcate compulsive behavior and overcome inhibitions, had a diminished capacity for self-control including young people it intentionally drew to its platform.

445.    DraftKings owed a heightened duty to those users who, through its internal data and analysis, it knew or should have known were suffering from gambling addictions.

446.    DraftKings knew that individuals with gambling addictions, including Plaintiffs and Class Members, would use its products.

447.    DraftKings breached these duties in designing its products by negligently designing them with features and algorithms as described above that are particularly addictive and likely to addict users who would not appreciate the risks posed by the products.

448.    DraftKings breached these duties by designing products that were less safe to use than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner.

449.    DraftKings breached these duties by failing to use reasonable care to use cost-effective, reasonably feasible alternative designs, including changes to the addictive features described above, and other safety measures, to minimize the harms described herein. Alternative designs that would reduce the addictive features of DraftKings's products were available, would have served effectively the same purpose as DraftKings's defectively designed products, and would have reduced the gravity and severity of danger DraftKings's products posed to Plaintiffs and Class Members.

450.    A reasonable company under the same or similar circumstances as each

Defendant would have designed a safer product.

451.    DraftKings's negligent design of its products was a direct and proximate cause and a substantial factor in the injuries sustained by Plaintiffs and Class Members.

452.    As described above, DraftKings's conduct was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, and warrants an award of punitive damages in an amount sufficient to punish DraftKings and deter others from like conduct.

453.    Plaintiffs demand judgment against each Defendant for injunctive relief and for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**TWELFTH CAUSE OF ACTION**
**Negligence – Failure to Warn (Asserted on behalf of Product Liability Class)**

454.    Plaintiffs Bell and Smothers reassert, reallege, and incorporate by reference all other paragraphs in the complaint.

455.    Plaintiffs Bell and Smothers bring this claim individually and on behalf of all other Product Liability Class Members.

456.    DraftKings knew or could reasonably foresee that its products were designed in a way that made them dangerous and likely to cause harm to a substantial portion of users.

457.    The risks associated with DraftKings products was knowable to DraftKings in light of DraftKings's own internal data and knowledge regarding its products and promotions at the time of their design, marketing, and deployment.

458.    DraftKings knew, or by the exercise of reasonable care, should have known that

ordinary consumers such as Plaintiffs and Class Members would not have realized the potential risks and dangers of its products including the risk of developing and exacerbating gambling addictions and the cascade of negative consequences that flow from such addictions including profound financial, mental, and emotional distress.

459.    Had Plaintiffs and Class Members received proper or adequate warnings or instructions as to the risks of using DraftKings products, they would have heeded the warning and not have become addicted to gambling, lost as much money, and suffered the foreseeable consequences of doing so.

460.    DraftKings owed a duty to all reasonably foreseeable users to provide adequate warnings about the risk of using its products that were known to it, or that it should have known through the exercise of reasonable care.

461.    DraftKings owed a heighted duty of care to users it knew were particularly susceptible to develop gambling addictions through the use of its products.

462.    DraftKings breached its duty by failing to use reasonable care in providing adequate warnings to Plaintiffs and Class Members, as set forth above.

463.    A reasonable company under the same or similar circumstances as each Defendant would have provided adequate warnings to consumers as described herein.

464.    DraftKings could have provided adequate warnings to prevent the harms and injuries to Plaintiffs and Class Members described herein.

465.    As a direct and proximate result of DraftKings's breach of its duty to provide adequate warnings, Plaintiffs and Class Members were harmed and sustained the injuries set forth herein.

466.    As described above, DraftKings's conduct was intentional, fraudulent, willful,

wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, and warrants an award of punitive damages in an amount sufficient to punish DraftKings and deter others from like conduct.

467.    Plaintiffs demand judgment against each Defendant for injunctive relief and for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, demands a jury trial on all claims so triable and judgment as follows:

A. Certifying the proposed Classes, appointing Plaintiffs James Beyer, Collin Smothers, Dashawn Bell, and Corey Davis as representatives of the No-Risk Promotion Class, appointing Plaintiffs Corey Davis, Colin Smothers, Dashawn Bell, and Mateen Zafer as representatives of the Signup Bonus Promotion Class, appointing Plaintiff James Beyer as a representative of the Targeted Underage User Class, appointing Plaintiffs Dashawn Bell and Colin Smothers as representatives of the Product Liability Class, and appointing counsel for Plaintiffs as Class Counsel;

B. Declaring that Defendants are financially responsible for notifying the Class Members of the pendency of this suit;

C. Declaring that Defendant's policies and practices as described herein constitute a violation of the ICFA;

D. Enjoining Defendant from the wrongful conduct as described herein;

E. Awarding actual and/or compensatory, multiple, punitive, and statutory damages in an amount according to proof but exceeding $75,000;

F. Awarding Plaintiffs their reasonable costs and expenses of suit, including attorneys' fees;

G. Awarding pre- and post-judgment interest to the extent the law allows; and

H. Awarding such further relief as this Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiffs hereby demand trial by jury on all issues in this Class Action Complaint that are so triable.

Dated: May 9, 2025                               Respectfully submitted,

                                                 _/s/ Mike Kanovitz_