# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

| | | |
|---|---|---|
| JAMES BEYER, COLLIN SMOTHERS, MATEEN ZAFER, COREY DAVIS, AND DASHAWN BELL, *individually and on behalf of all others similarly situated*, | ) ) ) ) ) | Case No. 1:25-CV-001336 |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| DRAFTKINGS, INC., and CROWN IL GAMING INC. d/b/a DRAFTKINGS, CASINO QUEEN INC., and NORTHSIDE CROWN GAMING LLC, | ) ) ) ) | |
| Defendants. | | |

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

Michael Kanovitz
Jon Loevy
Isaac Green
Aaron Tucek
Alexandra Wolfson
LOEVY & LOEVY
311 N Aberdeen Street, Suite 3
Chicago, IL 60607

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................II

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 1

LEGAL STANDARD .......................................................................................................... 4

ARGUMENT ....................................................................................................................... 4

    I.      Plaintiffs sufficiently pled their deception-based ICFA claims (Counts 1 & 2) ..................... 4

        A.      Plaintiffs' allegations satisfy Rule 9(b) ........................................................ 4

        B.      DraftKings's advertisements for each promotion were deceptive ........................... 6

        C.      Plaintiffs pled actual damages resulting from the promotions ............................... 10

    II.     The intentional misrepresentation claims should not be dismissed (Counts 4 & 5) ............ 12

    III.    Plaintiffs' claim for Unjust Enrichment is well-pled (Count 7) ............................................ 12

    IV.   Beyer alleges unfair conduct in his ICFA claim regarding targeting minors (Count 3) ......... 12

    V.    Plaintiffs adequately allege Casino Queen's involvement (Count 8) .................................... 13

    VI.   Plaintiffs' products liability claims should proceed (Counts 9–12) .................................... 13

        A.      DraftKings provides a product .............................................................. 14

        B.      DraftKings's product is unreasonably dangerous.................................... 18

        C.      Plaintiff suffered harm ...................................................................... 20

        D.      DraftKings has the same duties as any other manufacturer .................... 22

CONCLUSION..................................................................................................................... 22

## TABLE OF AUTHORITIES
### CASES

*100% Grated Parmesan Cheese Mktg. & Sales Practices Litig.*,
  275 F. Supp. 3d 910, 923 (N.D. Ill. 2017) ...................................................................... 10

*Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009) ................................................................... 4

*Bausch v. Stryker Corp.*, 630 F.3d 546, 557–57 (7th Cir. 2010) ..................................... 20

*Bell v. Publix Super Markets, Inc.*, 982 F.3d 468, 476 (7th Cir. 2020) ................... 7, 8, 9, 10

*Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 647 (7th Cir. 2019) ................ 10

*Blue v. Env't Eng'g, Inc.*, 828 N.E.2d 1128, 1141 (Ill. 2005) ..................................... 14

*Boone v. MB Fin. Bank, N.A.*, 375 F. Supp. 3d 987, 997 (N.D. Ill. 2019) ......................... 9

*Brandt v. Boston Scientific Corp.*, 792 N.E. 296 (Ill. 2003) ........................................ 16

*Brocklesby v. United States*, 767 F.2d 1288, 1295 (9th Cir. 1985) ............................... 15

*Brookes v. Lyft Inc.*, 2022 WL 19799628 at *3 (Fla. Cir. Ct. Sep. 30, 2022) .................. 16

*Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014) ................. 4, 12

*Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 737 (7th Cir. 2014) ................... 4

*Chandler v. Am. Gen. Fin., Inc.*, 768 N.E.2d 60, 68 (Ill. App. 2002) .............................. 9

*Cleary v. Philip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011) .................................. 12

*Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728, 760 (N.D. Cal. 2019) ......................... 13

*D'Ambrosio v. Rajala*, No. 24-cv-00678, 2025 WL 1383286 (N.D. Ill. May 13, 2025)......... 16

*Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 883 (7th Cir. 2005)..................................... 8

*DeBouse v. Bayer AG*, 922 N.E.2d 309 (Ill. 2009)...................................................... 4

*Doser v. Savage Mfg. & Sales, Inc.*, 568 N.E.2d 814, 824 (Ill. 1990)............................ 20

*Easysaver Rewards Litig.*, 737 F. Supp. 2d 1159, 1169 (S.D. Cal. 2010) ........................ 8

*Estate of Alex through Coker v. T-Mobile US, Inc.*, 313 F. Supp. 3d 723, 732 (N.D. Tex. 2018) ........... 16

*Firkin v. U.S. Polychemical Corp.*, 835 F. Supp. 1048, 1051 (N.D. Ill. 1993) .................. 15

*Five-Star AudioVisual, Inc. v. Unique Business Systems Corp.*,
769 F. Supp. 3d 840, 857 (N.D. Ill. 2025)…......................................................... 15

*Frye v. L'Oreal USA, Inc.*, 583 F. Supp. 2d 954, 957 (N.D. Ill. 2008) ................................ 11

*Garber v. Amazon.com, Inc.*, 380 F. Supp. 3d 766 (N.D. Ill. 2019) ..................................... 16

*Garner v. Boehringer Ingelheim Pharmaceuticals, Inc.* ................................................... 20

*Gerill Corp. v. Jack L. Hargrove Builders, Inc.*, 538 N.E.2d 530, 537–38 (Ill. 1989) ............................. 11

*Gillespie v. Edmier*, 182 N.E.3d 54, 58 (Ill. 2020) .............................................. 17

*Jablonski v. Ford Motor Co.*, 955 N.E.2d 1138, 1154 (Ill. 2011) ......................................... 22

*Kahn v. Walmart Inc.*, 107 F.4th 585, 594 (7th Cir. 2024) ................................................ 5, 7

*Lemmon v. Snap, Inc.*, 995 F.3d 1085 (9th Cir. 2021) ......................................... 16

*Lewis v. Lead Indus. Ass'n*, 178 N.E.3d 1046, 1055–56 (Ill. 2020) ...................................... 12

*Mangini v. R.J. Reynolds Tobacco Co.*, 21 Cal. Rptr. 2d 232, 241 (Cal. Ct. App. 1993) ........................... 13

*Mars, Inc. v. Heritage Builders of Effingham, Inc.*, 763 N.E.2d 428, 434 (Ill. App. 2002) ......................... 21

*McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242, 258 (Ill. 1999) ............................. 13

*McDaniel v. Trail King Indus., Inc.*, 248 F. Supp. 2d 749, 756 (N.D. Ill. 2002) ..................................... 19

*Micro Data Base Sys., Inc. v. Dharma Sys., Inc.*, 148 F.3d 649, 655 (7th Cir. 1998) .............................. 15

*Mikolajczyk v. Ford Motor Co.*, 901 N.E.2d 329, 335 (Ill. 2008) ......................................... 14

*Milford v. Commercial Carriers, Inc.*, 210 F. Supp. 2d 987 (N.D. Ill. 2002) ............................................ 17

*Moorman Mfg. Co. v. Nat'l Tank Co.*, 435 N.E.2d 443, 448 (1982) ..................................... 21

*Muir v. Playtex Prods., LLC*, 983 F. Supp. 2d 980, 990 (N.D. Ill. 2013) ............................................ 11

*Mut. Serv. Cas. Ins. Co. v. Elizabeth State Bank*, 265 F.3d 601, 617 (7th Cir. 2001) ............................. 21

*Newman v. Metro. Life Ins. Co.*, 885 F.3d 992, 1001 (7th Cir. 2018) ...................................... 9

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*,
631 F.3d 436, 446 (7th Cir. 2011) ...................................................... ……..13

*Ransome v. Wisconsin Elec. Power Co.*, 275 N.W.2d 641, 643 (Wis. 1979) ............................... 15

*Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 961 (Ill. 2002) ................................. 13

*Rudy v. Fam. Dollar Stores, Inc.*, 583 F. Supp. 3d 1149, 1160 (N.D. Ill. 2022) ............................... 10, 12

*Scanlon v. DraftKings, Inc.*,
    No. 2484CV01099-BLS2 (Suffolk Cnty. Super. Ct., Aug. 21, 2024) ......................... ………..8, 11

*Soc. Media Adolescent Addiction / Pers. Inj. Prods. Liab. Litig.*,
    702 F. Supp. 3d 809, 849 (N.D. Cal. 2023) ........................................................ 16, 17, 22

*Social Media Cases*, 2023 WL 6847378 (Cal. Super. Ct. Oct. 13, 2023) ............................. 18

*Sondag v. Pneumo Abex Corp.*, 55 N.E.3d 1259, 1265 (Ill. App. 2016) ................................ 22

*Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 762 (7th Cir. 2014) ..................................... 6, 10

*Tierney v. Vahle*, 304 F.3d 734, 739 (7th Cir. 2002) ....................................................... 4, 8

*Tolan & Son, Inc. v. KLLM Architects, Inc.*, 719 N.E.2d 288, 297 (Ill. App. 1999) ............................ 15

*Trent v. Brasch Mfg. Co.*, 477 N.E.2d 1312, 1314–15 (Ill. App. 1985).................................. 14

*Van Tassell v. United Mktg. Grp., Ltd. Liab. Co.*, 795 F. Supp. 2d 770, 780 (N.D. Ill. 2011) ................ 8

*Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730 (7th Cir. 2019) ......................................... 5

*Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777 & n.5 (7th Cir. 1994)........................... 5, 6

*Washington v. Hyatt Hotels Corp.*,
    No. 19-cv -04724, 2020 WL 3058118, at *5 (N.D. Ill. June 9, 2020) ....................... ….9

*Zurbriggen v. Twin Hill Acquisition Co., Inc.*,
    338 F. Supp. 3d 875, 899 (N.D. Ill. 2018) ................................................................ 18

**STATUTES & RULES**

Illinois Consumer Fraud Act ("ICFA"), 815 ILCS §§ 505/1............................................. 1

**OTHER AUTHORITIES**

5A Fed. Prac. & Proc. Civ. § 1298 (4th ed.) ................................................................ 5

Owen & Davis on Prod. Liab. § 6:9 (4th ed.)................................................................ 20

Restatement (Second) of Torts § 388 (1965))............................................................... 14

Restatement (Third) of Torts § 19 (1998) .................................................................. 15

## INTRODUCTION

DraftKings runs a widespread advertising campaign in Illinois fronting promotions that promise, in concrete terms, free money and risk-free gambling for new users who sign up and use its online sportsbook. These promises were misleading and contrary to the complicated and onerous terms of the promotions that actually require new users to gamble almost exclusively with their own money, which they almost always lose. FAC ¶¶4, 14, 16. Plaintiffs James Beyer, Collin Smothers, Mateen Zafer, Corey Davis, and Dashawn Bell, like many others, were tricked into opening accounts and risking (and losing) lots of money. Plaintiffs Bell and Smothers developed gambling disorders as a result of DraftKings's dangerously designed product, which inculcates compulsive betting.

DraftKings misconstrues Plaintiffs' claims and ignores their specific, detailed allegations. Plaintiffs sufficiently pled every element of their claims under the Illinois Consumer Fraud Act ("ICFA"), 815 ILCS §§ 505/1, *et seq.* Plaintiffs were reasonably deceived by the large-print statements in DraftKings's ads and they suffered concrete losses as a result. DraftKings's arguments regarding products liability are similarly unavailing. DraftKings has a carefully designed product and Bell and Smothers suffered the kind of damages that are cognizable in products liability.

None of DraftKings's other arguments justify dismissal. The Court should deny the motion.

## BACKGROUND

Gambling addiction in Illinois is skyrocketing as DraftKings, the industry leader, earns enormous amounts of money from customers it acquires with misleading ads for its promotions. Docket No. 34 ("FAC") ¶¶1–4, 15. DraftKings targets customers with deceptive promotions, which, along with other features of DraftKings's platform, are designed to hook people on gambling and then to compromise their ability to stop gambling. FAC ¶¶32-41, 98-108, 130-35, 155-59, 245-56.

Advertising for DraftKings's "Risk-Free" and "No Sweat" Bet Promotions (Counts 1 & 4) promised users the opportunity to place bets without the risk of losing money. FAC ¶¶19-20, 160.

DraftKings advertised these promotions widely throughout Illinois on television, billboards, social media, and in its mobile phone application ("app"). FAC ¶¶162-64, 166-71. The advertisements prominently featured promises like "Risk-Free Bet up to $1,000" and "NO LOSING FOR YOU TODAY!" FAC ¶¶163-64, 172–73, Fig. 3-4. While the precise wording Plaintiffs saw varied, the message was consistent: you can use this promotion and a bet without risking your money. FAC ¶166. But, when Plaintiffs lost their supposedly no-risk bet, they did not receive their money back. Instead, they got a "Bonus Bet" with no cash value that forced them to chase their loss (and win) a subsequent bet to get any money back. FAC ¶¶177, 179-80. Even then, unlike a regular bet, Plaintiffs did not receive the stake back—only the winnings minus the sportsbook's cut. FAC ¶¶182-83. Regulators, including the Illinois Gaming Board, have found these ads misleading. FAC ¶¶194–200. Each Plaintiff saw and relied on these ads and lost money. FAC ¶161; *see also infra* Section I(A).

Advertising for DraftKings's Sportsbook Deposit Match Promotions (Counts 2 & 5) promised to match deposits up to $1,000. FAC ¶¶25, 209. Through TV, social media, billboards, and its app, DraftKings advertised "$1,000 Sign Up Bonus" and a "deposit match up to $1,000," creating the clear impression users would receive (at least) cash equal to their deposit. FAC ¶¶210-14, 224-26, Figs. 11-15. The reality: DraftKings matches only 20% of deposits, requires users to wager 25x the bonus within 90 days on high-risk bets (-300 odds or longer) to get even that 20%, and "pays" the match in non-withdrawable "DK Dollars," which must be gambled to be turned into cash. FAC ¶¶216-17, 229-32. In sum, to get the advertised $1,000, users must deposit $5,000, risk $25,000, and then gamble (and win) some more—requirements DraftKings knew users would fail. FAC ¶¶217, 231, 234. Each of the Plaintiffs (except Beyer) alleges they were deceived by and relied on this advertising but never received the promised deposit match. FAC ¶¶52–53, 56, 59, 215, 238–39.

DraftKings's Intentionally Addictive Design and Its Devastating Effects. DraftKings used behavioral psychology to program its app to cause compulsive gambling in users. The app includes

features that target dopamine receptors by amplifying unpredictable, intermittent rewards and goal-chasing—techniques proven to create addiction. FAC ¶¶240-41. These features create neural pathways that make gambling on DraftKings's app far more addictive than traditional sports gambling. DraftKings accelerates addiction through rapid-fire in-game bets that settle in minutes, enticing users to keep betting, completing dozens of wagers quickly. FAC ¶242. Single-click and seamless betting, sensory feedback from the phone like bright pop-ups with emojis, and faster-than-TV score updates keep users in a trance-like "gambling zone" where they deposit and bet reflexively. FAC ¶¶244-45. Other features of the app incentivize accelerating deposits and loss-chasing, which subtly reinforce patterns of compulsive betting. FAC ¶¶108, 133-35, 416, 419, 432. Worse, DraftKings mines user data collected through the app to identify vulnerable individuals and targets them when they're weakest—after big losses or when trying to quit—with triggers to return to the addictive app and resume gambling. FAC ¶¶100-01, 154-59. And, despite its claims to the contrary, DraftKings fails to implement a host of feasible and obvious alternative designs to mitigate the dangerousness of its product, such as effective deposit and playtime limits. FAC ¶419.

These tactics destroyed Plaintiffs' lives. Bell went from casual sports fan to addict within months. He displayed obvious compulsive behaviors revealed through the copious data gathered by the app: for example, spending 150 hours in 45 days on the app, making 30+ daily deposits of $250 each—over $5,000 per day and far more than he could afford. FAC ¶¶49, 258, 262, 265-66. DraftKings's targeted app notifications pulled him back whenever he tried to stop. FAC ¶¶261-62. The result was devastating: over $100,000 lost, bankruptcy, pending foreclosure, a shattered family, and a debilitating addiction. FAC ¶¶50, 272-73. Smothers suffered similarly. He was lured back again and again to the app where he chased losses, bet compulsively, and received no assistance from the "responsible gaming" features DraftKings touts despite the clear signs he was betting beyond his means. FAC ¶¶275-78. He lost thousands and suffered lasting harm. FAC ¶¶62, 274, 279.

## LEGAL STANDARD

At this stage "all well-pled facts are taken as true and viewed in a light most favorable to the plaintiff," but "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009)). The court can consider "a concededly authentic document central to the plaintiff's claim (the usual example is a contract, in a suit for breach of contract)," but not a document "that require[s] discovery to authenticate or disambiguate." *Tierney v. Vahle*, 304 F.3d 734, 739 (7th Cir. 2002).

## ARGUMENT

### I.      Plaintiffs sufficiently pled their deception-based ICFA claims (Counts 1 & 2)

Deception-based claims under the ICFA have five elements: "(1) a deceptive act or practice by defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in a course of conduct involving trade or commerce, and (4) actual damage to the plaintiff that is (5) a result of the deception." *DeBouse v. Bayer AG*, 922 N.E.2d 309 (Ill. 2009).[1]

#### A.      Plaintiffs' allegations satisfy Rule 9(b)

DraftKings first argues that pursuant to Rule 9(b) "each Plaintiff was required to, but did not, identify the specific advertisement(s) they saw and relied upon." Dkt. 38 ("Mem.") at 5. DraftKings cites no law for this incorrect assertion. The Seventh Circuit has consistently held that Rule 9(b) does not require plaintiffs to identify "the precise date, time, and location that he saw the advertisement or every word that was included on it." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 737 (7th Cir. 2014). The Rule is primarily concerned with providing "fair notice" to defendants, and accordingly is less demanding where information, such as the precise content and timing of ads, "is uniquely within the defendant's knowledge." *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d

---

[1] DraftKings only challenges the sufficiency of Plaintiffs' pleadings as to deception and actual damage.

771, 777 & n.5 (7th Cir. 1994); *see also* 5A Fed. Prac. & Proc. Civ. § 1298 (4th ed.) (satisfaction of Rule 9(b) depends on "how much detail is necessary to give adequate notice to an adverse party and to enable that party to prepare a responsive pleading"). "The precise level of particularity required under Rule 9(b) depends on the facts of the case, but the rule ordinarily requires describing the who, what, when, where, and how of the fraud." *Kahn v. Walmart Inc.*, 107 F.4th 585, 594 (7th Cir. 2024).

The Seventh Circuit's recent decision in *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730 (7th Cir. 2019) shows Plaintiffs have satisfied Rule 9(b). There putative class-plaintiffs alleged a "Prescription Diet" pet food was deceptively marketed because it was advertised and labeled as a premium "prescription" product but was no different from regular pet food. *Id.* at 739. One plaintiff alleged she "saw marketing materials for Prescription Diet pet food before purchasing the cat food at PetSmart in February 2013 and thereafter," and the other plaintiff alleged she "saw similar marketing materials before purchasing Prescription Diet cat food from PetSmart in November 2013 and thereafter." *Id.* The court said, "[n]othing more is needed." *Id.* Plaintiffs allegations are more detailed than those in *Vanzant*.

As to the No-Risk Promotion, Plaintiffs state with specificity <u>what</u> the ads stated and <u>how</u> they were misleading. *See* FAC ¶¶160, 162 & Fig. 2 (typical TV advertisement), 164 & Fig. 3 (DraftKings influencer partner circulating DraftKings "Risk-Free Bet up to $1,000" ad on twitter), 172-73 & Fig. 4 (specific email content), 188 & Figs. 5–7 (example advertisement from October 2021 through March 2025), 201 & Fig. 10 (explaining why "No Sweat" advertisements are equally deceptive). Plaintiffs further allege that these ads omitted and obfuscated the terms that made the "risk free" or "no sweat" statements deceptive. *See* FAC ¶¶175–82, 189-93 & Figs. 8–9. Plaintiffs allege <u>where</u> the ads were distributed, FAC ¶¶162–64, and specifically <u>where</u> Plaintiffs can recall seeing them, FAC ¶¶165 (Davis saw ads on Twitter), 167 (Bell saw ads on TV, Instagram and Facebook, and in the DraftKings app), 168 (Zafer saw ads "on TV while watching basketball"),

5

169–72 (Smothers saw ads on Twitter, DraftKings's app, and email). Finally, Plaintiffs specify approximately <u>when</u> they were ultimately persuaded by these ads to use the Promotion: Smothers "opted into" the promotion in "early 2022" and "lost the bet" (¶¶60-61), Davis "opted-in" "shortly" after opening his account in November 2023 (¶¶56-57), Zafer "responded to" advertising and placed bets in January 2023 (¶¶52, 54). Bell and Beyer cannot recall exactly when they used the promotion but do allege that they did so (¶¶46–49). This information is all, of course, known to DraftKings, which tracks its users' data through the app. FAC ¶¶100, 123; *see also Vicom*, 20 F.3d at 777 & n.5.

The Deposit Match Promotion allegations also satisfy Rule 9(b). Plaintiffs identify the misleading statements, FAC ¶¶210, 212–14 & Figs. 11–12 ("Get A $1,000 DEPOSIT BONUS!"), 224 & Figs. 13–15, why they were deceptive, (¶¶216–23, 230–36), and where the statements were made, (¶¶210–14, 224). And Plaintiffs allege the approximate dates they saw these deceptive statements and used the promotions, FAC ¶¶48–49 (Bell signed up in February 2021), 52 (Zafer saw ads in January 2023), 56 (Davis saw ads and opened account November 2, 2023, made deposit February 23, 2024, 215 (alleging all Bell, Davis, Smothers, and Zafer each saw these statements and relied on them when they created their accounts and made deposits).[2]

These allegations are more than sufficient to provide DraftKings with adequate notice.

### B. DraftKings's advertisements for each promotion were deceptive

DraftKings's primary defense is that its advertising was not deceptive because the Promotions' terms were disclosed to the Plaintiffs. Mem. at 6–8. This argument misconstrues Plaintiffs' allegations and mistakes the law. A statement is deceptive if it "is likely to mislead a reasonable consumer, even if the statement is literally true." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 762 (7th Cir. 2014). Whether an advertisement is likely to mislead turns on "how real

---

[2] Plaintiffs concede that Smothers' allegation that he used the promotion "in or around February 2021," FAC ¶59, renders his Count 2 claim untimely.

6

consumers understand and react to [it]." *Bell v. Publix Super Markets, Inc.*, 982 F.3d 468, 476 (7th Cir. 2020). Plaintiffs were reasonably deceived by the statements in ads for No-Risk Promotions, FAC ¶¶47, 61, 186-87, and in ads for Deposit Match Promotions, FAC ¶¶226-229, 232-36.

An ICFA claim cannot be dismissed at the pleadings based on a fine-print-disclosure. *Bell* emphasized, that the deceptiveness analysis must "take into account all the information available to consumers and the context in which that information is provided and used" and, therefore "an accurate fine-print" disclosure "does not foreclose as a matter of law a claim that an ambiguous [advertisement] deceives reasonable consumers." 982 F.3d at 476–77.

Nor is it a defense to say that the victim should have discovered the deception before completing the transaction. Indeed, an ICFA "'bait-and-switch' deception" claim "survives dismissal on the pleadings even when a consumer discovers the [deception] before completing a transaction, let alone after." *Kahn v. Walmart Inc.*, 107 F.4th 585, 598–99 (7th Cir. 2024).

DraftKings seems to think the Plaintiffs' allegations regarding the terms of the No-Risk and Deposit Match Promotions proves these terms were "disclosed" to Plaintiffs. Mem. at 6–7. But DraftKings elides the fact that the terms were not adequately disclosed *in the advertisements*. Many of the ads for these promotions do not include any reference to additional terms at all. *See* FAC ¶¶187– 93 (No Risk), 213, 219–23 (Deposit Match). Plaintiffs do not dispute that some of the advertisements they viewed contained some fine-print terms or that the terms of each promotion were available—somewhere—on DraftKings's app, but they unambiguously allege that they did not see or understand these terms before they used the Promotions and instead relied on the large-print statements in the advertisements. FAC ¶¶190 (No-Risk), 228 (Deposit Match). At this stage, the Court should credit these allegations and ignore DraftKings's self-serving assertion that the terms of the Deposit Promotion were "conspicuously" displayed to Plaintiffs, which it improperly tries to

substantiate through a declaration from its employee, Gary Wimbridge. *See* Fed. R. Civ. P. 12(d).[3] Plaintiffs are entitled to discovery to resolve factual issues regarding "the overall deceptiveness of the mobile app and website, sign up process, and terms and conditions." Exhibit 1, Order on Motion to Dismiss at 8-9, *Scanlon v. DraftKings, Inc.*, No. 2484CV01099-BLS2 (Suffolk Cnty. Super. Ct., Aug. 21, 2024)) (refusing to consider Wimbridge's similar declaration).

DraftKings essentially argues that it did not commit deception because a sophisticated and eagle-eyed user could have discovered the misleading nature of its ads before using the Promotions. This position is divorced from the legal standard for deceptiveness: whether statements, in context, are likely to deceive reasonable consumers. *See Bell*, 982 F.3d at 476; *see also Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 883 (7th Cir. 2005) ("[T]he ICFA does not require a plaintiff to show . . . diligence in ascertaining the accuracy of misstatements"). The pleadings meet that standard based on the misleading large-print promises Plaintiffs saw and the "lack of sophistication" of gambling-naïve customers like Plaintiffs who were unlikely "to access and understand" the confusing terms of the promotions contradicting the ads' large-print promises. *Chandler v. Am. Gen. Fin., Inc.*, 768 N.E.2d

---

[3] Neither Wimbridge's declaration nor its exhibits fall within the narrow exception for "concededly authentic document central to the plaintiff's claim." *Tierney*, 304 F.3d at 739; *see also Van Tassell v. United Mktg. Grp., Ltd. Liab. Co.*, 795 F. Supp. 2d 770, 780 (N.D. Ill. 2011) (refusing to consider screenshots of online enrollment pages offered by defendant on a motion to dismiss where the only basis for screenshots authenticity was a declaration from defendant's employee). Nor would it be appropriate to convert DraftKings' motion to dismiss into one for summary judgment without first affording Plaintiffs the opportunity to conduct discovery. Plaintiffs would be entitled to "discovery to authenticate," *Tierney*, 304 F.3d at 739, the screenshots attached to the Wimbridge Declaration and to test whether they are actually "representative" of the deposit pages Plaintiffs would have seen on a particular date. *See In re Easysaver Rewards Litig.*, 737 F. Supp. 2d 1159, 1169 (S.D. Cal. 2010) (so holding).

Even if the Court were to consider it, the declaration does not authenticate the exhibits based on personal knowledge much less explain why the Court can be sure they are "representative" of what was displayed to the Plaintiffs. Wimbridge states some (unspecified) parts of his declaration are based not on personal knowledge but unverified hearsay: "information reported to [him] . . . by other individuals in the organization." Wimbridge Decl. at 5. In the Massachusetts case where Wimbridge submitted similar (rejected) declarations in support of DraftKings's (failed) motion to dismiss, Wimbridge subsequently testified that the screenshot he attached to his affidavit was a "recreation" made at DraftKings's legal team's request after the complaint was filed, and he admitted that he did not take the screenshot and could not even identify the specific person who did. *See* Exhibit 2, Excerpts from Wimbridge Dep. at 120:14-123:12.

60, 68 (Ill. App. 2002) (courts must account for sophistication of consumers to whom ads are directed); *see* FAC ¶187 (plaintiffs were "gambling-naive customers").

DraftKings cites three inapposite cases. Unlike in *Boone v. MB Fin. Bank, N.A.*, 375 F. Supp. 3d 987, 997 (N.D. Ill. 2019) and *Newman v. Metro. Life Ins. Co.*, 885 F.3d 992, 1001 (7th Cir. 2018), Plaintiffs are not claiming that contractual terms are deceptive because they led to an unexpected result. Those cases might be analogous if Plaintiffs were alleging that the promotion's terms themselves were deceptive, but instead, Plaintiffs are complaining about the misleading statements in ads for those promotions whose large-print promises contradict the later-disclosed fine-print terms. The ads at issue here, unlike the contract in *Boone,* therefore, did not disclose all of the terms.

*Newman*, meanwhile, emphasizes another reason DraftKings's argument should be rejected: it relies on drawing inferences against the Plaintiffs. *Newman* reversed the dismissal of a deceptive advertising claim based on a confusingly worded insurance brochure because the court concluded that the disclosure in the brochure was not so unambiguous as to make the plaintiffs' allegation of deception implausible. *See* 885 F.3d at 1001–02. The terms here are confusing. FAC ¶¶ 193, 225.

Nor is DraftKings helped by *Washington v. Hyatt Hotels Corp.*, No. 19-cv -04724, 2020 WL 3058118, at *5 (N.D. Ill. June 9, 2020), where screenshots in the complaint established that any deception was dispelled during the booking process when a price breakdown was presented to each consumer, clearly disclosing the allegedly concealed fees. By contract, the FAC alleges and shows how the terms were hidden from the Plaintiffs. *See* FAC ¶¶191-93, 228-30 & Figs. 8-9. To the extent DraftKings is relying on *Washington* for the broader proposition that there can be no ICFA claim so long as deception-dispelling information is somehow somewhere available to a consumer before they commit to a transaction, *Washington* supports that proposition only via a citation to a decision that was reversed by the Seventh Circuit in *Bell* for not drawing inferences in the plaintiffs favor. *See* 2020 WL 3058118, at *5 (citing *In re 100% Grated Parmesan Cheese Mktg. & Sales Practices Litig.*, 275 F.

9

Supp. 3d 910, 923 (N.D. Ill. 2017)). The Seventh Circuit found that where a plausibly deceptive statement appears in advertising, "[r]easonable consumers' expectations . . . cannot be decided as a matter of law" based on a court's beliefs about what further investigation consumers should have conducted or what conclusions they should have drawn. *Bell.*, 982 F.3d at 482.

Plaintiffs explain how their understandings of the promotions, based on the large-print promises in DraftKings's ads, were not "unreasonable or fanciful interpretations." *Bell*, 982 F.3d at 477. Plaintiffs' allegations that they believed they would get their money back if they lost a Risk-Free or No-Swear bet and a cash match of their full first deposit amount are "enough for now to indicate that a 'reasonable consumer'" interpreted the ads the same way. *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 647 (7th Cir. 2019); *see also Suchanek*, 764 F.3d at 762 ("[T]he determination whether an ad has a tendency to deceive is an impressionistic one more closely akin to a finding of fact than a conclusion of law." (cleaned up)).

### C. Plaintiffs pled actual damages resulting from the promotions

DraftKings next argues that the Plaintiffs "do not allege that they *lost* money in reliance on either promotion," and therefore have not pled actual damage. Mem. at 12. Once again, DraftKings is wrong on both the law and the facts. Plaintiffs did, as required, "plead that the deceptive or unfair act caused [them] to suffer actual damages, meaning pecuniary loss." *Benson*, 944 F.3d at 647.

As to the Deposit Match Promotion, Plaintiffs allege two types of cognizable losses. First, Plaintiffs contend that the ads' misrepresentations caused them to create and fund their accounts, which led to them losing money. FAC ¶¶215, 223. "Numerous courts have permitted ICFA claims to proceed where, as here, a plaintiff claimed that defendant misled her as to the nature of the product she was buying, and she either paid more for the product than she otherwise would have or would not have purchased the product had she known the truth." *Rudy v. Fam. Dollar Stores, Inc.*, 583 F. Supp. 3d 1149, 1160 (N.D. Ill. 2022). This amounts to a straightforward actual loss: the money

10

plaintiffs lost because, believing they would get their money matched, they made deposits that they then lost. The Deposit Match ads' deception "affected plaintiff[s] in a way that made [them] tangibly worse off." *Frye v. L'Oreal USA, Inc.*, 583 F. Supp. 2d 954, 957 (N.D. Ill. 2008).

Second, Plaintiffs allege a benefit-of-the-bargain loss: they expected to (but did not) receive a cash reward in exchange for creating an account and making a deposit. *See Gerill Corp. v. Jack L. Hargrove Builders, Inc.*, 538 N.E.2d 530, 537–38 (Ill. 1989) ("Under the benefit-of-the-bargain rule . . . damages are determined by assessing the difference between the actual value of the property sold and the value the property would have had if the representations had been true."). Thus, Plaintiffs lost an amount equal to each of their initial deposits, which they would have gotten "if the representations had been true." *Id.* A Massachusetts court recently endorsed this theory in analyzing the Deposit Match Promotion, finding it plausible that customers were "harmed because they bought into a service worth less than they believed." *See* Ex. 1, *Scanlon* Order at 6–7.

Likewise, Plaintiffs believed, pursuant to ads for the No-Risk Promotion, that they would win their bets or receive their money back in cash. FAC ¶179. Again, Plaintiffs suffered out-of-pocket damages in the form of the money they lost and did not recover through the bonus bet. *see Frye*, 583 F. Supp. 2d at 957 ("The measure of damages is the amount that will compensate plaintiff for the loss occasioned by the fraud, which is the amount she is actually out-of-pocket by reason of the transaction."), as well as benefit-of-the-bargain damages by receiving less than they would have "if the representations had been true," *Gerill*, 538 N.E.2d at 538; FAC ¶161.

Plaintiffs' damages are different from those in cases like *Frye* where there was "no observable economic consequences" to the deception. 583 F. Supp. 2d at 958. Plaintiffs lost quantifiable amounts of money as a result of the deception. And, at the pleading stage, plaintiffs need only articulate a concrete and measurable loss—not calculate it to the penny. *See Muir v. Playtex Prods., LLC*, 983 F. Supp. 2d 980, 990 (N.D. Ill. 2013).

11

## II. The intentional misrepresentation claims should not be dismissed (Counts 4 & 5)

As relevant to DraftKings's motion to dismiss, claims for intentional misrepresentation differ from an ICFA claim in that they require plaintiffs to plead actual reliance on the misrepresentation resulting in their damages. *See Lewis v. Lead Indus. Ass'n*, 178 N.E.3d 1046, 1055–56 (Ill. 2020).[4] DraftKings's only additional argument is that Plaintiffs could not have relied on the misleading ads because they had time to review the terms before using the promotions. Mem. at 14.

This argument requires drawing inferences against the Plaintiffs. *Contra Camasta*, 761 F.3d at 736. Plaintiffs allege that they did not see the full terms of the promotions before using them, FAC ¶¶192 (No-Risk), 230 (Deposit Match), and the Court should not credit the untested and unreliable contrary representations in Wimbridge's declaration on a motion to dismiss.

## III. Plaintiffs' claim for Unjust Enrichment is well-pled (Count 7)

To state a claim for unjust enrichment under Illinois law, Plaintiffs "must allege that the defendant has unjustly retained a benefit to the [their] detriment, and that defendant's retention of the benefit violates fundamental principles of justice, equity, and good conscience." *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011) (cleaned up). Plaintiffs have done so by alleging that DraftKings retained the money they were deceived into losing through its misleading promotions. FAC ¶¶396–98. Plaintiffs' claims in this regard are no more "generic" than those that courts have allowed to proceed alongside ICFA deception claims. *See, e.g., Rudy*, 583 F. Supp. 3d at 1166 (denying motion to dismiss). For the same reasons they adequately alleged DraftKings's ads were deceptive, Plaintiffs have pleaded that DraftKings inequitably retained the money they resultingly lost.

## IV. Beyer alleges unfair conduct in his ICFA claim regarding targeting minors (Count 3)

A practice is unfair if it "offends public policy . . . is immoral, unethical, oppressive, or unscrupulous . . . [or] causes substantial injury to consumers." *Robinson v. Toyota Motor Credit Corp.*,

---

[4] Plaintiffs voluntarily dismiss their fraudulent inducement claim (Count 6) as duplicative of Counts 4 & 5.

775 N.E.2d 951, 961 (Ill. 2002). "A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Id.* "[T]he relaxed pleading standards of Rule 8" govern this claim." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 446 (7th Cir. 2011).

Beyer plausibly alleges that DraftKings deliberately grooms minors to become future gamblers using its daily fantasy sports offerings, including through ineffective age verification, contests with cash prizes, and advertising that disproportionately reaches minors. FAC ¶¶122-29, 137-44. In this way DraftKings ensures young men become gamblers at age 21. FAC¶¶145–53.

Courts have long held that grooming minors to want dangerous products "offends public policy . . . is oppressive and unscrupulous" and causes substantial injury. *Mangini v. R.J. Reynolds Tobacco Co.*, 21 Cal. Rptr. 2d 232, 241 (Cal. Ct. App. 1993); *Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728, 760 (N.D. Cal. 2019) (same for targeting minors with vape advertising). Like Big Tobacco's Joe Camel campaign, DraftKings's strategy is (plausibly) unfair.

## V. Plaintiffs adequately allege Casino Queen's involvement (Count 8)

"[T]o state a claim for civil conspiracy, a plaintiff must allege an agreement and a tortious act committed in furtherance of that agreement." *McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242, 258 (Ill. 1999). Plaintiffs allege that Casino Queen and DraftKings have a partnership agreement to operate a digital sportsbook in Illinois. FAC ¶¶64-65, 84-85. DraftKings's deceptive advertisements are clearly in furtherance of that partnership. This claim is sufficiently pled.

## VI. Plaintiffs' products liability claims should proceed (Counts 9–12)

Plaintiffs bring products liability counts against DraftKings under both strict liability and negligence. A strict liability claim requires, "that the injury complained of resulted from a condition of the product, that the condition was unreasonably dangerous, and that it existed at the time the product left the manufacturer's control." *Mikolajczyk v. Ford Motor Co.*, 901 N.E.2d 329, 335 (Ill.

13

2008). A plaintiff may show that the product is unreasonably dangerous by showing either a design flaw or a failure to warn. *See id.* A product contains a design flaw if the product failed to safely perform as an ordinary consumer would expect, or if the dangers of the design outweigh the benefits. *See id.* at 352. A product requires a warning if its danger is not generally known. *See id.* To prevail on a negligence-based product liability claim, "a plaintiff must prove that either (1) the defendant deviated from the standard of care that other manufacturers in the industry followed at the time the product was designed, or (2) that the defendant knew or should have known, in the exercise of ordinary care, that the product was unreasonably dangerous and defendant failed to warn of its dangerous propensity." *Blue v. Env't Eng'g, Inc.*, 828 N.E.2d 1128, 1141 (Ill. 2005).

## A. DraftKings provides a product

Defendants devote the lion's share of their argument to the notion that DraftKings does not provide a "product." *See* Mem. at 16–17, 19–20. This argument relies on a cramped reading of "product" belied by legal authority and logic.

### 1. A product need not be tangible

Defendants begin by arguing that a product must be "chattel," based on a quotation from the Second Restatement of Torts. *See* Mem. at 16–17 (quoting Restatement (Second) of Torts § 388 (1965)). Defendants misleadingly suggest, therefore, that the Illinois Supreme Court "has adopted" the requirement that a product be "tangible" to give rise to product liability. The Court has done no such thing. Nor is it surprising that the Second Restatement, reported in the 1950s and 60s, would make that suggestion. *See* Restatement (Second) of Torts Intro. "Although the Illinois Supreme Court has not defined specifically a 'product' for purposes of strict liability in tort, our appellate court has repeatedly stated that 'the social policy justifications' underlying the adoption of strict liability, rather than a dictionary definition of the term 'product,' should be determinative of that issue." *Trent v. Brasch Mfg. Co.*, 477 N.E.2d 1312, 1314–15 (Ill. App. 1985). "These considerations,

14

when viewed in the context of this case, support the conclusion that [DraftKings's offerings] are products." *Firkin v. U.S. Polychemical Corp.*, 835 F. Supp. 1048, 1051 (N.D. Ill. 1993).[5]

For more than fifty years, courts have applied products liability law to intangible products, such as electricity, *see Ransome v. Wisconsin Elec. Power Co.*, 275 N.W.2d 641, 643 (Wis. 1979), and compilations of data for aviation; *see Brocklesby v. United States*, 767 F.2d 1288, 1295 (9th Cir. 1985). Illinois courts have likewise said that software makers are on "the tangible product end" of the "continuum" between "pure information providers and pure tangible good providers." *Tolan & Son, Inc. v. KLLM Architects, Inc.*, 719 N.E.2d 288, 297 (Ill. App. 1999).

This broader conception of "products" is captured in the more recent Third Restatement:

> A product is tangible personal property distributed commercially for use or consumption. Other items, such as real property and electricity, are products when the context of their distribution and use is sufficiently analogous to the distribution and use of tangible personal property that it is appropriate to apply the rules stated in this Restatement.

Restatement (Third) of Torts § 19 (1998).[6] The Third Restatement, in fact, provides that product liability can attach to software. According to the Restatement, when a court is faced with a software products liability claim, the court can "draw an analogy between the treatment of software under the Uniform Commercial Code and under products liability law." Restatement (Third) of Torts § 19. Courts generally treat software as a good under the UCC. *See, e.g.*, *Five-Star AudioVisual, Inc. v. Unique Business Systems Corp.*, 769 F. Supp. 3d 840, 857 (N.D. Ill. 2025) (audiovisual software "software is a product, not information."); *Micro Data Base Sys., Inc. v. Dharma Sys., Inc.*, 148 F.3d 649, 655 (7th Cir. 1998) (software is a good).

---

[5] These consideration include, *inter alia*, "1) the public interest in life and health; 2) the invitations and solicitations of the manufacturer to purchase the product; 3) the justice of imposing the loss on the manufacturer who created the risk and reaped the profit; 4) the superior ability of the commercial enterprise to distribute the risk of injury as a cost of doing business; [and] 5) the disparity in position and bargaining power that forces the consumer to depend entirely on the manufacturer." *Firkin*, 835 F. Supp. at 1051.
[6] The concept of a product has evolved over time. The Court can take judicial notice that smartphone apps did not exist when the Third Restatement was drafted. Se*e The App Store Turns 10*, https://www.apple.com/newsroom/2018/07/app-store-turns-10.

In recent years, courts have specifically concluded that mobile phone apps are software products subject to products liability law. In *Lemmon v. Snap, Inc.*, 995 F.3d 1085 (9th Cir. 2021), plaintiffs brought a products liability claim against Snapchat for negligent design, alleging that a Snapchat feature encouraged young people to drive at dangerous speeds. The court allowed the suit to proceed, reasoning that the Plaintiffs adequately pled that Snapchat "violat[ed] its distinct duty to design a reasonably safe product." *See id.* at 1092. Likewise, the Northern District of California determined that "various functionalities of defendants' [social media] platforms . . . are products." *In re Soc. Media Adolescent Addiction / Pers. Inj. Prods. Liab. Litig.*, 702 F. Supp. 3d 809, 849 (N.D. Cal. 2023); *see also Brookes v. Lyft Inc.*, 2022 WL 19799628 at *3 (Fla. Cir. Ct. Sep. 30, 2022)("Lyft should be responsible for any harm caused by its digital application in the same way the designer of any defective physical product is held accountable."); *Estate of Alex through Coker v. T-Mobile US, Inc.*, 313 F. Supp. 3d 723, 732 (N.D. Tex. 2018) (software on mobile phones is product).

The fact that the products were not tangible had no bearing on the above cases and has no bearing here. What matters is that DraftKings programs its app with specific features designed to produce specific effects, just as the designers in *Lemmon* and *In re Social Media Adolescent Addiction*.

The cases DraftKings cites, on the other hand, are not analogous to the product here. The plaintiff in the first case, *D'Ambrosio v. Rajala*, No. 24-cv-00678, 2025 WL 1383286 (N.D. Ill. May 13, 2025), sued Facebook because it allowed a third party to post unflattering stories about him online. That had to do with Facebook's capacity as a forum for expression not with flawed design. *Brandt v. Boston Scientific Corp.*, 792 N.E. 296 (Ill. 2003), is equally inapplicable. *Brandt* concerned a breach of warranty for a medical device, a claim the court disallowed, finding that the "predominant purpose" of the transaction was the service of implanting a surgical device.

*Garber v. Amazon.com, Inc.*, 380 F. Supp. 3d 766 (N.D. Ill. 2019), is equally distinguishable. There, plaintiffs sued over a dangerous hoverboard that they purchased from a third-party through

16

Amazon's website. The court determined that Amazon was not a "seller" or manufacturer of the product, so the dangerousness of the product had nothing to do with Amazon. Here, the platform does not facilitate the purchase of a dangerous product, the platform *is* the product.

Finally, in *Milford v. Commercial Carriers, Inc.*, 210 F. Supp. 2d 987 (N.D. Ill. 2002), the court declined to apply product liability to a designer who did not manufacture the faulty product in question, but merely provided "drawings, designs and blueprints" to the manufacturer. DraftKings not only designs its product but also manufactures and puts it into the stream of commerce.

Tangible or not, DraftKings offers a "product" for which it can be strictly liable.

### 2. Defendants' product is not "Unfixed and Changeable"

DraftKings's contention that its app cannot be considered a product because it is "inherently unfixed" is frivolous. *See* Mem. at 19. No intermediary changes DraftKings's product before it reached Plaintiffs. *See Gillespie v. Edmier*, 182 N.E.3d 54, 58 (Ill. 2020).[7]

DraftKings appears to be confusing product features with user experience. The app features that make DraftKings's product unreasonably dangerous, such as the ability to place rapid, continuous bets, the use of user data to draw users in and retrigger their addiction, and ineffective "responsible gaming" tools, are encoded into the app as fixed elements. *See* FAC at ¶¶133, 135. 218, 240-41. True, the user experience varies because users bet on different things, but that feature is common to all software products and has not troubled other courts. For example, in *In re Social Media Adolescent Addiction*, the plaintiffs challenged as unreasonably dangerous a design feature that enabled unrestricted session duration. *See* 702 F. Supp. 3d at 850. The feed on which they scroll looked different from person to person, but the feature allowed *every user* to scroll indefinitely. So too, while the Plaintiffs here may place different bets, that does not negate the fact that *every user* is

---

[7] There is nothing to DraftKings' argument that Plaintiffs' inability to preserve the version of the app they used dooms their claim. The case DraftKings cites itself shows that Plaintiffs need not themselves preserve the dangerous product to prevail. *See Stringer v. Packaging Corp. of Am.*, 815 N.E.2d 476, 479 (Ill. App. 2004).

exposed to the same, fixed, addiction-forming features.

DraftKings relies on a California state trial court decision, *Social Media Cases*, 2023 WL 6847378 (Cal. Super. Ct. Oct. 13, 2023), which reasoned that social media platforms "facilitate an interactive experience" that "evolves over time as the social media algorithm responds to user's inputs." *Id.* at *20. But that case failed to distinguish contrary precedent and ignored the fact that the algorithm causing the experience to "evolve" is an intentionally designed element that behaves in predictable ways. In any event, Plaintiffs have not alleged that DraftKings's app features "evolve."

### 3. Plaintiffs identify a product, not "business operations"

Finally, DraftKings also attempts to draw a specious distinction between products and business practices. *See* Mem. at 20. Such a distinction is not supported by case law and relies on a misapprehension of Plaintiff's complaint. Plaintiffs do not, as Defendants suggest, base their products liability claims on information transmitted through DraftKings's advertisements. *See* Mem. at 21. Rather, Plaintiffs base their claim on the design of the features that users encounter on the app. Neither the advertisements nor the information on DraftKings app are the product.[8]

### B. DraftKings's product is unreasonably dangerous

DraftKings next takes issue with Plaintiffs' allegations that its app is unreasonably dangerous. A plaintiff may prove that a product is unreasonably dangerous either by showing that the product is dangerous to an extent beyond what an ordinary consumer would expect, or by showing that the magnitude of the product's danger outweighs its utility. *See Zurbriggen v. Twin Hill Acquisition Co., Inc.*, 338 F. Supp. 3d 875, 899 (N.D. Ill. 2018). Plaintiffs plausibly plead both theories.

---

[8] Nor can DraftKings's app be deemed a "service." Whereas DraftKings broadly distributes a uniform output, developed through code that users interact with directly, "service providers, unlike product manufacturers, are usually in the business of providing expert knowledge to individual customers, which precludes providers from having high volume." Michael R. Maule, *Applying Strict Products Liability to Computer Software*, 27 TULSA L.J. 735, 745–46 (1992). DraftKings reaches millions of customers across multiple states because it made a product designed for a high volume of user interactions.

First, Plaintiffs plead sufficient facts to show that DraftKings's app is dangerous to an extent beyond which an ordinary customer would anticipate. Plaintiffs specifically allege that an average user would not expect to encounter such sneakily addiction-inducing features. *See* FAC ¶¶217-19, 231, 324, 416, 448. And they allege that DraftKings creates the false impression that it takes user safety seriously and empowers users to halt the onset of compulsive gambling, thereby belying the addictive nature of its platform. FAC ¶33, 254. Plaintiffs allege that DraftKings obscures the most dangerous aspects of its product, FAC ¶416, while it "markets itself as 'the safest sports betting platform,'" FAC ¶254. For example, it "touts the ability to set a daily, weekly, or deposit limit" but "allows users to change deposit limits whenever they want." *Id.* In light of these allegations, it does not "defy belief," Mem. at 18, that Bell and Smothers did not expect DraftKings to be so addictive.

Plaintiffs also adequately plead that the danger of DraftKings's product outweighs its utility. FAC ¶419. They allege that specific design choices cause users to engage in dangerous behaviors that ultimately lead to gambling addiction and its accompanying harms. FAC ¶240. For example, The Complaint alleges that, unlike in traditional sports betting, users can place many in-game quick-settling bets that trigger an addiction-inducing dopamine reward loop and lull users in a hypnotic state where they bet continuously. FAC ¶¶241-42, 44. These features, combined with ineffective responsible gaming tools, are built into DraftKings's mobile app, which provides "ready availability, rapid gratification, and a tendency to enable 'context-independent' cues that trigger habit response." FAC ¶132. And to keep users returning to its addictive product, DraftKings uses automated push-notifications and other outreach informed by sophisticated data analysis. *See id.* at ¶155–56. None of this is inherent to a sport betting platform.

These allegations are more than sufficient at this juncture. "Whether [a] product is defective or unreasonably dangerous is a question of fact that the jury should ordinarily resolve." *McDaniel v. Trail King Indus., Inc.*, 248 F. Supp. 2d 749, 756 (N.D. Ill. 2002); *Doser v. Savage Mfg. & Sales, Inc.*, 568

19

N.E.2d 814, 824 (Ill. 1990) (same).

DraftKings's only response is that their product cannot be unreasonably dangerous because they (assertedly) have not violated any Illinois statute or regulation and are licensed to offer sports betting. Mem. at 18. That no Illinois agency has censured DraftKings does not mean that DraftKings can escape liability for an unreasonably dangerous product. DraftKings cannot show express preemption because there is no Illinois law that preempts product liability in this context.

To the extent DraftKings is making an implied preemption argument, it wrongly conflates product liability with per se negligence. Product liability claims can sit comfortably alongside robust regulatory regimes. Indeed, *Garner v. Boehringer Ingelheim Pharmaceuticals, Inc.*, allowed claims alleging product liability and negligence per se (based on violation of federal pharmaceutical regulations) to proceed alongside one another. 888 F. Supp. 2d 911, 924–25, 927 (S.D. Ill. 2012); *see also Bausch v. Stryker Corp.*, 630 F.3d 546, 557–57 (7th Cir. 2010) (no implied preemption by FDCA).

To the extent that the existence of a related regulatory regime has any relevance to products liability, DraftKings gets the relationship backward. Product liability does not depend on the plaintiff proving the defendant violated a statute or regulation. But if a defendant *did* violate a statute or regulation, that suggests that the product is *also* unreasonably dangerous. *See* Owen & Davis on Prod. Liab. § 6:9 (4th ed.) ("[A] defendant's noncompliance with an applicable product safety statute or regulation may be considered evidence, though not dispositive, that a product was defective.").

Legal confusion aside, DraftKings's argument about the legality of gambling in Illinois misstates Plaintiffs' claims. Plaintiffs do not allege that the mere fact that DraftKings allows sports gambling is unreasonably dangerous. Plaintiffs allege that DraftKings's *specific* gambling product, one that encourages excessive, repetitive, particularly-addiction-inducing gambling, is.

## C. Plaintiff suffered harm

Plaintiffs also allege that they suffered cognizable harm from DraftKings's product.

DraftKings complains that Plaintiffs products liability claims fail because they have not plead "physical harm" with sufficient particularity. This is both legally and factually incorrect.

Legally, the "physical harm" requirement in products liability is a shorthand articulation of the application of the economic loss rule, which the Illinois Supreme Court adopted to separate contract claims, which protect expectation interests, from product liability claims, which protect a plaintiff who "has been exposed, through a hazardous product, to an unreasonable risk of injury to his person or property." *Moorman Mfg. Co. v. Nat'l Tank Co.*, 435 N.E.2d 443, 448 (1982).

In light of this provenance, the "physical harm" requirement simply excludes as damages in a products liability case, "damages for inadequate value, costs of repair[,] and replacement of the defective product, or consequent loss of profits—without any claim of personal injury or damage to other property." *Mars, Inc. v. Heritage Builders of Effingham, Inc.*, 763 N.E.2d 428, 434 (Ill. App. 2002) (quoting *Moorman*, 435 N.E.2d at 449). "Simply put, a product that damages only itself cannot be the subject of a suit for damages." *Id.* at 436. If a consumer suffers a loss because the product malfunctions without causing any secondary damage, that sounds in warranty, not in products liability. *See id.* Since parties may contract around warranty, holding manufacturers strictly liable for their products would circumvent contracts doctrine. *See Mut. Serv. Cas. Ins. Co. v. Elizabeth State Bank*, 265 F.3d 601, 617 (7th Cir. 2001). That concern is not implicated here. Plaintiffs do not complain that DraftKings's product malfunctioned and they lost bets they should have won as a result. They complain that the product operated as (dangerously) designed and caused them real injuries.

Factually, Plaintiffs Bell and Smothers pled cognizable damages under any understanding of "physical harm." They stated that they developed gambling addiction, a recognized mental disorder under the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM-V), which caused them financial hardship, professional turmoil, and the loss of living quarters. FAC at ¶¶49-50, 113, 262, 272-73, 278-79. They have a mental illness that results in

21

physiological anguish and substantially increases the risk of suicide. FAC ¶114. The effect of the app's addiction-triggering features is to "methodically, but unpredictably trigger dopamine-triggering rewards with dopamine gaps," FAC at ¶215, an "alteration of the body" that has formed habits and addictions with "detrimental effects" on the Plaintiffs. *See Sondag v. Pneumo Abex Corp.,* 55 N.E.3d 1259, 1265 (Ill. App. 2016). These harms are more "physical" than those in *In re Social Media Adolescent Addiction*, which the court found sufficient. *See* 702 F. Supp. 3d at 821 (plaintiffs alleged harm of "compulsive use," affecting their "physical, mental, and emotional health outcomes").

### D.    DraftKings has the same duties as any other manufacturer

Finally, Plaintiffs alleged that Defendants have no duty toward Plaintiffs. That's wrong: every "manufacturer has a nondelegable duty to design a reasonably safe product." *Jablonski v. Ford Motor Co.*, 955 N.E.2d 1138, 1154 (Ill. 2011). Defendants argue that they are different because "common-law tort principles do not require casinos to rescue compulsive gamblers from themselves." Mem. at 22 (citing non-binding caselaw). But that is not Plaintiffs' contention. Plaintiffs do not claim that DraftKings has a freestanding duty to identify and prevent their gambling-addiction related losses. Rather, Plaintiffs allege that DraftKings, in its capacity as an app designer, made an unreasonably dangerous, powerfully addictive product and failed to implement reasonable alternative designs that would make it less so. This is not a matter of someone leaving their house, walking into a casino, and losing too much money. This is a matter of DraftKings intentionally loading an addictive product onto a device that young men keep in their pockets. FAC ¶¶4, 27, 324, 414-15. The product is intentionally designed to displace other activities and overcome a user's will. Comparisons to brick-and-mortar casino negligence claims miss the substance of Plaintiffs' argument.

### CONCLUSION

DraftKings's motion should be denied in full. To the extent it is not, Plaintiffs should be permitted to amend to add further details as to product liability and their use of DraftKings's app.

Dated: July 9, 2025

/s/ *Isaac Green*
Michael Kanovitz
Jon Loevy
Isaac Green
Aaron Tucek
Alexandra Wolfson
LOEVY & LOEVY
311 N Aberdeen Street, Suite 3
Chicago, IL 60607

## <u>CERTIFICATE OF SERVICE</u>

I, Isaac Green, hereby certify that on July 9, 2025, a true and correct copy of the foregoing Response was filed using the Court's CM/ECF system, which will serve a copy on all counsel of record.

<u>/s/ Isaac Green</u>