IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JAMES BEYER, COLLIN SMOTHERS, MATEEN ZAFER, COREY DAVIS, and DASHAWAN BELL, individually and on behalf of all others similarly situated | ) ) ) ) ) | No. 25 C 1336 |
| | ) | Judge Robert W. Gettleman |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| DRAFTKINGS, INC., and CROWN IL GAMING INC. d/b/a DRAFTKINGS, CASINO QUEEN INC., and NORTHSIDE CROWN GAMING LLC, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OPINION & ORDER**

Plaintiffs James Beyer, Collin Smothers, Mateen Zafer, Corey Davis, and Dashawn Bell, on behalf of a putative class, bring this twelve-count, amended complaint against defendants DraftKings, Inc., Casino Queen, Inc., and Crown IL Gaming, Inc. (collectively "defendants"). Count I alleges that defendants violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS §§ 505/1, et seq. ("ICFA") by advertising "risk-free" and "no sweat" bet promotions.[1] Count II alleges that defendants violated the ICFA by advertising a signup bonus promotion. Count III alleges that defendants violated the ICFA by targeting underage users. Count IV alleges that defendants fraudulently misrepresented their no-risk bet promotion. Count V alleges that defendants fraudulently misrepresented their signup bonus promotion. Count VI alleges that defendants fraudulently induced plaintiffs to rely on materially misleading

---

[1] The complaint designates its counts as "First Cause of Action," etc. The court will refer to the counts by Roman numerals.

promotions. Count VII alleges that defendants were unjustly enriched by engaging in the above conduct. Count VIII alleges that defendants participated in a civil conspiracy to engage in the above conduct. Count IX alleges strict products liability against defendants for a design defect, namely that defendants' product is designed to addict users to gambling. Count X alleges strict liability based on defendants' failure to warn of the risks of using their product. Count XI alleges product liability based on defendants' negligent design of their product. Count XII alleges negligent failure to warn about the risks of using defendants' product.

Defendants move to dismiss the first amended complaint ("FAC") in its entirety. (Doc. 37). For the reasons explained below, defendants' motion is granted in part and denied in part.

## **BACKGROUND**

This is a case about DraftKings, a sports gambling platform that has exploded in popularity over the last five years in Illinois.[2] Sports gambling was legalized in Illinois in 2019. See 230 ILCS 45/25 et seq. In 2024, DraftKings's "handle," the aggregate sum of money that bettors risked on its platform, was over $5 billion in Illinois alone. See Illinois Gaming Board, "Sports Wagering Monthly Reports."[3] To entice new customers to wager on its platform, DraftKings advertises extensively on social media, television, billboards, and other media. In addition, DraftKings offers promotions for new customers. Two of these promotions are a focus of this lawsuit.

The first promotion offers new customers "Risk-Free" or "No Sweat" bets. This

---

[2] The court takes the facts from plaintiff's complaint. See Virnich v. Vorwald, 664 F.3d 206, 212 (7th Cir. 2011) (explaining that at the motion to dismiss stage, "the court must construe all of the plaintiff's factual allegations as true, and must draw all reasonable inferences in the plaintiff's favor").

[3] Available at https://igb.illinois.gov/sports-wagering/sports-reports.html

promotion was advertised through various media. For example, in one frame from a television advertisement, large text states that "New customers bet risk free up to $100." In another frame of the same commercial, the text of the advertisement reads "ALL WIN NO RISK." Neither of these statements are accompanied by fine print. In another example, a post on X advertised "Risk-Free bet up to $1000."

Despite the name, these promotions did not offer opportunities to bet without risk. Instead, customers who participate in these promotions and lose their wager receive a credit called a "bonus bet" equal to the value of their original losing wager. A bonus bet is not redeemable for cash. Instead, a bonus bet can be used to place an additional wager. If the customer wins that additional wager, they are paid out the winnings. But crucially, they are not returned the "stake," that is the original amount wagered. Here is brief illustration of the difference between a "normal" bet made with cash and a bonus bet: If a customer places a $100 normal bet with 50/50 odds and wins, they are returned the stake (that is the original $100), the winnings (an additional $100), minus a 9% "vig" (DraftKings's cut), for a total of $191. If a customer places a $100 bonus bet with 50/50 odds and wins, they are returned the winnings ($100) minus a 9% vig, for a total of $91. In addition, bonus bets must be used within a week or else they expire.

The second of these promotions is a "deposit match" offered to new customers and sometimes to existing customers. While this promotion appeared in different forms and on different media, most of them contained the representation that a new customer could "get a deposit bonus up to $1000" if they downloaded the DraftKings app. But for a customer to receive a $1000 deposit bonus redeemable for cash, they would have to satisfy three requirements:

1. The initial deposit must be $5,000 or greater.

2. The customer must wager at least $25,000 within 90 days on wagers with odds of -300 or longer (i.e., less than 75% chance of winning).

3. The bonus is awarded not in cash, but in "DK dollars," which themselves must be placed on winning wagers to be converted into cash.

Beyond these two promotions, plaintiff's complaint also alleges that DraftKings designs its platform to be addictive. For example, DraftKings offers numerous in-game bets that settle quickly, ever-shifting live odds during the course of an event, VIP-tiers for those who gamble certain amounts, precisely timed pop-ups offering new bets they can place for an event they are already watching or gambling upon, and targeted push notifications and email promotions to draw back in customers who have stopped gambling.

## <u>JURISDICTION</u>

Defendants removed the case to this court based upon the Class Action Fairness Act of 2005 ("CAFA"). In their notice of removal, defendants specified that: (1) the required diversity of citizenship under CAFA is satisfied, because "any member of a class of Plaintiffs is a citizen of a State different from any Defendant"; and (2) the CAFA jurisdictional threshold is satisfied because the amount in controversy exceeds "sum or value of $5,000,000, exclusive of interest and costs." 28 U.S.C. §§ 1332(d)(2), (d)(6).

While the court agrees that those two requirements are satisfied, the jurisdictional analysis under CAFA does not end with the fulfillment of those two requirements, and the court has an independent obligation to ensure that it has subject-matter jurisdiction. See Kanzelberger v. Kanzelberger, 782 F.2d 774, 777 (7th Cir. 1986) (explaining that "the federal courts are

obliged to police the constitutional and statutory limitations on their jurisdiction"); Fed R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").  In addition to the minimal diversity and amount in controversy requirements, CAFA contains the "local controversy exception," 28 U.S.C. §1332(d)(4)(A). Because this exception is mandatory, the court ordered the parties to submit briefing to explain the basis for federal jurisdiction under CAFA.  See Mullen v. GLV, Inc., 37 F.4th 1326, 1328 (7th Cir. 2022) (explaining that in Section 1332(d)(4) "'[s]hall' is a mandatory term"); see also Barichello v. McDonald, 98 F.3d 948, 955 (7th Cir. 1996) (explaining that with regard to abstention doctrines "the federal courts are obliged to inquire *sua sponte* whenever a doubt arises as to the existence of federal jurisdiction" (citation and internal quotation omitted)).

The court is satisfied that the local controversy exception does not apply and that it should properly exercise federal jurisdiction over this case.  Defendants informed the court that "another class action (Youngs v. DraftKings Inc., Case No. 2:25-cv-00179 (D.N.J.)) was filed by Plaintiffs' counsel on January 7, 2025, a day before this case was filed on January 8, asserting materially the same allegations."  The local controversy exception applies only if, among other requirements, "during the 3–year period preceding the filing of that class action, no other class action has been filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons."  28 U.S.C. §1332(d)(4)(A)(ii).  Thus, the local controversy exception does not apply to this case.  Consequently, the court finds that the requirements of CAFA have been met in this case, and it should properly exercise federal jurisdiction.

**LEGAL STANDARD**

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint. Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7, 570 F.3d 811, 820 (7th Cir. 2009). To survive a motion to dismiss, plaintiff must clear two hurdles: (1) "the complaint must describe the claim in sufficient detail to give the defendant fair notice of what the claim is and the grounds upon which it rests;" and (2) "its allegations must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level.'" Tamayo v. Blagojevich, 526 F.3d 1074, 1084 (7th Cir. 2008). At this stage, "the court must construe all of the plaintiff's factual allegations as true, and must draw all reasonable inferences in the plaintiff's favor." Virnich v. Vorwald, 664 F.3d 206, 212 (7th Cir. 2011). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

In addition, some of plaintiffs' claims sound in fraud and are thus subject to the higher pleading standard of Rule 9(b). For these claims, the complaint must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). In practice, "[t]his ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." AnchorBank, FSB v. Hofer, 649 F.3d 610, 615 (7th Cir. 2011); see also Vanzant v. Hill's Pet Nutrition, Inc., 934 F.3d 730, 738 (7th Cir. 2019) (explaining that "[i]f the claim rests on allegations of

deceptive conduct, then Rule 9(b) applies").

## **DISCUSSION**

### A.   **Sufficiency under Rule 9(b) (Counts I-VIII)**

Defendants argue that the fraud-based counts (I-VIII) fail to satisfy the heightened pleading standard of Rule 9(b).  At root, defendants' argument is that Rule 9(b) requires plaintiffs to "identify the specific advertisements(s) they saw and relied upon."  According to defendants, because plaintiffs failed to do so, their claims must be dismissed.

Plaintiffs respond that the complaint satisfies Rule 9(b) because it alleges the who, when, what, and how of the fraud.  As to the no-risk/no-sweat promotions, plaintiffs argue that they allege what the ads stated and how the ads were misleading.  Plaintiffs add that the complaint alleges where these ads were distributed and specifically alleges the media through which each plaintiff recalls seeing the ads.  And finally, plaintiffs argue that they adequately allege when the ads persuaded them to opt in.  Plaintiffs also argue that because DraftKings possesses the data for each of the plaintiff's app usage, defendants know precisely when the plaintiffs opted in to the promotion.  As to the deposit bonus, plaintiffs argue the same.

The court broadly agrees with plaintiffs.  The cases that defendants cite do not hold that Rule 9(b) requires the level of particularity that defendants envision.  Spivey v. Evig LLC dismissed claims on the merits of the ICFA and discussed Rule 9(b) only briefly in a footnote. 2025 WL 1638453, at *6 n.4 (N.D. Ill. June 9, 2025).  That issue notwithstanding, the plaintiff's claims in Spivey failed because the plaintiff could not identify any particular false or misleading statement that he saw in an advertisement or on the product labels, instead relying upon an

"overarching message" that the court characterized as "his own unreasonable gloss." 2025 WL 1638453, at *4 and *6. Defendants also rely on Mednick v. Precor, 320 F.R.D. 140 (N.D. Ill. 2017). That case discusses the ICFA with no mention of Rule 9(b). Nevertheless, it affirms the requirement that plaintiffs "must have seen the alleged misrepresentations" instead of relying on proof "by a generalized method that class members saw or heard information contained in the brochures or on [defendants'] website." Mednick, 320 F.R.D. at 150. Neither of these cases hold that Rule 9(b) requires a plaintiff to allege precisely which advertisement they saw. Rather, they stand for the common-sense principle that a plaintiff making an ICFA claim must have seen a false or misleading statement.

Contrary to defendants' assertion, there is no "black letter Rule 9(b) standard" that requires the exactitude in identification that defendants insist on. The black letter is simply the rule itself: plaintiffs must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P 9(b). Judicial interpretations of what that short text requires are not uniform. See generally Christopher M. Fairman, "An Invitation to the Rulemakers - Strike Rule 9(b)," 38 U.C. Davis L. Rev. 281, 297-98 (2004) (explaining that some courts follow a "circumstances approach," others a "fair notice" approach, while still others require "pleading the elements of fraud"); Wright & Miller 5A Fed. Prac. & Proc. Civ. § 1296 (4th ed.) (explaining that the "reasons for the heightened pleading requirement have not received universal acceptance"). The Seventh Circuit has held that "the precise level of particularity required under Rule 9(b) depends upon the facts of the case." Camasta v. Jos. A. Bank Clothiers, Inc., 761 F.3d 732, 737 (7th Cir. 2014). What a court demands under Rule 9(b) is dependent on the factual context of the complaint.

In this context, defendants' position is that Rule 9(b) demands the impossible. Defendant

8

contends that plaintiffs' pleadings fail to satisfy Rule 9(b) unless they identify which precise advertisements they saw. But defendants concede that their ads "were not uniform." In the modern age of digital advertising, the same ad campaign can spawn hundreds—if not hundreds of thousands—of variations on the same base advertisement. See, e.g., Shannon Denny, "How 432,000 Creative Variants Delivered Personalized Messaging… and Drove Leads," Think With Google (Mar. 2019)[4] (explaining, as the title makes evident, how contemporary advertisers can publish 432,000 variants of the same base advertisement); Henning, Lucy, "Dynamic Ads for 94% Increase in CTR: A Case Study," Elixirr Digital (April 8, 2021)[5] (explaining that "a single ad could spawn up to 6,250 unique combinations of title, image/video, text, description and call to action"). This trend is only becoming more pronounced with the rise of generative AI. See generally Umay, "How Creative Optimization Fuels Programmatic Ad Success in 2025," AppSamurai, (July 14, 2025)[6], (explaining that "with generative tools, mobile marketers can now spin out hundreds of ad variants almost instantly"). As best the court can tell, defendants' position is that for plaintiffs to satisfy Rule 9(b), they must somehow zero in on the precise ad variant they saw.

Defendants' interpretation of Rule 9(b) would effectively gut the ICFA and similar consumer protection statutes with regard to digital advertising. Of course, consumers cannot know that an advertisement is fraudulent, deceptive, or misleading, until they attempt to rely upon it at some future time. But there is no practical way for consumers to reach back to last week's (or month's) social media feed or webpage visit to locate the precise advertisement

---

[4] Available at https://www.thinkwithgoogle.com/intl/en-emea/future-of-marketing/creativity/how-creative-variants-delivered-personalized-messaging-and-drove-leads/
[5] Available at https://www.elixirrdigital.com/us/2021/04/08/dynamic-ads-for-94-increase-in-ctr-a-case-study/
[6] Available at https://appsamurai.com/blog/how-creative-optimization-fuels-programmatic-ad-success-in-2025/

variant that was served to them. Thus, under defendants' rule, consumers' only practicable recourse to protect themselves from misleading digital advertising is to record the contents (via screenshot or some recording) or the precise details (content, date, time, digital medium, etc.) of each and every advertisement served to them.[7]

There is a more reasonable approach to Rule 9(b) in the digital advertising context; it is what plaintiffs have (mostly) done here. See Corley v. Rosewood Care Ctr., Inc., 142 F.3d 1041, 1051 (7th Cir. 1998) (explaining that the Seventh Circuit has "noted on a number of occasions that the particularity requirement of Rule 9(b) must be relaxed where the plaintiff lacks access to all facts necessary to detail his claim"). Plaintiffs allege that two separate DraftKings promotions were false, misleading, or deceptive: the "risk-free" bet promotion and the $1,000 deposit match promotion. For each promotion, at least some plaintiffs have: (1) included representative examples of the advertisements they saw; (2) described why the advertisements are misleading; (3) described where and when each plaintiff was exposed to the advertisements; and (4) described how they relied upon the advertisements.

i.      "Risk-Free" bet promotion

The complaint contains four examples of DraftKings advertisements promoting "risk free" bets (figs. 2, 3, 4, and 6) and two further examples of similar promotions called "no-sweat" bets (figs. 5 and 10). Plaintiffs explain why these advertisements are misleading. They promote bets as carrying no risk when in fact they did carry a risk. Smothers alleges that he saw such ads on Twitter and in the DraftKings app in early 2022 and relied on them when opting into a "risk

---

[7] Even then, without a screenshot or other recording, it is unclear how a consumer with those details and could take that information and determine which precise advertisement variant they saw; there is no public database of digital ad spot purchases.

free" promotion.[8]  Davis alleges that he saw an ad similar to the one in figure 3 on Twitter and opted in to a "no-risk" promotion shortly after February 23, 2024.  Zafer alleges he saw "ads for no-risk bets on DraftKings on TV while watching basketball" and placed such a bet while present in Illinois.  Bell alleges he saw advertisements for no-risk bets on television, on his Instagram and Facebook feeds, and in the DraftKings app, and that he participated in it.  Beyer also alleges that he participated in DraftKings's Illinois no-risk promotions after seeing advertising for it.

The court finds that plaintiffs Smothers and Davis have stated with sufficient particularity the circumstances constituting fraud.  They allege what statements they saw and provided representative examples of the advertisements in which those statements were contained, how those statements were false or misleading, when they saw those statements, and when they relied upon them.  On the other hand, the court finds that Zafer, Bell, and Beyer fail to allege with sufficient particularity the circumstances around their allegations.  The primary deficiency in their claims is the failure to specify when they saw the advertisements.[9]  See e.g., Baldwin v. Star Sci., Inc., 78 F. Supp. 3d 724, 738 (N.D. Ill. 2015) (dismissing a complaint alleging an ICFA deceptive advertising claim that "does not specify when or where he saw the misrepresentations").  Thus, Counts I and IV are dismissed without prejudice as to plaintiffs Zafer, Bell, and Beyer.

---

[8] In addition, Smothers received an email with an "NFL Thanksgiving Risk-Free Bet" (fig. 4) on November 24th, 2022.  This was not the precise advertisement Smothers relied upon when opting in earlier that same year, but it is representative of the allegedly misleading advertising that DraftKings disseminated to Smothers and other plaintiffs.

[9] In the complaint, plaintiffs Zafer, Bell, and Beyer concede cannot say when they saw the ads.  Plaintiffs point out in their response that this information may be in defendants' possession.  Consequently, the court's denial of these claims is without prejudice to these plaintiffs' ability to amend the complaint.

ii.     Deposit Match Promotion

The complaint contains four examples of advertisements for a $1,000 deposit bonus (figs. 11, 13, 14, 15) and a screen capture of the same offer in DraftKing's own mobile application. Plaintiffs explain why these advertisements are misleading.  They appear to promise that up to $1,000 of funds deposited into DraftKings would be matched when, in fact, for a user to receive a $1,000 bonus, they actually need to deposit five times that amount ($5,000), and then, within 90 days, risk $25,000 on DraftKings sports bets, among other conditions as described above.

Zafer alleges that he created and funded an account on DraftKings in January 2023 in response to a deposit match promotion he had seen advertised on television while watching a basketball game.  He specifically alleges seeing advertisements around that time that include Kevin Hart, a comedian that is a DraftKing's brand ambassador.  Davis alleges that he opened an account on DraftKings while in Illinois on November 2, 2023, after seeing advertisements for DraftKings's new customer "Deposit Match" bonus across various platforms including Twitter, and he made his first deposit under the promotion on February 23, 2024.  Smothers alleges that he opened and funded an account on DraftKings after viewing deposit-match advertisements described in the complaint promotions in or around February 2021.  Bell alleges that he made a deposit after seeing television advertising containing the statement "with DraftKings Sportsbook you get out what you put in, like a 100% deposit match up to $1,000," and the deposit-match offer in the DraftKings app.

The court finds that Zafer, Davis, and Smothers have alleged with sufficient particularity the circumstances constituting fraud.[10]  They allege what statements they saw and provided

_____

[10] Beyer, the fifth plaintiff, is not included in any of the claims related to the deposit match promotion.

representative examples of the advertisements in which those statements were contained, how those statements were false or misleading, when they saw those statements, and when they relied on them.  Again, Bell fails specify when he saw the deposit match promotion.  Consequently, Count II is dismissed without prejudice as to Bell.[11]

## B.  ICFA (Counts I, II, and III)

Counts I and II allege deception under the ICFA for the "no-risk" bet promotion and the deposit match promotion, respectively.  A deception claim under the ICFA consists of four elements: "(1) the defendant committed a deceptive act or practice; (2) the defendant intended for the plaintiff to rely on the deception; (3) the deception happened in the course of trade or commerce; and (4) the deception proximately caused the plaintiff's injury."  Cocroft v. HSBC Banks USA, N.A., 796 F.3d 680, 687 (7th Cir. 2015).   Defendants argue that plaintiffs' ICFA claims should be dismissed because its promotional advertising was not deceptive, and plaintiffs have not pled actual damage concerning the promotions.

### i.    Deceptive act or practice

Defendants argue that the ICFA deception claims (Counts I and II) fail because plaintiffs fail to allege that defendants committed a deceptive act or practice. Defendants contend that because the terms and conditions of the "no-risk bet" promotion were disclosed to consumers, either through fine print or a link, there was no deception.  Defendant makes a similar argument regarding the deposit match promotion; the terms and conditions were in the fine print.

---

[11] As the court noted above, plaintiff's point out that the information may be in defendants' possession. Consequently, the court dismisses Count II as to Bell without prejudice.

13

Plaintiffs offer two responses.  First, the disclosures of the terms and conditions appeared in some, but not all, of the advertisements at issue.  According to plaintiffs, many of the advertisements contained no reference to any additional terms.  Second, "an accurate fine-print" disclosure "does not foreclose as a matter of law a claim that an ambiguous [advertisement] deceives reasonable consumers."  Bell v. Publix Super Markets, Inc., 982 F.3d 468, 476 (7th Cir. 2020).

The court agrees with plaintiffs.  As plaintiffs correctly argue, a statement is deceptive under the ICFA if it "is likely to mislead a reasonable consumer, even if the statement is literally true." Suchanek v. Sturm Foods, Inc., 764 F.3d 750, 762 (7th Cir. 2014).  Thus, even with disclosures, the advertisements could have deceived a reasonable consumer.[12]  Additionally, an ultimate determination of whether an advertisement was deceptive must "take into account all the information available to consumers and the context in which that information is provided and used," Bell, 982 F.3d at 477, as well as the sophistication of the consumers viewing the advertisements.  See Chandler v. Am. Gen. Fin., Inc., 768 N.E.2d 60, 68 (Ill. App. 1st 2002) (explaining that in the context of financial disclosures under the ICFA that "[t]he financial sophistication of a borrower can be critically important").  Thus, at the motion to dismiss stage— where the court must construe plaintiff's factual allegations as true and draw all reasonable inferences in the plaintiff's favor—it would be inappropriate to dismiss the ICFA claims because some of the advertisements contained disclosures.

---

[12] The court also notes that it appears from the record that at least some of the advertisements at issue contained no disclosures whatever.

ii.     Damages

Defendants argue that the ICFA deception claims (Counts I and II) fail because plaintiffs have not alleged actual damages or that the damage complained of was proximately caused by the deception.  Defendants acknowledge that plaintiffs allege that they placed and lost bets in reliance on the promotions but argue that plaintiffs failed to allege how much the loss was and when it occurred.

Plaintiffs respond that their complaint alleges actual damages in a straightforward manner. For the deposit match promotion, plaintiffs allege that the advertisements' misrepresentations caused them to create and fund their accounts.  Plaintiffs allege that this caused a loss both because plaintiffs deposited money they otherwise would not have and lost it gambling, and because plaintiffs did not receive the benefit of the bargain they thought they would receive, a cash reward up to $1,000.  For the "no risk" bet promotion, plaintiffs suffered damages in the form of the money that they lost and did not recover as advertised.

The court agrees with plaintiffs.  Under the ICFA, plaintiffs "must plausibly plead that the deceptive or unfair act caused [them] to suffer actual damages, meaning pecuniary loss."  Benson v. Fannie May Confections Brands, Inc., 944 F.3d 639, 647 (7th Cir. 2019).  Plaintiffs plausibly allege that the deposit match caused them to lose money because they did not receive the deposit match that they were promised.  Plaintiffs also plausibly allege that the "no-risk" bet promotion caused them to lose money because it induced them to place losing bets that they otherwise would not have made, and after losing they were denied the benefit advertised.  Defendants have provided no authority to support the contention that plaintiffs are required to calculate exact dollar amounts at the pleading stage, and Illinois courts do not require such precise

quantification.  See Muir v. Playtex Prods., LLC, 983 F. Supp. 2d 980, 990 (N.D. Ill. 2013) (collecting cases).

As for whether plaintiffs plausibly alleged proximate causation, Illinois courts have been clear that "[t]he required allegation of proximate causation is minimal, because that determination is best left to the trier of fact."  Chandler, 768 N.E.2d at 70; see also Connick v. Suzuki Motor Co., 675 N.E.2d 584, 595 (Ill. 1996) (explaining that "the required allegation of proximate cause is minimal since that determination is best left to the trier of fact").  Plaintiffs' allegation that defendants' deceptive advertisements proximately caused them to suffer actual damages is thus sufficient at this stage.

Because the court finds plaintiffs have sufficiently pleaded a deceptive act and damages, defendants' motion to dismiss Counts I and II is denied.

iii.    Unfairness

In addition to the deception claims, plaintiff Beyer brings an unfair practice claim under the ICFA for defendants' alleged practice of targeting underage users (Count III).  An unfair practice claim under the ICFA requires a court to analyze "whether the practice (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers." Batson v. Live Nation Ent., Inc., 746 F.3d 827, 830 (7th Cir. 2014).  Defendants argue that this court should dismiss that claim because their alleged conduct was not unfair. Defendants offer arguments on all three prongs of the unfair practice analysis.

First, defendants argue that the alleged practice does not offend public policy.  Defendants' overarching argument is that Beyer fails to allege that defendants engaged in any specific act that

16

violated any law. According to defendants, the alleged practice does not offend public policy because there is no allegation that Beyer was permitted to place bets while under the age of 21. In addition, defendants argue that Beyer's participation in Daily Fantasy Sports ("DFS") is not unlawful because the Illinois Supreme Court has ruled that DFS is not considered gambling as a matter of Illinois law. Defendants also argue that none of the advertisements that Beyer alleges to have seen violated any Illinois statute or regulation.

Second, defendants argue that the alleged practice is not "immoral, oppressive, or unscrupulous." Defendants' general argument on this prong is that because defendants did not force anyone to gamble, their actions were not immoral, oppressive or unscrupulous as a matter of law. According to defendants, their actions can qualify as immoral, oppressive, or unscrupulous only if they rendered the customers' choice to gamble involuntary.

Third, defendants argue that Beyer fails to allege substantial injury to consumers. Defendants' argument here echoes their argument on the second prong; because plaintiff could have walked away from gambling, the alleged unfair practice could have been reasonably avoided. Thus, defendants maintain that the alleged practice could not have caused substantial injury to Beyer and others.

Plaintiffs respond that the complaint plausibly alleges that defendants' practice of advertising towards minors was unfair, as is required under the pleading standards of Rule 8. Plaintiffs cite authority stating that an unfair practice claim under the ICFA need not meet all three prongs. Plaintiffs liken the allegation here to cases where tobacco companies groomed minors into tobacco users, a practice that plaintiffs argue courts have long held is unfair because it offends public policy, is oppressive and unscrupulous, and causes a substantial injury.

17

The court finds that plaintiffs successfully state an unfair practice claim under the ICFA. Defendants correctly state that an ICFA unfair practices claim requires a court to analyze "whether the practice (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers." Batson, 746 F.3d at 830.[13] Nevertheless, "[a]ll three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." Robinson v. Toyota Motor Credit Corp., 775 N.E.2d 951, 961 (Ill. 2002) (citation and internal quotation omitted). The complaint alleges that defendants "deliberately targeted and groomed underage Illinoisans to join its platform and to play daily fantasy sports contests before they were of legal sports betting age….to encourage them to develop sports betting habits and an affinity for DraftKings before they were even old enough to bet."

First, the court finds that this alleged practice offends Illinois public policy. The Illinois Supreme Court has stated that, "In general, it can be said that public policy concerns what is right and just and what affects the citizens of the State collectively. It is to be found in the State's

---

[13]    A note on statutory background: the ICFA directs that "consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5 (a) of the Federal Trade Commission Act." 815 ILCS 505/2. The Federal Trade Commission Act is a federal statute, and Section 5(a) of the Act broadly defines the term "unfair or deceptive acts or practices" as: "acts or practices involving foreign commerce that—(i) cause or are likely to cause reasonably foreseeable injury within the United States; or (ii) involve material conduct occurring within the United States." 15 U.S.C. §45(a)(4).

       The FTC and federal courts considering Section 5(a) have built more meaning on top of Section 5(a)'s austere statutory foundation, and Illinois law directs courts considering ICFA unfairness claims to consider their work. See Robinson, 775 N.E.2d at 960 (explaining that "[i]n determining whether a given course of conduct or act is unfair, we observe the Consumer Fraud Act mandates that 'consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act'"). The FTC is the origin of the three-factor analysis employed by Illinois courts. See FTC v. Sperry & Hutchinson Co., 405 U.S. 233 (1972). In addition to considering the interpretations of federal courts, the Illinois Supreme Court has also seriously considered the persuasive authority of other state courts working with similar statutes, going so far as to state that "we believe Cheshire," a case before the Connecticut Supreme Court, "expresses the correct standard and hereby adopt it as our own." Robinson, 775 N.E.2d at 961.

constitution and statutes and, when they are silent, in its judicial decisions." <u>Palmateer v. Int'l</u>

<u>Harvester Co.</u>, 421 N.E.2d 876, 878 (Ill. 1981).[14] Illinois prohibits people under the age of 21

from sports wagering. <u>See</u> 230 ILCS 45/25-25(b) (stating that "[a] person placing a wager under

this Act shall be at least 21 years of age"). The Illinois Administrative Code prohibits the

advertising of sports wagering to people under 21. Ill. Admin. Code tit. 11, § 1900.340(e)(1). In

addition to prohibiting the advertising of sports wagering to people under 21, the Illinois

Administrative Code comprehensively prohibits methods of advertising that may appeal to those

under 21, including methods that defendants are alleged to have employed here. See Ill. Admin.

Code tit. 11, § 1900.340 (prohibiting, among other things, advertisements containing "images,

symbols, celebrity or entertainer endorsements, or language designed to appeal specifically to

those under 21 years of age," advertisements that "feature anyone who is, or appears to be, under

21 years of age," and advertising "in media outlets, including social media, that appeal primarily

to individuals under 21 years of age"). Together, these sources reflect a strong public policy

against people under the age of 21 participating in sports betting and against advertising sports

betting to people under the age of 21. The alleged practice of intentionally grooming people

under 21 to participate in sports betting that plainly contravenes the public policy of Illinois.

Second, the court finds that the alleged practice is "immoral, unethical, oppressive, or

unscrupulous." Plaintiffs' analogy to the marketing of nicotine products to underage users is apt.

The Northern District of California, analyzing the same three factors at issue here, determined

that "'exploit[ing] minors by luring them into an unhealthy and potentially life-threatening

---

[14] Contrary to a bulk of defendants' argument on this prong, while public policy is found in the state's constitution, statutes, and judicial decisions, a practice offending public policy need not violate a specific statute. <u>Cf. Ekl v. Knecht</u>, 585 N.E.2d 156, 163 (Ill. App. 2d 1991) (finding that "defendant's conduct is offensive to public policy" without finding that such conduct violated a specific statute). Defendants do not offer any authority supporting that proposition, and the court can locate none.

addiction before they have achieved the maturity necessary to make an informed decision whether to take up smoking despite its health risks' was oppressive and unscrupulous." Colgate v. JUUL Labs, Inc., 402 F. Supp. 3d 728, 759 (N.D. Cal. 2019) (quoting Mangini v. R.J. Reynolds Tobacco Co., 21 Cal. Rptr. 2d 232, 242 (Cal. Ct. App. 1993), overruled on other grounds by In re Tobacco Cases II, 41 Cal. 4th 1257, 63 Cal.Rptr.3d 418, 163 P.3d 106 (Cal. 2007)).  Here, plaintiffs allege that defendants are luring people under the age of 21 into a financially ruinous addiction before they have achieved the maturity necessary to make an informed decision as to whether to take up sports gambling despite its financial risks.  The analysis here is intertwined with the public policy analysis, because Illinois public policy is clear that people under 21 have not achieved the maturity required to make an informed decision about sports gambling.  Consequently, the court finds that the alleged practice is immoral, unethical, and unscrupulous.

Finally, plaintiffs plausibly allege that this practice causes substantial damage to consumers.  While the strength of the causal relationship between the alleged practice and the growth of gambling losses or addiction is a matter that will require further proof, the complaint plausibly alleges that the alleged practice causes substantial damage to at least a subset of consumers.

Plaintiffs have plausibly alleged that defendants' practice meets all three factors of the unfairness analysis.  Consequently, plaintiffs have met their burden to state an unfair practice claim under the ICFA, and the motion to dismiss Count III is denied.  See Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc., 536 F.3d 663, 670 (7th Cir. 2008) (explaining that "a cause of action for unfair practices under the Consumer Fraud Act need only meet the notice pleading standard of Rule 8(a)"); Cripe v. Leiter, 703 N.E.2d 100, 103 (Ill. 1998) (explaining that "the [ICFA] is to be liberally construed to effectuate its purpose").

20

## C.  Intentional Misrepresentation (Counts IV, V, VI)[15]

Defendants move to dismiss Counts IV and V, which are common law claims alleging that defendants intentionally misrepresented the no-risk promotion and the signup bonus promotion.  Both parties agree that to state a common law fraudulent misrepresentation[16] claim, plaintiffs must allege, among other things that "the plaintiff reasonably relied upon the truth of the statement…and the plaintiff suffered damages as a result of his reliance"  Duffy v. Ticketreserve, Inc., 722 F. Supp. 2d 977, 991 (N.D. Ill. 2010) (cleaned up); see also Lewis v. Lead Indus. Ass'n, 178 N.E.3d 1046, 1055–56 (Ill. 2020) (listing elements of fraudulent misrepresentation including "action by the plaintiff in justifiable reliance on the truth of the statement…and damage to the plaintiff resulting from such reliance").

Defendants move to dismiss these counts because plaintiff's reliance was not reasonable. According to defendants, because the promotions fully disclosed all the terms and conditions, plaintiffs cannot have reasonably relied on the alleged misrepresentations.  Plaintiffs respond that the complaint alleges that they did not see the full terms and conditions of the promotions before using them. Thus, plaintiffs could have reasonably relied on the alleged misrepresentations.

The court agrees with plaintiffs.  The complaint provides sufficient facts to plausibly infer that plaintiffs reasonably relied upon the alleged misrepresentations associated with the "no-risk" bet and deposit match promotions.  At the motion to dismiss stage, "the court must construe all of the plaintiff's factual allegations as true, and must draw all reasonable inferences

---

[15] Plaintiffs move to voluntarily dismiss Count VI.  Accordingly, Count VI is dismissed.

[16] "Fraudulent misrepresentation" and "intentional misrepresentation" are two different labels for the same common-law claim under Illinois law and thus are used interchangeably.

in the plaintiff's favor." Virnich, 664 F.3d at 212. Defendants' argument requires the court to make factual determinations that are inappropriate in this procedural posture. Consequently, the motion to dismiss Counts IV and V is denied.

### D. Unjust Enrichment (Count VII)

Defendants move to dismiss Count VII, an unjust enrichment claim. According to defendants, the claim should be dismissed because plaintiffs fail to specify the "benefit" conferred on defendants and because plaintiffs' fraud claims fail. Where, as here, unjust enrichment claim is predicated on the same conduct as alleged under the ICFA, the claims rise and fall together. Cleary v. Philip Morris Inc., 656 F.3d 511, 517 (7th Cir. 2011) (explaining that "if an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to this related claim—and, of course, unjust enrichment will stand or fall with the related claim"). Because the ICFA claims have survived the motion to dismiss, the unjust enrichment claim survives as well. Consequently, the motion to dismiss Count VII is denied.

### E. Civil Conspiracy (Count VIII)

Defendants move to dismiss Count VIII, which alleges a civil conspiracy between DraftKings and Casino Queen. Defendants first argue that the complaint is silent at to Casino Queen's involvement in any of the alleged acts. Plaintiffs respond that they sufficiently allege that Casino Queen has a partnership agreement with DraftKings, and that DraftKing's deceptive advertisements are in furtherance of that agreement.

The court agrees with plaintiffs. At the motion to dismiss stage, the court must take all of

the plaintiff's factual allegations as true and draw all reasonable inferences in the plaintiff's favor. Virnich 664 F.3d at 212. The complaint alleges that Casino Queen enforces the terms of DraftKing's deceptive advertisements, that DraftKings's deceptive advertising could not work without the infrastructure and support Casino Queen provides, and that Casino Queen is the license holder for DraftKings in Illinois. The complaint sufficiently alleges that Casino Queen participates in DraftKing's alleged deceptive acts.

Defendants also argue that the civil conspiracy claim fails because, where a plaintiff fails to state an independent cause of action underlying its conspiracy allegations, the claim for conspiracy also fails. While this is a correct statement of law, defendants misinterpret its meaning. See Indeck N. Am. Power Fund, L.P. v. Norweb PLC, 735 N.E.2d 649, 662 (Ill. App. 5th 2000). Defendants seem to think that the complaint must allege an independent cause of action related specifically to Casino Queen. But the Illinois Supreme Court has explained that "the function of a conspiracy claim is to extend liability in tort beyond the active wrongdoer to those who have merely planned, assisted or encouraged the wrongdoer's acts." Adcock v. Brakegate, Ltd., 645 N.E.2d 888, 894 (Ill. 1994). In other words, plaintiffs must allege that the two members of an alleged conspiracy acted in concert to do something unlawful, i.e. the independent cause of action. See id. Because plaintiffs have stated multiple independent causes of action, discussed above, defendants' argument fails.

## F. Products Liability (Counts IX-XII)

### i. Whether DraftKings is a "product"

Defendants argue that the court should dismiss the products liability claims because DraftKings is not a "product" under Illinois liability law. According to defendants, the

DraftKings app is not a "chattel" or a "tangible" object and thus cannot be subject to a products liability action. Additionally, defendants argue that its app provides a service, and Illinois has never expanded products liability law to a website or an app that provides services. Plaintiffs respond that a product need not be tangible. Plaintiffs point to cases from the last twenty years holding that software and mobile phone apps are products and thus can be subject to product liability claims.

The court recognizes that a clear consensus on the question of whether an app or software is a "product" for the purposes of tort liability has yet to emerge. See generally Asaf Lubin, "On Software Bugs and Legal Bugs: Product Liability in the Age of Code," 100 Indiana Law Journal 1891, 1904-05 (2025) (hereafter "On Software Bugs") (observing that "courts remain deeply divided, and the jurisprudence on software, digital technologies, and strict liability reflects this disarray….no state high court has definitively ruled on whether software qualifies as a product"). Although the smartphone has dominated day-to-day life for at least a decade, it appears that courts have struggled to cleanly adapt the common law to contemporary reality. See generally Pew Research Center, "Mobile Fact Sheet," (Nov. 13, 2024) (showing smart phone ownership in America rising from 67% in 2015 to 91% in 2024); Pew Research Center, "Americans' Use of Mobile Technology and Home Broadband," (Jan. 31, 2024) (showing 41% of U.S adults use the internet "almost constantly").

This is an issue that must be treated thoughtfully, because it is poised to become ever more relevant as our physical and digital lives become further entwined. Consequently, the court is not inclined to adopt defendants' arguments because they employ crude tools to parse a complex problem. Whether an app should be treated as a product for purposes of tort liability

will not turn merely on whether it is "tangible."[17]  Similarly, classifying the entire app either a product or a service will not suffice.

Instead, the court will structure its analysis using an approach inspired by the Northern District of California, which addressed the same question (albeit under California law), by focusing on "whether the various <u>functionalities</u> of defendants' platforms challenged by plaintiffs are products." <u>In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.</u>, 702 F. Supp. 3d 809, 849 (N.D. Cal. 2023); <u>see also</u> "On Software Bugs," 100 Indiana Law Journal at 1908-09 (observing that "[t]he analysis of the federal court in this case is by far the most robust and the most complex ever offered as to the treatment of software as a product under product liability rules").  Thus, instead of focusing on the question of whether the DraftKings app as a whole is a "product," the analysis here is focused on what is alleged in the complaint.  Plaintiffs allege that the app's interface is designed to addict users and prevent them from understanding the terms of its promotions or the risk of developing addiction to its products.  More specifically, plaintiffs allege that the app interface:

1. Is designed to increase the pace of this dopamine payoff by offering numerous in-game bets that settle quickly;

2. Utilizes user data to time notifications and other outreach to users in a way that is designed to encourage them to gamble more and more on the platform;

3. Is designed to create and maintain a user's flow-state "by serving rapid fire updates for ongoing bets—with scores and odds constantly refreshing faster than on television

---

[17] The court notes that the concept of tangibility appears in the Third Restatement, which Illinois courts have not adopted.  <u>See</u> Restatement (Third) of Torts—Product Liability, § 19.  The concept of tangibility does not feature in the Second Restatement, which Illinois courts have adopted.  <u>See</u> <u>Busch v. Graphic Color Corp.</u>, 662 N.E.2d 397, 409 (Ill. 1996); Restatement (Second) of Torts, § 388.

to keep users watching the app—and serving users precisely timed pop-ups, often in bright colors with emojis, alerting them of new bets they can place within the sporting event they are already watching or within a new sporting event as soon as the one they are watching has concluded; and

4. Allows users to place a bet or make a deposit with a single click, making it nearly impossible for a compulsive gambler to stop.

Instead of challenging the entire app, plaintiffs here specifically challenge the design of the app interface.  Thus, the question that the court must resolve is whether the interface of the DraftKings app is a product under Illinois products liability law.  See In re Soc. Media Adolescent Addiction, 702 F. Supp. 3d at 852 (finding that "content-agnostic" "defects [that] are…more akin to user interface/experience choices" are products).

To begin, "the Illinois Supreme Court has not defined specifically a 'product' for purposes of strict liability in tort."  Trent v. Brasch Mfg. Co., 477 N.E.2d 1312, 1314–15 (Ill. App. 1st 1985).  Defendants are correct that Illinois has applied the Restatement (Second) of Torts ("Second Restatement") to strict products liability claims.[18]  See, e.g. Busch v. Graphic Color Corp., 662 N.E.2d 397, 409 (Ill. 1996).  But the Second Restatement does not contain a definition of "product," and Illinois courts do not interpret the Second Restatement to indirectly supply a definition of "product," as defendants suggest this court should do.  See Second Restatement, § 288.  Instead, Illinois appellate courts have "repeatedly stated that 'the social policy justifications' underlying the adoption of strict liability, rather than a dictionary definition of the term 'product,' should be determinative of that issue."  Trent, 477 N.E.2d at 1314–15

---

[18] The court notes that defendant's invocation of the definition of a product from the Third Restatement is accordingly unpersuasive.

(collecting cases).  Those policy reasons are as follows:

> "(1) the public interest in life and health; (2) the invitations and solicitations of the
> manufacturer to purchase the product; (3) the justice of imposing the loss on the
> manufacturer who created the risk and reaped the profit; and (4) the superior ability of the
> commercial enterprise to distribute the risk of injury proximately caused by the defective
> condition of its product by passing the loss on to the public as a cost of doing business."
> Trent, 477 N.E.2d at 1314–15, (citing Suvada v. White Motor Co., 210 N.E.2d 182, 186
> (Ill. 1965)).

The court finds that the interface of the DraftKings app is a product under Illinois law.
The public interest in health is implicated by the alleged interface defects; it is undisputed that
gambling addiction is a serious, and growing, mental health problem.  Defendants' solicitation of
users has already been extensively discussed.  Assuming that the allegations are true, justice
counsels in favor of imposing the loss on the manufacturer who intentionally created the risk in
order to reap additional profit.  Finally, defendants are in a far superior position to distribute the
"loss" from the risk of the defective condition to the public because, according to the complaint,
they are responsible for the defects.  To the extent that curing the defects will be costly to
defendants, they are well-positioned to pass on those losses vis-à-vis the fees (vig) they charge
on the millions of transactions they process per year.

Beyond these policy considerations, Illinois courts have also distinguished between
products and services for the purposes of assessing tort liability.  In Immergluck v. Ridgeview
House, Inc., 368 N.E.2d 803, 805 (Ill. App. 1st 1977), the court explained that:

> "Professional services do not ordinarily lend themselves to the doctrine of tort liability

27

without fault because they lack the elements which gave rise to the doctrine. There is no mass production of goods or a large body of distant consumers whom it would be unfair to require to trace the article they used along the channels of trade to the original manufacturer and there to pinpoint an act of negligence remote from their knowledge and even from their ability to inquire….Those who hire (experts) are not justified in expecting infallibility, but can expect only reasonable care and competence. They purchase service, not insurance."

The app interface is not a service. Unlike the professional services excluded from products liability, the DraftKings app's interface is mass produced and distributed to a large body of distant consumers; approximately 91% of American adults can download it instantly. See Pew Research Center, "Mobile Fact Sheet," (showing smart phone ownership in America at 91% in 2024). Consumers do not have knowledge of or access to the design of the interface or the origin of the code utilized in the interface, which may have been originally developed for use in other contexts. See generally "On Software Bugs," 100 Indiana Law Journal at 1896-97 (arguing that "[strict] [p]roduct liability offers a superior framework for addressing the risks of insecure software because it focuses on defects in the product itself, rather than on whether the manufacturer met a duty or standard of care…which will be harder and harder to ascertain against the original software developer as their software code embeds itself in new applications and new use cases").

The core functionalities of the DraftKings app—for example, taking wagers and paying out winners—are likely services. Defendants' point that these services are at the core of their business operations is well taken. Nevertheless, "[a]lthough the defendant is primarily a service business, when it places a defective product in the stream of commerce incident to its regular

28

course of business it may be liable under the products liability doctrine." <u>Niffenegger v. Lakeland Const. Co.</u>, 420 N.E.2d 262, 265 (Ill. App. 2d 1981); see also <u>Brookes v. Lyft Inc.</u>, 2022 WL 19799628, at *3 (Fla. Cir. Ct. Sep. 30, 2022) (stating in case alleging that Lyft's app interface distracts drivers, that "Lyft's connection to the application is not simply the use of it to provide a service. Lyft is the designer and distributor of the application"). Consequently, the court finds that the interface of the DraftKings app is a product for purposes of Illinois products liability law.

### ii. Unreasonably Dangerous

Defendants argue that plaintiffs have failed to allege that its product was unreasonably dangerous. Defendants correctly contend that for both a strict liability and negligent design theory (Counts IX-XI), "the threshold question" is "always whether the product was unreasonably dangerous due to the existence of a defective condition." <u>Show v. Ford Motor Co.</u>, 697 F. Supp. 2d 975, 987 (N.D. Ill. 2010), <u>aff'd</u>, 659 F.3d 584 (7th Cir. 2011). Defendants argue that there are "simply no allegations of a defective condition" because the app "performs exactly as expected—it allows users to bet on sports."

The court disagrees. Although defendants are well within their rights to deny the allegations, this is a motion to dismiss. The complaint alleges that various design features, discussed above, make the app addictive and foster compulsive gambling. "Whether the product is defective or unreasonably dangerous is a question of fact that the jury should ordinarily resolve." <u>McDaniel v. Trail King Indus., Inc.</u>, 248 F. Supp. 2d 749, 756 (N.D. Ill. 2002) (citing <u>Doser v. Savage Mfg. & Sales, Inc.</u>, 568 N.E.2d 814, 819 (Ill. 1990)). The court will not decide an open factual question on a motion to dismiss.

### iii.     Physical Harm

Defendants correctly argue that physical harm "is an essential element of any action for products liability." Sondag v. Pneumo Abex Corp., 55 N.E.3d 1259, 1263 (Ill. App. 4th 2016). Defendants contend that plaintiffs' products liability claims fail because they do not allege that plaintiffs suffered physical harm.

The court disagrees. Again, at the motion to dismiss stage, the court must accept plaintiffs' factual allegations as true. The complaint alleges that named plaintiffs and putative class members developed gambling addictions, "which are associated with concomitant physical and mental injuries." After drawing inferences in plaintiffs' favor, the court finds it plausible that gambling addiction is a physical harm. Of course, at a later stage, plaintiffs will be required to specify and prove the physical injuries that they allege flowed from plaintiffs' gambling addictions. But at the pleading stage, plaintiffs have adequately alleged that they suffered physical harm.

### iv.     Duty (Counts XI and XII)

Defendants correctly argue that for all negligence claims, "plaintiff must establish the existence of a duty of care owed by the defendant, a breach of that duty, an injury that was proximately caused by that breach, and damages." Calles v. Scripto-Tokai Corp., 864 N.E.2d 249, 263 (Ill. 2007). Defendants contend that plaintiffs' negligence claims fail because they fail to allege that defendants owed plaintiffs a duty. Plaintiffs respond that every manufacturer has a duty to design a reasonably safe product.

The court agrees with plaintiffs. Contrary to defendants' contention, the complaint

30

alleges that defendants owed a duty to plaintiffs eight times. Defendants' additional argument that casinos do not owe a duty "to rescue compulsive gamblers from themselves" is inapt here. As discussed above, plaintiffs' product liability claims do not challenge defendants' service of taking wagers and paying out winners. Instead, the claims here relate to the interface of defendants' app, which the court has already classified as a product for the purposes of Illinois products liability law. In designing an app interface, like designing any other product, a "manufacturer has a nondelegable duty to design a reasonably safe product." Jablonski v. Ford Motor Co., 955 N.E.2d 1138, 1154 (Ill. 2011). Consequently, plaintiffs have adequately pled that defendants owed them a duty.

## CONCLUSION

For the above reasons, defendants' motion to dismiss (Doc. 37) is granted in part and denied in part. Counts I and IV are dismissed without prejudice as to plaintiffs Zafer, Bell, and Beyer. Count II is dismissed without prejudice as to Bell. Count VI is dismissed. The court denies defendants' motion to dismiss as to all other plaintiffs on all remaining counts. Defendants are directed to file an answer to this complaint on or before December 23, 2025. The parties are directed to file a joint status report using this court's form on or before January 5, 2026.

ENTER:

**Robert W. Gettleman**
**United States District Judge**

DATE:   November 25, 2025

31